UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

PLUMBERS LOCAL NO. 98 DEFINED )    No.
BENEFIT PENSION FUND, on behalf of )
itself and all others similarly situated, )    **JURY TRIAL DEMANDED**
                                         )
                Plaintiff,               )
                                         )
        vs.                              )
                                         )
COVENTRY HEALTH CARE, INC., DALE )
B. WOLF, SHAWN M. GUERTIN, and JOHN )
J. RUHLMANN,                             )
                                         )
                Defendants.              )
                                         )
_____ )

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Coventry Health Care, Inc. ("Coventry" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Coventry between February 9, 2007 and October 22, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Plumbers Local No. 98 Defined Benefit Pension Fund, as set forth in the accompanying certification, purchased the securities of Coventry during the Class Period and has been damaged thereby.

7.      Defendant Coventry is a national managed health care company that operates health plans, insurance companies, network rental/managed care services companies, and workers' compensation services companies. The Company maintains its principal place of business at 6705 Rockledge Drive, Suite 900 in Bethesda, Maryland.

8.      Defendant Dale B. Wolf ("Wolf"), at all relevant times, served as the Company's Chief Executive Officer ("CEO") and Director.

9.      Defendant Shawn M. Guertin ("Guertin"), at all relevant times, served as the Company's Executive Vice President, Chief Financial Officer ("CFO") and Treasurer.

10.     Defendant John J. Ruhlmann ("Ruhlmann"), at all relevant times, served as the Company's Senior Vice President and Corporate Controller.

11.     Defendants Wolf, Guertin and Ruhlmann are collectively referred to herein as the "Individual Defendants."

12.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

- 2 -

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Coventry, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial information; and financial statements, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose common stock was and is traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board of Director membership and/or Executive and Managerial positions with Coventry, each of the Individual Defendants had access to the adverse undisclosed information about Coventry's business prospects, financial information and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Coventry and its business issued or adopted by the Company materially false and misleading.

16.     The Individual Defendants, because of their positions of control and authority as Corporate Officers and/or Directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Coventry's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Coventry's business, operations, management and the intrinsic value of Coventry's common stock; (ii) enabled the Individual Defendants and other Coventry insiders to sell more than 800,000 shares of their personally-held

- 4 -

Coventry stock for proceeds of over $46 million; (iii) and caused Plaintiff and other members of the Class to purchase Coventry common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Coventry during the Class Period and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Coventry common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Coventry or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- 5 -

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Coventry; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

24.     Defendant Coventry operates as a managed healthcare company via health plans, insurance companies, and network rental and workers' compensation services companies. The Company offers risk and fee-based managed care products and services to a broad cross section of individuals, employer and government-funded groups, government agencies, and other insurance carriers and administrators through its Commercial Business, Individual Consumer & Government Business, and Specialty Business divisions via a direct sales staff and a network of independent brokers.

25.     Coventry's Commercial Business division product line includes its health maintenance organization ("HMO"), preferred provider organizations ("PPO"), and point of service

- 6 -

products. This division also offers commercial management services products and consumer-directed benefit options, including health reimbursement accounts and health savings accounts.

26.     The Company's Individual Consumer and Government division offers health benefits to members participating in the Medicare Advantage HMO, Medicare Advantage PPO, Medicare Advantage Private-Fee-For-Service, Medicare Prescription Drug, and Medicaid programs. This division also provides fully-insured managed care services, as well as other products and services, such as pharmacy benefit management, clinical management, and fiscal intermediary services.

27.     Coventry's Specialty Business division offers various products, including access to provider network, pharmacy benefits management, field case management, telephonic case management, independent medical exam, and bill review capabilities; and network rental services and other managed care products through a PPO network to national, regional, and local third party administrators and insurance carriers. This division also includes mental-behavioral health benefits business and dental benefits business.

## Background

28.     Prior to the beginning to the Class Period, at the Company's Investor Day with securities analysts and investors on December 6, 2006, Coventry's executive management explained that while the Commercial Business division had been the cornerstone of the Coventry's business, going forward, much of the Company's growth would emanate from its Individual Consumer and Government division. Fran Soistman, a Conventry Executive Vice President, announced that the Company had recently launched its Medicare Private-Fee-For-Service ("PFFS") initiative stating in pertinent part as follows:

> Medicare Part D was the first time that Coventry embarked on a national Medicare initiative. And the success that we have realized thus far with Medicare Part D was the model that we replicated for Private-Fee-for-Service, which we launched three weeks ago.

- 7 -

I would depict the Medicare business growth engine as one that has the capacity. It has the horsepower. It has a track record, both with the Medicare Advantage business of delivering consistent performance, both top line and bottom line. But, the Medicare Part D was, perhaps, the first time we really opened it up and showed you what we could do on a much larger scale. And obviously, we look to replicate that with Medicare Private-Fee-for-Service.

*        *        *

Let's move on to the Private-Fee-for-Service product, our new product, again branded as Advantra Freedom. Well, let's start with taking success on the Part D side and replicating that on the Private-Fee-for-Service side. We learned a lot, we did a lot of things right on Part D and we're replicated that for Private-Fee-for-Service starting with dedicated leadership and bringing the entire organization together. It's what you've come to expect from Coventry, the IT folks, they respond, they get the job done. Customer service organization, they respond, they get the job done. It's all that happens behind the scenes that you never really hear about, but trust me, none of this is possible if it didn't happen. So that's in place, we're very pleased with our readiness for private fee.

29.    Coventry's Form 10-K for the year ended December 31, 2006, contained the

following description of the product stating in pertinent part as follows:

Commencing January 1, 2007, the Company will offer Medicare Advantage Private Fee for Service ("PFFS") plans in 43 states under the name Advantra Freedom. These plans are offered under a contract with [The Centers for Medicare & Medicaid Services] and provide enrollees with all benefits they receive under Original Medicare plus additional benefits such as preventive care and eyeglasses/hearing aid coverage and pharmacy benefits. Enrollees are not limited to network providers, but may utilize any provider willing to accept the plan's terms and conditions. Providers generally receive the same reimbursement as under original Medicare. The Company's products will be underwritten by its health insurance subsidiaries.

30.    Accordingly, heading into the Class Period, Coventry's future growth prospects were

highly dependent on its new Medicare PFFS initiative. Indeed, in early 2007, securities analysts

noted that the key theme for Coventry's outlook was its push into the Medicare PFFS market as the

membership and growth of its Commercial business had stalled. In fact, in a February 2007 research

report, JP Morgan Securities referred to Coventry's Commercial business as it "Achilles heel".

31.    Throughout the Class Period, Defendants issued numerous materially false and

misleading statements which failed to disclose that the Company engaged in a deliberate undisclosed

under-pricing practice to obtain new Medicare PFFS members. Through the employment of this practice, Defendants, as they knew or recklessly ignored, deceptively created the appearance that Coventry's new Medicare PFFS initiative was capable of the high growth necessary to offset the Company's contracting Commercial business.

32.    Defendants knew or recklessly failed to disclose the true risks associated with Coventry's Medicare PFFS under-pricing strategies, including the fact that while Coventry's Medicare PFFS products were rapidly gaining market share, such gains were having a material adverse effect on the Company's profit margins and profitability. Unbeknownst to investors however, the true negative effects of such practice on the Company's profitability and profits margins were masked by improper claims assumptions that understated Coventry's health care claim costs.

33.    Accordingly, Coventry's under-pricing strategies and other deceptive practices did not reflect the Company's true "medical loss ratio" ("MLR"). The MLR, or the ratio of expenses of providing healthcare services expressed as a percentage of insurance premiums, is a significant and closely watched financial indicator of healthcare companies. Generally, a low medical loss ratio is rewarded on Wall Street by higher stock prices since it indicates that a lower fraction of revenues are spent paying health care claims, translating into greater profits.

34.    During the Class Period, Defendants issued false financial information and made false statements about Coventry's business, while concealing material adverse longer term trends. At the same time Defendants were issuing positive false and misleading statements about Coventry, Company insiders collectively sold more than 800,000 Coventry common shares for gross proceeds in excess of $46 million.

**Materially False and Misleading**
**Statements Made During the Class Period**

35.    The Class Period begins on February 9, 2007 when Coventry issued a press release

announcing financial results for its fourth quarter and year ended December 31, 2007. The Company

also announced that was increasing its 2007 Medicare PFFS membership growth expectations by

65% to 90,000- 100,000 members. That same day on a conference call for investors with securities

analysts, Defendants, commenting on Coventry's Medicare PFFS initiative, stated, in part:

Defendant Wolf:

On Private Fee-For-Service, our team has built a terrific new business for us. We
will likely wrap up January with something just over 70,000 new members. We
expect to exceed 85,000 new members by the end of the first quarter and somewhere
between 90,000 and 100,000 members by year-end.

Defendant Guertin:

Cash flow from operations is outstanding, and health plan reserves are stable. Our
most significant growth initiative of 2006, Medicare Part D, has produced
outstanding results, both top line and bottom line, and our newest growth initiative,
Medicare Private Fee-For-Service, is off to a roaring start.

*    *    *

In addition, as you heard Dale describe, we are exceeding our expectations on
Medicare Private Fee-For-Service, both in terms of the total membership and how
quickly it is coming on board. During the quarter, we spent a little over $7 million in
support of the Medicare Private Fee-For-Service implementation.

*    *    *

From a business perspective, the most significant changes in the guidance are in the
area of Medicare Private Fee-For-Service and commercial risk revenue. On
Medicare Private Fee-For-Service, our previous guidance had assumed 50,000 to
65,000 members with associated revenue of approximately $500 million. We now
believe that we will get to 90,000 to 100,000 members by year-end and produce
revenue closer to $700 million.

Partially offsetting this revenue gain is a reduced revenue outlook for commercial
risk, based on the expected loss of risk membership in the first quarter of 2007.
While we expect to claw our way back towards flat by the end of the year as we have
in the past, the lower-than-expected risk membership during the year will bring the
commercial risk revenue down from our previous expectation.

\*      \*      \*

## Carl McDonald, Analyst, CIBC

First question is on Private Fee-For-Service, and essentially, it is -- does the much better-than-expected growth there make you nervous in the sense that my analysis of some of the benefit designs and rates in the Private Fee-For-Service would suggest that you guys are offering better benefits at a lower cost than many of the competitors. So, how much of that do you think is influencing the growth, as opposed to distribution or some other advantage that you think you have?

## Defendant Wolf

You know, when I was in my old job, Carl, I would have been nervous; now that I'm in my new job, I don't do nervous anymore; that's Shawn's job.

You know, all I can tell you is that I think we put a pretty attractive product on the market in Part D in 2006. It wasn't the most attractive product on the market, but it was a pretty attractive product, and it turned out we hit it just right in reaching balance between profitability and growth.

Can I ever been 100% sure that we didn't err slightly on one side or another? Of course not. But I have a high degree of confidence in our financial and actuarial teams who built this. We didn't take any different approach to it than we did in the Part D or any of our other businesses, frankly, and we are not confused about -- in this Company about profitability comes first and growth comes second.

So I feel very good about it. We'll see -- time will tell.

36.    On March 15, 2007, Coventry issued a press release announcing that it had won a

35,000 member Medicare PFFS employee-sponsored retiree contract. The press release stated in

pertinent part as follows:

Coventry Health Care Selected by the State of West Virginia Public Employees Insurance Agency to Provide Retiree Health Benefits

Advantra Freedom Plan Preserves Current Benefits for Retirees and Spouses

BETHESDA, Md.--(BUSINESS WIRE)--March 15, 2007--Coventry Health Care, Inc. (NYSE:CVH) today announced that it was selected by the state of West Virginia's Public Employees Insurance Agency (PEIA) as the state's Medicare Advantage plan to provide health insurance for its 35,000 retirees effective July 1, 2007.

"We are extremely pleased to expand our relationship with PEIA," said Fran Soistman, Jr., executive vice president of Coventry Health Care. "Coventry Health

Care and its Charleston-based Carelink Health Plan have a long-standing relationship with PEIA's active employees, so we look forward to also serving its retirees and spouses." In addition to PEIA, Coventry serves approximately 80,000 other West Virginians through its commercial, Medicare Advantage and Medicaid programs.

"The goal is to take care of our retirees who have taken care of the state over the years, and with Coventry's health plan and their national presence, we can do just that," said Ted Cheatham, director of West Virginia Public Employees Insurance Agency. "Not only does this help us preserve the level of benefits for our retirees, but it helps the state slow the growth of future liabilities in funding retiree benefits. It's a win for our retirees, our state and our taxpayers."

Under the customized retiree benefit plan, both medical and prescription drug (Medicare Part D) coverage will be offered, including several drugs excluded from the Part D formularies. There is freedom to choose any provider with this plan, along with access to a 24-hour nurse line, enhanced clinical programs (voluntary disease and case management programs), and fitness programs. The retiree benefit plan also will offer free health risk assessments, social worker support and targeted support for those with serious medical needs.

Under the customized retiree benefit plan, both medical and prescription drug (Medicare Part D) coverage will be offered, including several drugs excluded from the Part D formularies. There is freedom to choose any provider with this plan, along with access to a 24-hour nurse line, enhanced clinical programs (voluntary disease and case management programs), and fitness programs. The retiree benefit plan also will offer free health risk assessments, social worker support and targeted support for those with serious medical needs.

37.    On March 19, 2007, Defendant Guertin spoke at a Lehman Brother Global Healthcare

Conference stating, in part:

Looking more specifically at the Medicare outlook for 2007, we are at or better than expectations, really for all three of our Medicare product lines, and our traditional HMO membership will be up 5% to 10%. Part D revenue will probably grow around 10% year over year. And we'll exceed our expectations and probably just about anyone's expectations on private fee-for-service with 135,000 new members and new revenue in excess of $900 million this year.

38.    On April 27, 2007, Coventry issued a press release announcing its financial results for

its first quarter of 2007, the period ended March 31, 2007. For the quarter, the Company reported

operating revenues of $2.24 billion and net earnings of $121.7 million, or $0.76 per diluted share.

Defendant Wolf, commenting on the results, stated:

We are right on track for another year of strong growth in revenue and earnings per share. In the first three months of the year we announced a meaningful acquisition, repurchased four million shares, refinanced debt at favorable rates, and successfully launched Medicare PFFS. We were able to accomplish all of these things while continuing to deliver the strong operational and financial results you have come to expect.

39.     Coventry's financial results for its 2007 first quarter were repeated in the Company's

Form 10-Q filed with the SEC on or about May 10, 2007 (the "2007 first quarter Form 10-Q"),

which was signed by Defendants Wolf and Guertin. With regard to Coventry's operating results, the

2007 first quarter Form 10-Q represented, in part:

Managed care premium revenue increased as a result of growth in our Individual Consumer and Government Business division. This growth is primarily a result of new membership from our new Medicare Private-Fee-For-Service products and additional members in both our Medicare Part D and Medicare Advantage products. Additionally, we completed an acquisition of Medicaid membership in our Missouri market effective February 1, 2007. Partially offsetting the increase was a decline of managed care premium revenue in our Commercial Business division as a result of a decline in membership over the prior year quarter.

Management services revenue declined slightly over the prior year quarter primarily as a result of membership losses in our National Accounts business.

Medical costs increased almost exclusively as a result of new business in our Individual Consumer and Government Business division discussed above. Medical costs as a percentage of premium revenue increased 0.3% compared with the prior year quarter. This increase is primarily a result of the change in mix of business over the prior year quarter, predominantly in our higher yield and higher medical loss ratio Medicare products driven by our new Private-Fee-For-Service members.

*       *       *

Commercial Business Division

Commercial group risk premium revenue declined as a result of membership declines in our commercial group risk business from the prior year quarter. However, a portion of those members changed from our risk products to our non-risk products. Partially offsetting the membership decrease was an increase in average premium yields per member per month in our commercial group risk business. Commercial premium yields increased as a result of rate increases that occurred throughout all markets. Commercial ASO revenue declined due to membership losses in our national accounts non-risk business.

Gross margin decreased as a result of the decline in revenue discussed above. Total Commercial medical costs also declined as a result of the decrease in membership. Medical costs as a percentage of premium revenue declined as well, primarily as a result of premium yield increases exceeding medical cost trend.

Individual Consumer & Government Business Division

Government revenue increased as a result of increased Medicare-Private-Fee-For-Service membership, Medicare Part D membership, and Medicaid membership. Medicare Part D revenue includes $66.2 million attributable to the estimation of Centers for Medicare and Medicaid Services (CMS) risk sharing payments. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the first quarter. We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will reverse itself later in the year and will eventually be insignificant as of year end.

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, given our individually distributed PFFS products generally do not include a pharmacy benefit. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare risk medical costs as a percentage of premium revenue increased over the prior year quarter as a result of the addition of new Medicare Private-Fee-For-Service business, which has a higher medical loss ratio given our individually distributed Private-Fee-For-Service products generally do not include a pharmacy benefit. Medicare Part D medical costs as a percentage of premium revenue has decreased over the prior year quarter as a result of favorable pharmacy cost trend as members move to generic brands. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

40.     With regard to Coventry's outlook, the 2007 first quarter Form 10-Q represented, in

part:

During 2007, we have the following expectations for our three business lines:

Commercial Division - we believe Commercial group risk membership will return to being flat with the December 2006 year-end results, to potentially down one percent

and expect the health plan ASO membership to be up between 2% - 3%. We will continue to expand our commercial footprint in our new markets of Oklahoma City and South Carolina, as well as opening up a new market in Memphis.

Individual Consumer & Government Division - our new product for 2007, Private-Fee-For-Service, is off to a very robust start and is being offered in 43 states. By year-end, we are expecting 135,000 new members and almost $1 billion of new revenue.

Specialty Division - our acquisition of Concentra's workers compensation business, effective April 2, 2007 is expected to have a small favorable effect on earnings this year.

41.    The 2007 first quarter Form 10-Q also represented:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended March 31, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

42.    These disclosure and internal control representations were then certified by

Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2007

first quarter Form 10-Q.

43.    On July 31, 2007, Coventry issued a press release announcing its financial results for

its second quarter of 2007, the period ended June 30, 2007. For the quarter, the Company reported

operating revenues of $2.33 billion and net earnings of $151.3 million, or $0.96 per diluted share.

Defendant Wolf, commenting on the results, stated:

I am pleased to report another strong quarter from our well-diversified portfolio of businesses. The Commercial Business division reported an outstanding medical loss ratio, the Individual Consumer & Government Business division continued to display impressive growth, and the Specialty Business division performed very well as we successfully integrated the Concentra workers' compensation services businesses. In

- 15 -

addition to delivering these reliable financial and operational results, we continue to deploy capital strategically and position the Company for future growth opportunities.

44.    Coventry's financial results for its 2007 second quarter were repeated in the

Company's Form 10-Q filed with the SEC on or about August 8, 2007 (the "2007 second quarter

Form 10-Q"), which was signed by Defendants Wolf and Guertin. With regard to Coventry's

operating results, the 2007 second quarter Form 10-Q represented, in part:

> Managed care premium revenue increased as a result of growth in our Individual Consumer and Government Business division described above. Additionally, we completed an acquisition of Medicaid membership in our Missouri market effective February 1, 2007. Partially offsetting the increase was a decline of managed care premium revenue in our Commercial Business division, also described above.

> Management services revenue increased compared to the prior year quarter as a result of the acquisition of Concentra. This increase is partially offset by a decline of management services revenue in our Commercial division, primarily as a result of membership losses in our National Accounts business.

> Medical costs increased almost exclusively as a result of new business in our Individual Consumer and Government Business division discussed above. Medical costs as a percentage of premium revenue were unchanged from prior year period.

> Medical expenses for the six months ended June 30, 2007, include approximately $111.8 million of favorable medical cost development related to prior calendar years. The favorable development in 2007 is a result of $94.8 million of lower than anticipated medical cost increases and $17.0 million higher than expected completion factors. . . .

*    *    *

Commercial Business Division

Quarters and Six Months Ended June 30, 2007 and 2006

> Commercial group risk premium revenue declined for the quarter and six months ended June 30, 2007 from the same periods in 2006 as a result of membership declines in our commercial group risk business. However, a portion of those members changed from our risk products to our non-risk products. Partially offsetting the membership decrease was an increase in average premium yields per member per month in our commercial group risk business. Commercial premium yields increased as a result of rate increases that occurred throughout all markets. Commercial ASO revenue declined due to membership losses in our national accounts non-risk business.

Gross margin decreased as a result of the decline in revenue discussed above. Total Commercial medical costs also declined as a result of the decrease in membership.

Individual Consumer & Government Business Division

Quarters and Six Months Ended June 30, 2007 and 2006

Government revenue increased for the quarter and six months ended June 30, 2007 from the same period in 2006 as a result of new membership from the Medicare PFFS business as well as the increased Medicare Part D, Medicaid and Individual membership. Medicare Part D revenue includes adjustments attributable to the estimation of Centers for Medicare & Medicaid Services ("CMS") Risk Sharing payments. The quarter ended June 30, 2007 includes a reduction of revenue of $31.7 million while the six months ended June 30, 2007 includes additional revenue of $34.5 million; these amounts are primarily related to the 2007 rate year. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the second quarter. We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will continue to reverse through the year.

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, since our individually distributed PFFS products generally do not include a pharmacy benefit. Medicare Part D premium yields have declined for both the three and six months ended June 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals. The six months ended June 30, 2007 included $34.5M compared to $56.7 million for the same period in 2006. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

45.     With regard to Coventry's outlook, the 2007 second quarter Form 10-Q represented,

in part:

For the remainder of 2007, we have the following expectations for our three business lines:

Commercial Division - we expect that on an organic basis the health plan ASO membership will be slightly down at year-end as compared to our June 30, 2007 membership and expect Commercial group risk membership in the aggregate will be slightly up at year-end as compared to our June 30, 2007 membership.

Individual Consumer & Government Division - for our new product for 2007, Private-Fee-For-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end.

Specialty Division - our acquisition of Concentra's workers compensation business, effective April 2, 2007 is expected to have a small favorable effect on earnings this year.

46.    The 2007 second quarter Form 10-Q also represented as follows:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended June 30, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

47.    These disclosure and internal control representations were then certified by

Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2007

second quarter Form 10-Q.

48.    On October 26, 2007, Coventry issued a press release announcing its financial results

for its third quarter of 2007, the period ended September 31, 2007. For the quarter, the Company

reported operating revenues of $2.52 billion and net earnings of $168.7 million, or $1.08 per diluted

share. Defendant Wolf, commenting on the results, stated:

I am pleased to present another quarter of impressive top and bottom line growth from our well-diversified portfolio of businesses. Seeking and seizing organic and

acquisition opportunities should enable Coventry to grow operating revenue by more than 25% in 2007 and approaching 30% in 2008. This positions us well for another year of steady and reliable earnings growth in 2008.

49.     Coventry's financial results for its 2007 third quarter were repeated in the Company's

Form 10-Q filed with the SEC on or about November 9, 2007 (the "2007 third quarter Form 10-Q"),

which was signed by Defendants Wolf and Guertin.

50.     With regard to Coventry's operating results, the 2007 third quarter Form 10-Q

represented, in part:

> Managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions. The growth resulted primarily from sales of new products, growth in existing products and from acquisitions. In 2007, we began selling our new PFFS products and have increased sales of our individual product. Increasing membership in both our Part D and Medicare Advantage products contributed to our managed care premium growth as well. Medicaid premium revenue increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2007. Additionally, we completed several acquisitions during 2007. Those include acquisitions of Medicaid membership in our Missouri market effective February 1, 2007, an acquisition of Mutual of Omaha's commercial employer group health business in Nebraska and Iowa on July 2, 2007, and an acquisition of Vista Health Plans on September 10, 2007.

> Management services revenue increased compared to the prior year quarter as a result of acquisitions. Those acquisitions included Concentra and Mutual's national Federal Employees Health Benefits administration business. This increase was partially offset by membership losses in our Commercial Division's National Accounts business.

> Medical costs increased almost exclusively as a result of new business discussed above. Medical costs as a percentage of premium revenue increased 0.4% compared with the prior year quarter. This change is discussed in detail in the segment disclosures below.

> Cost of sales is a new line on our statements of operations and is a direct result of the Concentra acquisition. Cost of sales consists of the expense for prescription drugs provided by our workers' compensation pharmacy benefit manager and for the independent medical examinations performed by physicians on injured workers. These costs are associated with fee-based products and excludes the cost of drugs related to our risk products, which are recorded in medical costs.

*     *     *

Commercial Division

Quarters and Nine Months Ended September 30, 2007 and 2006

Commercial group risk premium revenue increased for the quarter and nine months ended September 30, 2007 from the same periods in 2006 as a result of the acquisitions of Mutual and Vista, which accounted for $48.5 million in current quarter revenue. The increase was also a result of an increase in average premium yields per member per month in our commercial group risk business.

Commercial premium yields increased as a result of rate increases that occurred throughout all markets. This increase was partially offset by membership declines in our same store commercial group risk business. However, a portion of those members changed from our risk products to our non-risk products.

Commercial management services revenue declined for the nine month period in 2007 due to membership losses in our national accounts non-risk business, partially offset by an increase in our commercial health plan ASO membership.

The gross margin decreased as a result of the decline in commercial management services revenue discussed above and the increase in the Health Plan Commercial medical loss ratio for the nine month period in 2007 compared to the same period of 2006. The increase in the medical loss ratio is a result of the inclusion of the acquired Mutual of Omaha business in the third quarter of 2007, as well as the low medical loss ratio experienced by our Louisiana health plan in 2006, which was driven by the unique circumstances that existed in the Louisiana market at that time.

Individual Consumer & Government Division

Quarters and Nine Months Ended September 30, 2007 and 2006

Government revenue increased for the quarter and nine months ended September 30, 2007 from the same periods in 2006 as a result of membership from our new Medicare PFFS business, as well as the increased Part D, Medicaid and Individual membership, both organic and acquired. Part D revenue includes adjustments attributable to the estimation of Centers for Medicare & Medicaid Services ("CMS") Risk Sharing payments. The quarter ended September 30, 2007 includes a reduction of revenue of $68.7 million, while the nine months ended September 30, 2007 includes a reduction of revenue of $34.2 million. The reduction of revenue of $34.2 million for the nine months ended September 30, 2007, represents the amount we would pay to CMS if we settled with CMS as of the end of the third quarter. We expect the Part D program to be profitable on a full-year basis and, as a result, expect that the reductions to revenue for the CMS risk-share related to the 2007 contract year will continue through the year.

Medicare Advantage risk premium yields per member per month decreased as a result of the addition of our new Medicare Private-Fee-For-Service business, which has a lower premium yield than our existing Medicare Advantage business, since our

- 20 -

individually distributed PFFS products generally do not include a pharmacy benefit. This average premium yield decrease was partially offset by the rate increases from the annual competitive bid filings for our Medicare Advantage products, as well as from increases in risk factor adjustment scores for certain of our Medicare products. Part D premium yields have declined for both the three and nine months ended September 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals as well as the annual competitive bid filings for our Part D products. The nine months ended September 30, 2007 included a reduction of revenue of $34.2 million compared to additional revenue of $15.7 million for the same period in 2006.

This change is a result of the improved profitability of the Part D program, which is discussed below. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006 and July 1, 2007.

The increase in gross margin was driven by the increased business discussed above and was offset by the increased medical costs associated with this increased business. Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year nine month period as a result of an increase in large claims incurred in our Missouri market.

51.    The 2007 third quarter Form 10-Q also disclosed:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended September 30, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

52.    These disclosure and internal control representations were then certified by

Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2007

third quarter Form 10-Q.

53.     On January 7, 2008, Coventry re-affirmed its earnings expectations of $1.17 to $1.18

per diluted share for fourth quarter 2007 and $4.42 to $4.58 per diluted share for full year of 2008.

54.     On February 8, 2008, Coventry issued a press release announcing its financial results

for the fourth quarter and year ended December 31, 2007. Coventry reported operating revenues of

$2.79 billion and net earnings of $184.3 million, or $1.18 per diluted share, during the fourth quarter

2007 and total revenues of $9.88 billion and net earnings of $626.1 million, or $3.98 per diluted

share for the year ended December 31, 2007. Defendant Wolf, commenting on the results, stated:

> Coventry's 2007 results were characterized by strong financial and operational
> performance, with the fourth quarter as no exception. Our 2007 organic growth
> initiatives and capital deployment activities have positioned us well for another year
> with industry-leading revenue growth and steady and reliable earnings results.

55.     Coventry's financial results for its 2007 fourth quarter and fiscal year were repeated

in the Company's Form 10-K filed with the SEC on or about February 28, 2008 (the "2007 Form 10-

K"), which was signed by Defendants Wolf and Guertin.

56.     With regard to Coventry's operating results, the 2007 Form 10-K represented, in part:

> Managed care premium revenue increased in both our Individual Consumer &
> Government and Commercial divisions. The growth is a result of our new Medicare
> PFFS product, growth in existing products as well as from the acquisitions; each of
> which is described above. Partially offsetting the increase was a decline in same
> store Commercial risk membership over the prior year period.
>
> Management services revenue increased compared to the prior year as a result of the
> acquisition of Concentra and Mutual described above. This increase was partially
> offset by membership losses in our Commercial Division's National Accounts
> business.
>
> Medical costs increased almost exclusively as a result of new business in both our
> Individual Consumer & Government Division and Commercial Division discussed
> above. Medical costs as a percentage of premium revenue ("medical loss ratio")
> increased 0.3% from the prior year as a result of slightly higher medical loss ratios,
> associated with acquired businesses and from our new Medicare PFFS business
> which has a slightly higher medical loss ratio than our overall business.

57.     The 2007 Form 10-K also disclosed:

Coventry's management, including the principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting (as defined in Rule 13a-15(f) under the U.S. Securities Exchange Act of 1934) is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Coventry's management has performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Controls - Integrated Framework, and believes that the COSO framework is a suitable framework for such an evaluation. Management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

*    *    *

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 ), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

58.     These disclosure and internal control representations were then certified by

Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2007

Form 10-K.

59.    On March 17, 2008, Coventry issued a press release that adjusted its 2008 guidance:

BETHESDA, Md.--(BUSINESS WIRE)--March 17, 2008--Coventry Health Care, Inc. (NYSE: CVH) today announced that, after completing an analysis of financial results through February 2008 and a thorough review of each of the Company's lines of business, the Company expects full year GAAP earnings per share (EPS) on a diluted basis of $4.39 to $4.50, or growth of 10% to 13% from 2007. While still early in the year, the Company is pleased to report that all lines of business are performing well and that the underlying fundamentals continue to be sound.

The Company will present at the Lehman Brothers Global Healthcare Conference in Miami, Florida, at 1:30 p.m. ET on Tuesday, March 18, 2008. The public may access a live webcast of the presentation and accompanying slides (which are being posted on the Investor Relations page of the Company's website simultaneously with the issuance of this press release) which will review highlights of the Company's business performance and financial outlook including the following:

    -- The Company's view of stable commercial medical cost trends remains unchanged and the commercial group risk medical loss ratio (MLR) in 2008 is expected to be approximately flat as compared to 2007 on a "same store" basis.

    -- The Company has experienced positive development on the December 2007 medical claims reserves at a level consistent with the Company's expectations. Therefore, based upon data from the first two months of 2008, the Company's estimates of medical costs incurred in 2007 appear to have been accurate.

    -- Medicare Part D results remain on track with no changes to the expected full year MLR in the low 80%'s and first quarter MLR of approximately 104%.

    -- The Company has added approximately 29,000 Medicare Advantage members in the first two months of 2008 and forecasts Medicare Advantage performance consistent with previous expectations, excluding the impact of influenza-related costs in Q1 2008 as discussed below.

    -- The Company's Medicaid risk business is performing on track with previous guidance.

    The Company has been monitoring the impact of the following matters and has identified two developments which differ from our previous expectations:

    -- Influenza levels in the first quarter of 2008 have been elevated to date but appear to be subsiding as of March 15, 2008. The Company expects the impact of influenza-related medical costs across all lines of business to be approximately $10.0 million higher ($0.04 per diluted share) than originally anticipated in its forecast for the first quarter of 2008. This matter is expected to only impact the first quarter of 2008.

-- As a result of recent Federal Reserve actions to reduce the Federal Funds Rate, the Company has experienced greater than anticipated downward pressure on net investment income in the first quarter of 2008. The Company also expects continued downward pressure for the remainder of the year as the Federal Reserve continues to reduce the Federal Funds Rate. The Company expects net investment income will be $9.0 million lower ($0.04 per diluted share) than previously expected with the impact generally being realized evenly throughout each quarter of 2008.

"Not withstanding the downward adjustment to our full year EPS range, we are very pleased with the consistent performance and strong, fundamentally sound positioning of our on-going businesses," said Shawn Guertin, chief financial officer of Coventry Health Care. "We continue to feel confident about each of our business lines, the results of our recent acquisitions, the success of our organic growth initiatives and our long term strategic positioning."

Accordingly, the Company is providing revised consolidated guidance for full year 2008 as follows:

*    *    *

-- Consolidated revenues of $11.99 billion to $12.49 billion

-- Consolidated MLR% of 79.9% to 80.3%

-- Cost of sales expense of $160.0 million to $180.0 million

*    *    *

-- GAAP EPS on a diluted basis of $4.39 to $4.50

60.    On April 25, 2008, Coventry issued a press release announcing its financial results for its first quarter of 2008, the period ended March 31, 2008. For the quarter, the Company reported operating revenues of $2.94 billion and net earnings of $125 million, or $0.81 per diluted share. Coventry also reiterated its 2008 earnings guidance. Defendant Wolf, commenting on the results, stated:

Consistent with our comments in mid-March, we are pleased to confirm that our businesses continue to perform well and are fundamentally sound. We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future.

61.    Coventry's financial results for its 2008 first quarter were repeated in the Company's

Form 10-Q filed with the SEC on or about May 12, 2008 (the "2008 first quarter Form 10-Q"),

which was signed by Defendants Wolf and Guertin.

62.    With regard to Coventry's operating results, the 2008 first quarter Form 10-Q

represented, in part:

> Managed care premium revenue increased in both our Individual Consumer &
> Government and Commercial Divisions. The increase is a result of growth in
> existing products as well as from the acquisitions described above. Partially
> offsetting the increase was a decline in same store Commercial risk membership over
> the prior year quarter.

> Management services revenue increased compared to the prior year quarter primarily
> as a result of the acquisition of Concentra, Inc. ("Concentra") in the second quarter of
> 2007 and Mutual, described above, and continued organic growth in our workers'
> compensation services business. This increase was partially offset by the Other ASO
> membership decline described above.

> Medical costs increased almost exclusively as a result of new business in both our
> Individual Consumer & Government Division and Commercial Division discussed
> above. Total medical costs as a percentage of premium revenue ("medical loss ratio")
> increased 0.6% from the prior year quarter as a result of a higher medical loss ratio in
> the current quarter for our Commercial and Medicare Part D businesses. The
> Commercial medical loss ratio increase is a result of the mix of business from the
> inclusion of Vista and Mutual as well as the effect of influenza-related expense in the
> quarter. The Medicare Part D medical loss ratio increase was driven by a widening
> of the risk corridors and growth in our low-income auto-assign population in 2008.

*    *    *

> Commercial Division

> Commercial group risk premium revenue increased from the prior year quarter as a
> result of the acquisitions of Mutual and Vista, which accounted for $150.4 million in
> revenue. The increase was also a result of an increase in average realized premium
> yields per member per month in our commercial group risk business, resulting from
> renewal rate increases, benefit buydowns on renewing groups, and the mix of new
> group business net of terminated groups. This increase in revenue was partially
> offset by membership declines in our same store commercial group risk business.
> However, a portion of those members changed from our risk products to our non-risk
> products.

Commercial management services revenue declined from the prior year quarter due to membership losses in our national accounts non-risk business as well as due to fee negotiations related to the long-term renewal of our contract as plan administrator to the Mail Handler's Benefit Plan. These declines are partially offset by an increase in our commercial health plan ASO membership.

Gross margin increased as a result of the acquisitions discussed above. The increase is partially offset by the decline in commercial management services revenue discussed above and the increase in the Commercial health plan medical loss ratio in the first quarter of 2008 compared to same quarter of 2007.

Individual Consumer & Government Division

Individual Consumer & Government Division revenue increased from the prior year quarter as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.

Medicare Advantage risk premium yields, excluding the impact of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month decreased to $753.55 in 2008 from $810.08 in 2007. The decrease is a result of a larger portion of our Medicare Private-Fee-For-Service ("PFFS") business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings noted above.

Part D premium yields, excluding the impact of CMS risk sharing premium adjustments and revenue ceded to external parties, have declined in the first quarter of 2008 compared to same quarter of 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $110.73 in 2008 compared to $119.84 in 2007.

When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.

Medicaid premium yields increased as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.

The increase in gross margin was driven by the membership growth, both organic and acquired, as discussed above, partially offset by the increased medical costs

associated with this membership growth. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low-income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

63.    With regard to Coventry's outlook, the 2007 first quarter Form 10-Q represented, in

part:

We are forecasting growth in diluted earnings per share of 10% to 13% in 2008.

With respect to our business divisions:

Commercial Division - After our membership loss in the first quarter, we expect to grow commercial risk membership for the remaining three quarters of 2008 and remain relatively flat compared to December 31, 2007. The commercial group risk medical loss ratio is expected to be in the mid to high 78%'s, including the effect of acquisitions.

Individual Consumer & Government Division - This division is expected to have another year of strong growth. We expect continued growth in Medicare Advantage in 2008 and we are expecting 100,000 new members in 2008, including a large group effective May 1, 2008. Medicare Part D increased approximately 150,000 members in the first quarter of 2008. We expect the Medicare Part D membership to be level for the remainder of the year. With respect to Medicaid, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earn a low single digit operating margin. Our core Medicaid risk business performed well in the first quarter of 2008 and we expect that to continue throughout 2008.

Specialty Division - Our workers' compensation services continue to experience meaningful year over year growth and we expect this to continue throughout 2008. We continue to seek additional strategically related businesses for this division, most recently acquiring MHNet, a mental-behavioral health company, as discussed above.

64.    The 2008 first quarter Form 10-Q also disclosed:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended March 31, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

65.    These disclosure and internal control representations were then certified by

Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2008

first quarter Form 10-Q.

66.    On June 18, 2008, Coventry issued a press release announcing that it had revised its

2008 outlook, reducing second quarter and full year 2008 earnings per share estimates. The press

release disclosed, in part:

Based upon a review of each line of business, the Company has observed and quantified the following developments contributing to the revised expectations and guidance:

-- Medicare Advantage Medical Loss Ratio (MLR). The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-Service (PFFS) business. The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million. The Company is forecasting the overall Medicare Advantage MLR to be between 87.2% and 87.6% for the first half of 2008, inclusive of the negative development outlined above and a revised view on 2008 PFFS performance. The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008. The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.

-- Commercial Group Risk MLR. The commercial group risk MLR is being pressured by higher than expected levels of outpatient utilization and, to a lesser extent, a higher than expected inpatient unit cost trend caused by an increased severity level of facility claims. The Company's revised 2008 health plan commercial group risk MLR forecast is approximately 80.3% versus previous guidance of approximately 78.8%. Based upon estimates through May 2008, the Company expects the second quarter MLR to be in the range of 82.3% to 82.7% with the first half of 2008 MLR in the range of 80.6% to 80.8%. The second half of 2008 is expected to run at an MLR of approximately 80.0%. The Company has initiated

- 29 -

forward pricing action to reflect the higher than expected trend. The higher than previously expected commercial group risk MLR has resulted in a reduction of $0.32 per diluted share to the midpoint of the Company's 2008 EPS guidance.

-- Other Modifications. The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%. The reduction in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and an anticipation of Medicare Advantage membership growth in 2008 of approximately 90,000 members compared to a previous forecast for growth of 100,000 members. The decrease in management services revenue guidance is driven by a lower than expected level of bill volume in the Company's workers' compensation services business. Offsetting these decreases to the top-line are forecasted reductions in operating costs, including actions planned by the Company, and improvements in non-operating items. These modifications to operating items have resulted in a reduction to the midpoint of the Company's 2008 EPS guidance of $0.09 per diluted share which is offset by the favorable $0.09 per diluted share impact of the non-operating changes to the Company's 2008 EPS guidance.

The following table summarizes the estimated impact of these items as measured against the midpoint of previously provided Company guidance:

| | |
|---|---|
| Previous Midpoint of 2008 diluted EPS guidance range: | $ 4.44 |
| Revised view of Medicare Advantage MLR (midpoint up 320 bps) | ($ 0.42) |
| Commercial Group Risk MLR estimate increased from 78.8% to 80.3% | ($0.32) |
| Net impact of other operating modifications | ($ 0.09) |
| Change in non-operating items | $ 0.09 |
| Revised Midpoint of 2008 diluted EPS guidance range: | $ 3.70 |

67.    Defendant Wolf, commenting on the earnings revision, stated;

We are very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year. We have implemented corrective actions that we anticipate will put us back on an acceptable EPS growth path for 2009 and beyond.

68.    In response to the Company's earnings announcement, the price of Coventry common

stock declined by more than 22% from $40.00 to $31.30 per share on very heavy trading volume.

69.    On July 25, 2008, Coventry issued a press release announcing its financial results for

its second quarter of 2008, the period ended June 30, 2008. For the quarter, the Company reported

operating revenues of $2.98 billion and net earnings of $83.2 million, or $0.55 per diluted share.

70.    Coventry's financial results for its 2008 second quarter were repeated in the

Company's Form 10-Q filed with the SEC on or about August 7, 2008 (the "2008 second quarter

Form 10-Q"), which was signed by Defendants Wolf and Guertin.

71.    With regard to Coventry's operating results, the 2008 second quarter Form 10-Q

represented, in part:

> Managed care premium revenue increased in both our Individual Consumer &
> Government Division and Commercial Division. The increase is a result of growth
> in existing products as well as from our acquisitions described herein. Partially
> offsetting the increase was a decline in same store Commercial risk membership over
> the prior year quarter.
>
> Management services revenue increased compared to the prior year quarter primarily
> as a result of continued growth in our workers' compensation services business and
> the acquisition of Mutual, discussed herein. This increase was partially offset by the
> Other ASO membership decline described above.
>
> Medical costs increased as a result of new business in both our Individual Consumer
> & Government Division and Commercial Division discussed above. Medical costs
> also increased due to increased Commercial medical cost trend as well as
> unfavorable IBNR reserve development on our Medicare Private-Fee-For-Service
> ("PFFS") business. Total medical costs as a percentage of premium revenue
> ("medical loss ratio") increased 6.2% from the prior year quarter as a result of our
> Commercial and Medicare businesses. The Commercial medical loss ratio increase
> is a result of higher than expected levels of inpatient and outpatient facility cost
> trends. To a lesser extent the increase is also due to the mix of business from the
> inclusion of Vista and Mutual. The increase in the Medicare PFFS medical loss ratio
> is a result of receiving a much higher than expected level of PFFS claims related to
> prior periods, as well as a resulting higher outlook for the current year. We expect
> the Medicare Advantage medical loss ratio to be in the mid 80's for the last six
> months of 2008. The Medicare Part D medical loss ratio increase was a result of the
> premium rate changes from the annual competitive bid filings for our Medicare part
> D products as well as a widening of the risk corridors and growth in our low-income
> auto-assign population in 2008.

                              *        *        *

> Commercial Division
>
> Quarters and Six Months Ended June 30, 2008 and 2007
>
> Commercial group risk premium revenue increased for the quarter and six months
> ended June 30, 2008 from the same periods in 2007 as a result of the acquisitions of

Mutual and Vista, which accounted for $151 million in current quarter revenue and $302 million for the six months ended June 30, 2008. The increase was also a result of an increase in average realized premium yields per member per month in our commercial group risk business, resulting from renewal rate increases net of benefit buy downs on renewing groups and the mix of new group business net of terminated groups. This increase in revenue was partially offset by membership declines in our same store commercial group risk business. However, a portion of those members changed from our risk products to our non-risk products.

Commercial management services revenue declined from the prior year periods due to membership losses in our national accounts non-risk business as well as due to fee negotiations related to the long-term renewal of our contract as plan administrator to the Mail Handler's Benefit Plan. These declines are partially offset by an increase in our commercial health plan ASO membership.

Gross margin decreased as a result of the increase in the Commercial health plan medical loss ratio in 2008 compared to 2007 and the decline in commercial management services revenue discussed above. The decrease is partially offset by the gross margin derived from the acquisitions discussed above.

Individual Consumer & Government Division

Quarters and Six Months Ended June 30, 2008 and 2007

Individual Consumer & Government Division revenue increased for the quarter and six months ended June 30, 2008 from the same periods in 2007 as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.

Medicare Advantage risk premium yields, excluding the effect of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month for the six month period ending June 30 decreased to $747.36 in 2008 from $802.97 in 2007. The decrease is a result of a larger portion of our Medicare PFFS business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings and risk factor scores noted above.

Part D premium yields for the six month period ending June 30, 2008 excluding the effect of CMS risk sharing premium adjustments and revenue ceded to external parties, have declined in 2008 compared to 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $92.60 in 2008 compared to $99.26 in 2007.

When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.

Medicaid premium yields increased for the quarter and six month 2008 periods as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.

The decrease in gross margin for the quarter ended June 30, 2008 was driven by increased medical costs associated with our Medicare PFFS business in 2008. This decrease is partially offset by higher gross margins for our Medicaid HMO and Individual businesses associated with the membership growth, both organic and acquired, as discussed above. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low-income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

72.    With regard to Coventry's outlook, the 2008 second quarter Form 10-Q represented,

in part:

> Within our suite of Medicaid products, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earned a low single digit operating margin. Our core Medicaid risk business performed well in the first half of 2008 and we expect that to continue throughout 2008.

73.    The 2008 second quarter Form 10-Q also disclosed:

> We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

> There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended June 30, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

74. These disclosure and internal control representations were then certified by Defendants Wolf and Guertin and such certifications were filed with the SEC in Coventry's 2008 second quarter Form 10-Q.

75. The statements referenced in ¶¶35-67, 69-74 were materially false and misleading when made because they misrepresented and failed to disclose at least the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company employed under-pricing strategies to create the appearance that its new Medicare PFFS initiative was capable of driving the high growth necessary to offset Coventry's contracting Commercial business;

(b)    that the Company failed to disclose the true risks associated with its under-pricing strategies, including the fact that Coventry was generating new Medicare PFFS membership at the expense of profit margins and profitability;

(c)    that the true negative affects of the Company's under-pricing strategies were masked by improper claims assumptions that materially understated Coventry's healthcare claim expenses;

(d)    that Coventry's disclosure and internal controls representations, and Defendants Wolf's and Guertin's certifications thereon, were materially false and misleading when made;

(e)    and that, as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and earnings guidance during the Class Period.

76. Then, on October 21, 2008, Coventry issued a press release announcing its financial results for its third quarter of 2008, the period ended September 31, 2008. For the quarter, the

Company reported operating revenues of $2.98 billion and net earnings of $85.5 million, or $.58 per

diluted share. Defendant Wolf, commenting on the results, stated:

> Our results for 2008 are unacceptable, and a great disappointment to me and the
> entire Company. However, we have identified and understand the issues that have
> affected our results. We have implemented a corrective action plan which we expect
> will increasingly be reflected in the Company's results throughout 2009 and fully
> realized in 2010. Most importantly, I continue to have confidence in our future
> prospects, both strategically and financially.

77.    Defendant Guertin, on a conference call with securities analysts, stated:

> Make no mistake here, we have identified the areas pressuring operating results this
> year, and have implemented action plans to improve our performance. What we
> cannot change here is the calendar, which impacts the timing of when we see the
> positive impacts of all of our actions, nor can we control the unprecedented economic
> factors that seem to impact the landscape each and every day.
>
> As you saw in the press release, upon observing higher than expected medical loss
> ratios on commercial in the third quarter, we once again tore apart each of our
> commercial health plans to get at the drivers of this pressure. Here we had the
> benefit of an additional quarter of completed data from 2008 for our analysis. There
> were four key conclusions that have emerged from this review; one, following the
> second quarter we believed the core medical trend in 2008 was 150 basis points
> higher than expected. The good news here is that the third quarter review showed
> that the core medical trends results were no worse than this. This is very important.
>
> As you know, we implemented forward pricing action earlier this year assuming 150
> basis points of elevated trend, and some additional margin for any further
> deterioration. This estimate still appears accurate, and as it pertains to the core
> medical trend we have not seen any further deterioration.
>
> The second conclusion was that we were experiencing some additional MLR
> pressure that we tracked back to more subtle pricing and underwriting issues in two
> specific health plans. The nature of the issues we uncovered are not simple, easy to
> identify issues like "I wanted a certain price, and that price was cut". They have
> more to do with the interplay between underwriting risk assessment and pricing
> factors as well as some of the more detailed factors in the underwriting and pricing
> model itself.
>
> The nature of most of these items is not that business that was written was
> unprofitable, rather it was less profitable than it had been historically and less
> profitable than what we assumed in our forecasts. The impact of these issues added
> 70 basis points to our outlook on full year commercial MLR. Needless to say, as a
> result of these reviews, all the changes needed to address these issues have been put
> in place as we speak today.

The third conclusion was that having a full year of Vista versus three plus months last year was having a bigger impact on the commercial MLR than we had previously thought. You will recall that our prior guidance assumed that the MLR in 2008 would be 50 basis points higher than 2007, due to this factor. An examination of updated experience for this year shows that this will be closer to 95 basis points or an increase of 45 basis points from our previous estimate. Let me be clear on this topic, this is still a very good and important asset for the company, and I have every confidence in the team we have in place in south Florida. It is the nature of this business that this calendar year's results are largely a reflection of operating action taken prior to our ownership.

The final conclusion from this review was that we had seen significant MLR deterioration on our federal employee HMO business. This is not mail handlers, but rather the risk HMO business we're in out of each of our health plans. As you all know this business is what we refer to as slice where we are one of multiple options. It would appear at this point that we have experienced a significant degree of adverse selection in the most recent renewal cycle, which has caused the MLR deterioration in this block of business. The overall impact of this issue is an increase of 25 basis points from our previous MLR guidance. We have already set our participation in this program for 2009, and while we have made some changes to premiums and benefits, the jury is still out on what will happen to this block from both a membership and MLR perspective in 2009. But clearly, any ongoing result like this would warrant consideration of a different path for 2010.

Let me conclude my comments on the commercial business by reiterating that our fundamental outlook on trend for 2008 and 2009 is the same as a quarter ago, at 9% plus or minus 50 basis points. As you know, we decisively implemented forward pricing action earlier this year; in addition, this quarter we have made additional pricing changes on top of this to deal with the specific issues we found. All of our health plans are actively working on initiatives to improve medical expense trend outcomes in 2009. The biggest question in my mind today is not whether we will fix this issue, but all things being equal, how much of it will show up in 2009 before it fully shows up in 2010.

Let me start out on Medicare Private Fee for Service by clarifying what this is and isn't as it pertains to the third quarter developments. This is not an issue that has anything to do with any additional reserve development back to 2007, nor is it any issue with any internal claim payment practices. Those issues were identified and fully corrected in the second quarter. It is an issue about current year 2008 performance on this product. To no surprise, revenue per member in 2008 is largely as expected. The problem, therefore, is being driven on the medical expense side and in particular on our individual products as opposed to our group products.

We are experiencing trends in 2008 of around 9% on the individual business versus a comparable expected trend in the 5% range. You will recall that on this product we pay Medicare rates to providers, so with the exception of the implementation of MS-DRGs in the fourth quarter of 2007, the variances from expected results are largely

driven by higher than expected utilization, with the biggest variance being observed in the outpatient category. Looking deeper into this, we can also see that one of our particular individual plan offerings is the real culprit here. In essence our individual membership is primarily distributed across three plans; one is a richer premium bearing product, while the other two are leaner plan designs with zero premiums.

In 2008 this richer premium bearing product is running a loss ratio in the mid to upper 90s, while the zero premium products are running in the mid to upper 80s. In our 2009 bids we have made some meaningful redesigns of this particular product in terms of where it is offered, the benefit plan design, and the corresponding premiums. The ultimate impact of these specific changes, as well as the refinement of our view on 2009 performance of Private Fee for Service in total, will clearly be front and center over the next couple of months.

78.    In response to these announcements, the price of Coventry common stock declined from $28.49 per share to $13.93 per share, or more than 51%, on very heavy trading volume.

79.    The markets for Coventry common stock were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and material omissions of fact, Coventry common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Coventry common stock relying upon the integrity of the market price of Coventry common stock and market information relating to Coventry, and have been damaged thereby.

80.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Coventry common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

81.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the

- 37 -

Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Coventry's business, prospects and operations. These material misstatements and omissions of fact had the cause and effect of creating in the market an unrealistically positive assessment of Coventry and its business, prospects and operations, thus causing Coventry common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Coventry common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

82.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Coventry, their control over, and/or receipt and/or modification of Coventry's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Coventry, participated in the fraudulent scheme alleged herein.

83.    Defendants were further motivated to engage in this course of conduct in order to allow the Individual Defendants and other Company insiders to sell more than 800,000 shares of their personally-held Coventry common stock for gross proceeds in excess of $46 million. The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| E CREASEY | 6/11/2007 | 1,500 | $60.27 | $90,405 |
| | | 1,500 | | $90,405 |
| | | | | |
| PATRISHA DAVIS | 6/7/2007 | 9,112 | $60.00 | $546,720 |
| | 6/7/2007 | 4,000 | $59.84 | $239,360 |
| | 6/14/2007 | 967 | $60.33 | $58,339 |
| | 6/15/2007 | 1,908 | $60.40 | $115,243 |
| | | 15,987 | | $959,662 |
| | | | | |
| HARVEY DEMOVICK | 5/31/2007 | 12,454 | $59.15 | $736,654 |
| | 6/14/2007 | 20,000 | $60.51 | $1,210,200 |
| | 6/15/2007 | 10,000 | $60.75 | $607,500 |
| | 6/26/2007 | 20,000 | $58.50 | $1,170,060 |
| | 6/26/2007 | 20,000 | $58.76 | $1,175,200 |
| | 6/27/2007 | 12,500 | $59.50 | $743,750 |
| | | 94,954 | | $5,643,364 |
| | | | | |
| EMERSON FARLEY | 12/11/2007 | 3,800 | $58.25 | $221,350 |
| | 12/11/2007 | 822 | $58.28 | $47,906 |
| | 12/11/2007 | 300 | $58.26 | $17,478 |
| | 12/11/2007 | 61 | $58.31 | $3,557 |
| | 12/11/2007 | 17 | $58.29 | $991 |
| | 12/12/2007 | 4,000 | $58.75 | $235,000 |
| | | 9,000 | | $526,282 |
| | | | | |
| DAVID FINKEL | 6/14/2007 | 967 | $60.33 | $58,339 |
| | 9/13/2007 | 5,000 | $60.08 | $300,400 |
| | 9/13/2007 | 5,000 | $60.06 | $300,300 |
| | 9/13/2007 | 3,438 | $60.06 | $206,486 |
| | 9/13/2007 | 1,562 | $60.06 | $93,814 |
| | | 15,967 | | $959,339 |
| | | | | |
| SHAWN GUERTIN | 6/14/2007 | 1,665 | $60.33 | $100,449 |
| | | 1,665 | | $100,449 |
| LAWRENCE KUGELMAN | 9/24/2007 | 2,250 | $61.22 | $137,745 |
| | | 2,250 | | $137,745 |
| | | | | |
| BERNARD MANSHEIM | 6/4/2007 | 2,934 | $59.70 | $175,160 |

- 39 -

| | | | | |
|---|---|---|---|---|
| | 6/4/2007 | 893 | $59.61 | $53,232 |
| | 6/4/2007 | 186 | $59.65 | $11,095 |
| | 6/5/2007 | 5,987 | $59.60 | $356,825 |
| | 6/14/2007 | 1,439 | $60.33 | $86,815 |
| | 7/6/2007 | 22,500 | $59.91 | $1,347,975 |
| | 7/6/2007 | 11,250 | $59.91 | $673,988 |
| | | 45,189 | | $2,705,089 |
| | | | | |
| THOMAS MCDONOUGH | 5/21/2007 | 50,000 | $59.92 | $2,996,000 |
| | 6/14/2007 | 7,913 | $60.33 | $477,391 |
| | 9/6/2007 | 21,000 | $57.80 | $1,213,800 |
| | 9/6/2007 | 17,000 | $57.75 | $981,750 |
| | 9/6/2007 | 11,000 | $57.70 | $634,700 |
| | 9/6/2007 | 8,500 | $57.65 | $490,025 |
| | 9/6/2007 | 7,500 | $57.76 | $433,200 |
| | 9/6/2007 | 6,500 | $57.78 | $375,570 |
| | 9/6/2007 | 6,000 | $57.79 | $346,740 |
| | 9/6/2007 | 5,500 | $57.74 | $317,570 |
| | 9/6/2007 | 5,000 | $57.68 | $288,400 |
| | 9/6/2007 | 4,000 | $57.64 | $230,560 |
| | 9/6/2007 | 4,000 | $57.72 | $230,880 |
| | 9/6/2007 | 3,000 | $57.77 | $173,310 |
| | 9/6/2007 | 3,000 | $57.63 | $172,890 |
| | 9/6/2007 | 2,500 | $57.73 | $144,325 |
| | 9/6/2007 | 2,500 | $57.60 | $144,000 |
| | 9/6/2007 | 2,500 | $57.55 | $143,875 |
| | 9/6/2007 | 2,500 | $57.58 | $143,950 |
| | 9/6/2007 | 2,500 | $57.81 | $144,525 |
| | 9/6/2007 | 2,000 | $57.59 | $115,180 |
| | 9/6/2007 | 2,000 | $57.82 | $115,640 |
| | 9/6/2007 | 2,000 | $57.83 | $115,660 |
| | 9/6/2007 | 1,500 | $57.67 | $86,505 |
| | 9/6/2007 | 1,500 | $57.62 | $86,430 |
| | 9/6/2007 | 1,500 | $57.57 | $86,355 |
| | | 182,913 | | $10,689,231 |
| | | | | |
| JAMES MCGARRY | 5/30/2007 | 10,000 | $60.00 | $600,000 |
| | 6/14/2007 | 992 | $60.33 | $59,847 |
| | | 10,992 | | $659,847 |
| | | | | |
| ROBERT MOREY | 5/1/2007 | 8,700 | $57.57 | $500,859 |
| | | 8,700 | | $500,859 |

| | | | | |
|---|---|---|---|---|
| FRANCIS SOISTMAN | 6/14/2007 | 1,665 | $60.33 | $100,449 |
| | 5/14/2008 | 5,921 | $43.40 | $256,971 |
| | 5/14/2008 | 5,500 | $43.39 | $238,645 |
| | 5/14/2008 | 2,991 | $43.30 | $129,510 |
| | 5/14/2008 | 2,900 | $43.38 | $125,802 |
| | 5/14/2008 | 1,625 | $43.32 | $70,395 |
| | 5/14/2008 | 1,600 | $43.31 | $69,296 |
| | 5/14/2008 | 1,512 | $43.34 | $65,530 |
| | 5/14/2008 | 1,444 | $43.33 | $62,569 |
| | 5/14/2008 | 1,100 | $43.43 | $47,773 |
| | 5/14/2008 | 872 | $43.41 | $37,854 |
| | 5/14/2008 | 800 | $43.40 | $34,720 |
| | 5/14/2008 | 700 | $43.29 | $30,303 |
| | 5/14/2008 | 700 | $43.41 | $30,387 |
| | 5/14/2008 | 600 | $43.28 | $25,968 |
| | 5/14/2008 | 428 | $43.37 | $18,562 |
| | 5/14/2008 | 400 | $43.39 | $17,356 |
| | 5/14/2008 | 307 | $43.42 | $13,330 |
| | 5/14/2008 | 100 | $43.43 | $4,343 |
| | 5/14/2008 | 100 | $43.32 | $4,332 |
| | 5/14/2008 | 100 | $43.36 | $4,336 |
| | 5/14/2008 | 100 | $43.40 | $4,340 |
| | 5/14/2008 | 100 | $43.41 | $4,341 |
| | 5/14/2008 | 100 | $43.42 | $4,342 |
| | | 31,665 | | $1,401,455 |
| | | | | |
| ELIZABETH TALLETT | 5/3/2007 | 1,500 | $58.67 | $88,005 |
| | 11/1/2007 | 1,100 | $60.01 | $66,011 |
| | 11/1/2007 | 700 | $60.03 | $42,021 |
| | 11/1/2007 | 450 | $60.02 | $27,009 |
| | | 3,750 | | $223,046 |
| | | | | |
| ALLEN WISE | 6/14/2007 | 75,000 | $60.46 | $4,534,500 |
| | 6/25/2007 | 25,000 | $58.65 | $1,466,250 |
| | 9/27/2007 | 5,816 | $62.12 | $361,290 |
| | | 105,816 | | $6,362,040 |
| | | | | |
| DALE WOLF | 5/3/2007 | 12,300 | $58.30 | $717,090 |
| | 5/3/2007 | 6,900 | $58.31 | $402,339 |
| | 5/3/2007 | 6,300 | $57.95 | $365,085 |

- 41 -

| | 5/3/2007 | 4,300 | $58.27 | $250,561 |
|---|---|---|---|---|
| | 5/3/2007 | 4,145 | $58.25 | $241,446 |
| | 5/3/2007 | 3,800 | $58.00 | $220,400 |
| | 5/3/2007 | 3,700 | $57.97 | $214,489 |
| | 5/3/2007 | 3,400 | $57.96 | $197,064 |
| | 5/3/2007 | 3,400 | $57.99 | $197,166 |
| | 5/3/2007 | 3,000 | $58.19 | $174,570 |
| | 5/3/2007 | 2,700 | $58.32 | $157,464 |
| | 5/3/2007 | 2,400 | $58.06 | $139,344 |
| | 5/3/2007 | 2,100 | $58.18 | $122,178 |
| | 5/3/2007 | 1,700 | $58.26 | $99,042 |
| | 5/3/2007 | 1,655 | $58.16 | $96,255 |
| | 5/3/2007 | 1,655 | $58.24 | $96,387 |
| | 5/3/2007 | 1,600 | $58.13 | $93,008 |
| | 5/3/2007 | 1,600 | $58.20 | $93,120 |
| | 5/3/2007 | 1,600 | $58.22 | $93,152 |
| | 5/3/2007 | 1,400 | $58.17 | $81,438 |
| | 5/3/2007 | 1,400 | $58.28 | $81,592 |
| | 5/3/2007 | 1,300 | $58.35 | $75,855 |
| | 5/3/2007 | 1,245 | $58.15 | $72,397 |
| | 5/3/2007 | 1,227 | $58.09 | $71,276 |
| | 5/3/2007 | 1,200 | $58.01 | $69,612 |
| | 5/3/2007 | 1,200 | $58.07 | $69,684 |
| | 5/3/2007 | 1,100 | $58.11 | $63,921 |
| | 5/3/2007 | 1,000 | $57.94 | $57,940 |
| | 5/3/2007 | 1,000 | $58.21 | $58,210 |
| | 5/3/2007 | 900 | $57.92 | $52,128 |
| | 5/3/2007 | 900 | $58.47 | $52,623 |
| | 5/3/2007 | 873 | $58.10 | $50,721 |
| | 5/3/2007 | 800 | $58.28 | $46,624 |
| | 5/3/2007 | 800 | $58.67 | $46,936 |
| | 5/3/2007 | 600 | $58.08 | $34,848 |
| | 5/3/2007 | 500 | $58.23 | $29,115 |
| | 5/3/2007 | 500 | $58.38 | $29,190 |
| | 5/3/2007 | 500 | $58.42 | $29,210 |
| | 5/3/2007 | 400 | $58.04 | $23,216 |
| | 5/3/2007 | 400 | $58.46 | $23,384 |
| | 5/3/2007 | 400 | $58.49 | $23,396 |
| | 5/3/2007 | 300 | $57.98 | $17,394 |
| | 5/3/2007 | 300 | $58.12 | $17,436 |
| | 5/3/2007 | 300 | $58.34 | $17,502 |
| | 5/3/2007 | 300 | $58.41 | $17,523 |
| | 5/3/2007 | 200 | $58.33 | $11,666 |
| | 5/3/2007 | 200 | $58.36 | $11,672 |
| | 5/3/2007 | 100 | $58.02 | $5,802 |

- 42 -

| | | | | |
|---|---|---|---|---|
| | 5/3/2007 | 100 | $58.14 | $5,814 |
| | 5/3/2007 | 100 | $58.17 | $5,817 |
| | 5/3/2007 | 100 | $58.24 | $5,824 |
| | 5/3/2007 | 100 | $58.31 | $5,831 |
| | 5/16/2007 | 12,500 | $60.00 | $750,000 |
| | 5/16/2007 | 4,476 | $59.90 | $268,112 |
| | 5/16/2007 | 2,355 | $59.92 | $141,112 |
| | 5/16/2007 | 1,800 | $59.97 | $107,946 |
| | 5/16/2007 | 1,545 | $59.93 | $92,592 |
| | 5/16/2007 | 1,200 | $60.01 | $72,012 |
| | 5/16/2007 | 1,100 | $60.02 | $66,022 |
| | 5/16/2007 | 824 | $59.91 | $49,366 |
| | 5/16/2007 | 800 | $59.99 | $47,992 |
| | 5/16/2007 | 800 | $60.00 | $48,000 |
| | 5/16/2007 | 800 | $60.04 | $48,032 |
| | 5/16/2007 | 600 | $59.96 | $35,976 |
| | 5/16/2007 | 400 | $59.88 | $23,952 |
| | 5/16/2007 | 300 | $59.94 | $17,982 |
| | 5/16/2007 | 300 | $59.95 | $17,985 |
| | 5/16/2007 | 200 | $59.98 | $11,996 |
| | 6/29/2007 | 22,413 | $57.77 | $1,294,799 |
| | 8/6/2007 | 15,000 | $57.40 | $861,000 |
| | 11/1/2007 | 3,639 | $59.95 | $218,158 |
| | 11/1/2007 | 3,075 | $59.92 | $184,254 |
| | 11/1/2007 | 2,709 | $59.91 | $162,296 |
| | 11/1/2007 | 2,400 | $59.96 | $143,904 |
| | 11/1/2007 | 1,967 | $59.93 | $117,882 |
| | 11/1/2007 | 1,765 | $59.89 | $105,706 |
| | 11/1/2007 | 1,758 | $59.97 | $105,427 |
| | 11/1/2007 | 1,661 | $59.94 | $99,560 |
| | 11/1/2007 | 995 | $59.87 | $59,571 |
| | 11/1/2007 | 935 | $59.90 | $56,007 |
| | 11/1/2007 | 805 | $59.85 | $48,179 |
| | 11/1/2007 | 700 | $59.88 | $41,916 |
| | 11/1/2007 | 500 | $59.65 | $29,825 |
| | 11/1/2007 | 500 | $59.66 | $29,830 |
| | 11/1/2007 | 500 | $59.71 | $29,855 |
| | 11/1/2007 | 500 | $59.73 | $29,865 |
| | 11/1/2007 | 400 | $59.77 | $23,908 |
| | 11/1/2007 | 300 | $59.86 | $17,958 |
| | 11/1/2007 | 200 | $59.67 | $11,934 |
| | 11/1/2007 | 200 | $59.70 | $11,940 |
| | 11/1/2007 | 200 | $59.84 | $11,968 |
| | 11/1/2007 | 100 | $59.62 | $5,962 |
| | 11/1/2007 | 100 | $59.63 | $5,963 |

| | 11/1/2007 | 100 | $59.68 | $5,968 |
|---|---|---|---|---|
| | 11/1/2007 | 100 | $59.69 | $5,969 |
| | 11/1/2007 | 100 | $59.74 | $5,974 |
| | 11/1/2007 | 100 | $59.75 | $5,975 |
| | 11/1/2007 | 100 | $59.78 | $5,978 |
| | 11/1/2007 | 100 | $59.80 | $5,980 |
| | 2/19/2008 | 3,200 | $54.66 | $174,912 |
| | 2/19/2008 | 2,795 | $54.47 | $152,244 |
| | 2/19/2008 | 2,700 | $54.85 | $148,095 |
| | 2/19/2008 | 2,500 | $55.00 | $137,500 |
| | 2/19/2008 | 1,900 | $54.38 | $103,322 |
| | 2/19/2008 | 1,600 | $54.40 | $87,040 |
| | 2/19/2008 | 1,590 | $54.49 | $86,639 |
| | 2/19/2008 | 1,500 | $54.35 | $81,525 |
| | 2/19/2008 | 1,200 | $54.44 | $65,328 |
| | 2/19/2008 | 1,160 | $54.42 | $63,127 |
| | 2/19/2008 | 1,155 | $54.41 | $62,844 |
| | 2/19/2008 | 1,000 | $54.57 | $54,570 |
| | 2/19/2008 | 999 | $54.45 | $54,396 |
| | 2/19/2008 | 901 | $54.46 | $49,068 |
| | 2/19/2008 | 900 | $54.83 | $49,347 |
| | 2/19/2008 | 800 | $54.43 | $43,544 |
| | 2/19/2008 | 800 | $54.79 | $43,832 |
| | 2/19/2008 | 700 | $54.37 | $38,059 |
| | 2/19/2008 | 600 | $54.34 | $32,604 |
| | 2/19/2008 | 600 | $54.48 | $32,688 |
| | 2/19/2008 | 500 | $54.39 | $27,195 |
| | 2/19/2008 | 500 | $54.71 | $27,355 |
| | 2/19/2008 | 400 | $54.28 | $21,712 |
| | 2/19/2008 | 300 | $54.23 | $16,269 |
| | 2/19/2008 | 300 | $54.29 | $16,287 |
| | 2/19/2008 | 300 | $54.50 | $16,350 |
| | 2/19/2008 | 300 | $54.55 | $16,365 |
| | 2/19/2008 | 300 | $54.65 | $16,395 |
| | 2/19/2008 | 300 | $54.69 | $16,407 |
| | 2/19/2008 | 300 | $54.73 | $16,419 |
| | 2/19/2008 | 300 | $54.86 | $16,458 |
| | 2/19/2008 | 200 | $54.30 | $10,860 |
| | 2/19/2008 | 200 | $54.31 | $10,862 |
| | 2/19/2008 | 200 | $54.32 | $10,864 |
| | 2/19/2008 | 200 | $54.36 | $10,872 |
| | 2/19/2008 | 200 | $54.20 | $10,840 |
| | 2/19/2008 | 200 | $54.51 | $10,902 |
| | 2/19/2008 | 200 | $54.72 | $10,944 |
| | 2/19/2008 | 200 | $54.74 | $10,948 |

| | 2/19/2008 | 200 | $54.76 | $10,952 |
|---|---|---|---|---|
| | 2/19/2008 | 100 | $54.24 | $5,424 |
| | 2/19/2008 | 100 | $54.26 | $5,426 |
| | 2/19/2008 | 100 | $54.27 | $5,427 |
| | 2/19/2008 | 100 | $54.38 | $5,438 |
| | 2/19/2008 | 100 | $54.63 | $5,463 |
| | 2/19/2008 | 100 | $54.64 | $5,464 |
| | 2/19/2008 | 100 | $54.68 | $5,468 |
| | 2/19/2008 | 100 | $54.75 | $5,475 |
| | | 218,922 | | $12,687,870 |
| | | | | |
| THOMAS ZIELINSKI | 5/31/2007 | 13,042 | $59.50 | $775,999 |
| | 5/31/2007 | 4,958 | $59.95 | $297,232 |
| | 6/14/2007 | 2,285 | $60.33 | $137,854 |
| | 11/16/2007 | 6,000 | $59.60 | $357,600 |
| | 11/16/2007 | 5,500 | $59.64 | $328,020 |
| | 11/16/2007 | 5,000 | $59.61 | $298,050 |
| | 11/16/2007 | 4,800 | $59.61 | $286,128 |
| | 11/16/2007 | 4,000 | $59.61 | $238,440 |
| | 11/16/2007 | 3,500 | $59.60 | $208,600 |
| | 11/16/2007 | 1,200 | $59.61 | $71,532 |
| | 11/16/2007 | 1,000 | $59.61 | $59,610 |
| | 11/16/2007 | 500 | $59.64 | $29,820 |
| | | 51,785 | | $3,088,885 |
| | | | | |
| | **Total:** | **801,055** | | **$46,735,570** |

**Loss Causation/Economic Loss**

84.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Coventry common stock and operated as a fraud or deceit on Class Period purchasers of Coventry common stock by failing to disclose Coventry's under-pricing practice and related deceptions. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Coventry common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Coventry common stock during the Class Period,

Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

85.    Defendants' false and misleading statements had the intended effect and caused Coventry's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $62.36 per share on September 26, 2007.

86.    As a direct result of Defendants' disclosures as alleged herein, the price of Coventry common stock fell precipitously.  These drops removed the inflation from the price of Coventry common stock, causing real economic loss to investors who had purchased Coventry common stock during the Class Period.

87.    The declines in the price of Coventry common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Coventry common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Coventry common stock and the subsequent significant decline in the value of Coventry common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

88.    At all relevant times, the market for Coventry common stock was an efficient market for the following reasons, among others:

(a)    Coventry common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Coventry filed periodic public reports with the SEC and the NYSE;

(c)    Coventry regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Coventry was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

89.    As a result of the foregoing, the market for Coventry common stock promptly digested current information regarding Coventry from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Coventry common stock during the Class Period suffered similar injury through their purchase of Coventry common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

90.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the

- 47 -

statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are

liable for those false forward-looking statements because at the time each of those forward-looking

statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of Coventry who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

92.    During the Class Period, Defendants disseminated or approved the materially false

and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

93.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the purchasers of the Company's common stock during the Class Period.

94.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for Coventry common stock. Plaintiff and the Class

would not have purchased Coventry common stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading

statements.

95.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Coventry common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

96.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.    The Individual Defendants acted as controlling persons of Coventry within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Coventry, and their ownership of Coventry stock, the Individual Defendants had the power and authority to cause Coventry to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____/s/_____
DANIEL F. GOLDSTEIN (01036)
DANA W. MCKEE (04447)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: (410) 962-1030
Fax: (410) 385-0869 (fax)
dfg@browngold.com
dwm@browngold.com

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

_____/s/_____
DANIEL F. GOLDSTEIN

Of Counsel:

COUGHLIN STOIA GELLER RUDMAN
& ROBBINS, LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: 631/367-7100
Fax: (631) 367-1173

SULLIVAN, WARD, ASHER & PATTON, P.C.
JACQUELINE A. KELLY
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: (248) 746-0700
Fax: (248) 746-2760

*Attorneys for Plaintiffs*

- 50 -