UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re COVENTRY HEALTHCARE, INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 8:09-cv-02337-AW<br><br>Judge Alexander Williams, Jr. |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) | CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs New England Teamsters & Trucking Industry Pension Fund, United Food and Commercial Workers Union Local 880 – Retail Food Employers Joint Pension Fund, and Southern California IBEW-NECA Pension Plan ("Lead Plaintiffs" or "Plaintiffs") allege the following based upon their individual and personal knowledge as to Plaintiffs' own acts, and the investigation undertaken by Plaintiffs' counsel, which included a review of regulatory filings and reports, securities analysts' reports and advisories about Coventry Healthcare, Inc. ("Coventry" or the "Company"), press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of Coventry, and consultations with experts. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action brought on behalf of purchasers of the common stock of Coventry between February 9, 2007 and October 22, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Coventry is a managed healthcare company which offers a wide a range of healthcare plans and products.  This case arises from Defendants' materially false and misleading statements relating to Coventry's Private Fee-for-Service ("PFFS") Medicare product, which the Company introduced at the start of 2007.  PFFS is a type of Medicare plan offered by private companies, which allows plan members to receive care from any provider eligible to treat Medicare beneficiaries.

3.      During the Class Period, Coventry and its investors were relying on the success of this key initiative to drive profitability and offset the lack of growth in the Company's ailing commercial healthcare business. Through a combination of under-pricing and over-selling by

aggressive marketing tactics, Coventry was able to rapidly gain market share in the PFFS business during the first half of 2007.

4.     By mid-2007 however, the surge in PFFS membership was overwhelming the Company's then-existing claims processing infrastructure, which resulted in significant errors and delays in processing PFFS claims.  This inability to timely process PFFS claims materially distorted and understated the Company's true claims exposure.  As a result, Coventry's Class Period financial results were artificially inflated and its financial statements were materially false and misleading and not prepared in conformity with Generally Accepted Accounting Principles ("GAAP").

5.     Specifically, Coventry materially understated its PFFS claim reserves, including its incurred but not reported ("IBNR") reserve.[1]  Coventry's failure to accurately measure and reserve for its PFFS claims expenses, in turn, distorted its Medical Loss Ratio ("MLR"), which represents the ratio of expenses of providing healthcare services, expressed as a percentage of insurance premiums – a key metric of profitability for healthcare companies that is closely watched by investors.  As a result, the MLR for Coventry's PFFS business was much higher than the Company was reporting to investors.

6.     Defendants, however, failed to inform investors about the numerous problems that were plaguing Coventry's PFFS initiative.  Instead, they continued to tout the growth in PFFS membership, made numerous positive statements about the Company's prized new business, and issued bullish 2008 earnings guidance based on the supposed success of PFFS.

---

[1]     Since healthcare companies frequently pay medical claims after the end of a particular accounting period, they are required to establish a reserve for claims that have been incurred by the company, but which remain unpaid at the end of an accounting period.

7.      By early 2008, it was known to Defendants that, as a result of these problems, profits from Coventry's PFFS business would not be in line with expectations.  Critically, by this time, Coventry had already submitted its annual premium pricing bids for its 2008 PFFS plans to CMS (defined below), the government entity which regulates private companies offering Medicare products.  In accordance with CMS guidelines, Coventry was locked into the premium prices that it could charge for its PFFS plans for the remainder of 2008, meaning that the Company could not adjust pricing to account for the higher expenses that had become apparent.

8.      Defendants therefore knew, or recklessly disregarded, that Coventry's PFFS profits would continue to fall short for the rest of 2008, and the Company would be unable to achieve its bullish 2008 earnings projections.  Defendants concealed this fact from investors during the first half of 2008, however, in order to buy time to shore up the Company's other business segments and compensate for the losses in PFFS, before Coventry was forced to announce the earnings revision that Defendants knew would be necessary.  Defendants and other insiders also took the opportunity to sell more than 800,000 shares of their personally-held Coventry stock for proceeds of over $46 million, while in possession of this material adverse information.

9.      Investors began to learn the truth about the failure of Coventry's PFFS initiative on June 18, 2008, when Coventry announced that it was reducing its 2008 earnings guidance by 17%, and reported a significant spike in the MLR for its PFFS business.

10.     The Company also announced a dramatic *$50 million* increase in IBNR reserves for its PFFS business "related to 2007," and disclosed that Coventry was still processing claims going back as far as the first quarter of 2007.[2]

---

[2]      Emphasis is added unless otherwise noted.

11.     Defendants, however, also downplayed the severity of these problems, and misleadingly blamed them on delays in claims being received from providers, which had purportedly led to a sudden influx of claims during the quarter.  In response to these partial disclosures, the price of Coventry's stock fell by more than 22%, from $40.00 per share to $31.30 per share.

12.     Then, on October 21, 2008, Coventry stunned investors by slashing its 2008 earnings guidance for a second time, due in part to continued increases in the MLR for Coventry's PFFS business, which the Company attributed to "higher than expected [plan] utilization" – *i.e.*, claims expenses.  The clear import of these disclosures, and the message that the market understood, was that Coventry had not resolved the problems with its PFFS business and PFFS would continue to be more costly and less profitable for the Company, such that the Company would not be able to generate the future growth that Coventry and its investors had been counting on.  Investors sharply reacted to these disclosures, sending Coventry's stock down an additional 51%, from $28.49 per share to a close of $13.93 per share.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiffs New England Teamsters & Trucking Industry Pension Fund, United Food and Commercial Workers Union Local 880 – Retail Food Employers Joint Pension Fund, and Southern California IBEW-NECA Pension Plan purchased the common stock of Coventry during the Class Period, as detailed in the certifications previously filed with the Court and incorporated herein by reference, and were damaged thereby.

18.     Defendant Coventry is a national managed healthcare company that operates health plans, insurance companies, network rental/managed care services companies, and workers' compensation services companies.  The Company maintains its principal place of business at 6705 Rockledge Drive, Suite 900 in Bethesda, Maryland.  Coventry's stock trades on the New York Stock Exchange ("NYSE") under the symbol "CVH."

19.     Defendant Dale B. Wolf ("Wolf") served as President and Chief Executive Officer ("CEO") and Director of Coventry at all relevant times, until his resignation on January 30, 2009.

20.     Defendant Shawn M. Guertin ("Guertin") served as Executive Vice President, Chief Financial Officer ("CFO") and Treasurer of Coventry at all relevant times, until his resignation on November 16, 2009.

21.     Defendant John J. Ruhlmann ("Ruhlmann"), at all relevant times, served as the Company's Senior Vice President and Corporate Controller.

22.     Defendant Francis S. Soistman, Jr. ("Soistman") served as Executive Vice President of Coventry's Individual Consumer and Government Business Division at all relevant times, until his resignation on March 2, 2009.

23.     Defendants Wolf, Guertin, Ruhlmann and Soistman are collectively referred to herein as the "Individual Defendants," and Coventry and the Individual Defendants are collectively referred to herein as "Defendants."

24.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Coventry, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial information, and financial statements, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based

upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their board of director membership and/or executive and managerial positions with Coventry, each of the Individual Defendants had access to the adverse undisclosed information about Coventry's business prospects, financial information and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Coventry and its business issued or adopted by the Company materially false and misleading.

27. The Individual Defendants, because of their positions of control and authority as corporate officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

28. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Coventry common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Coventry's business, operations,

management and the intrinsic value of Coventry common stock; (ii) enabled the Individual Defendants and other Coventry insiders to sell more than 800,000 shares of their personally-held Coventry stock for proceeds of over $46 million; and (iii) caused Plaintiffs and other members of the Class to purchase Coventry common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

29.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Coventry during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Coventry common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Coventry or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Coventry; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

35.     The allegations made herein are further supported by the first-hand knowledge of nine (9) confidential witnesses ("CWs").  These informants had direct knowledge about Coventry's operations, including its PFFS business, prior to and during the Class Period.  As detailed below, each CW served in a position at Coventry which provided them with access to the information they are alleged to possess.

36.     Confidential Witness No. 1 ("CW1") is a former executive management-level employee who worked at Coventry during the entirety of the Class Period, and at all relevant times herein.  CW1 worked at Coventry's corporate headquarters in Bethesda, Maryland and reported

directly to Defendant Wolf.   CW1 participated in senior management-level discussions and meetings.  As a result, CW1 had a detailed understanding of the problems that Coventry encountered with its PFFS business during the Class Period, including claim delays and the Company's failure to properly reserve for PFFS claims.

37.     Confidential Witness No. 2 ("CW2") is a former Medicare Underwriting Consultant who worked at Coventry's corporate headquarters in Bethesda, Maryland from March 2007 to May 2010.  During the Class Period, CW2 was a member of a small group of employees responsible for underwriting Coventry's PFFS product.  In addition, CW2 periodically attended "executive review meetings" regarding Coventry's PFFS business, at which Defendant Soistman, and occasionally Defendant Guertin, were present.

38.     Confidential Witness No. 3 ("CW3") is a former Provider Relations Inside Representative who was employed by Coventry from April 2007 through May 2009.  CW3 was responsible for assisting PFFS providers with all issues, including claims resolution.  In addition, CW3 was tasked with helping Coventry's Claims Department tackle the huge backlog of PFFS claims that accumulated during the Class Period.

39.     Confidential Witness No. 4 ("CW4") is a former PFFS Claims Processor who was employed by Coventry from September 2008 through April 2010.  CW4 was responsible for reviewing and processing PFFS claims.

40.     Confidential Witness No. 5 ("CW5") is a former Technical Claims Specialist who worked in Coventry's Houston, Texas claims center from December 2006 through April 2010.  CW5 was responsible for reviewing and processing PFFS claims.

41.     Confidential Witness No. 6 ("CW6") is a former Senior Customer Communications Specialist who was employed by Coventry from January 2004 through March 2008.  CW6's responsibilities included resolving complaints from PFFS customers.

42.     Confidential Witness No. 7 ("CW7") is a former Service Operations Manager in Coventry's Individual Consumer and Government division.  CW7 was employed by Coventry from February 2006 through August 2008.  CW7's responsibilities included setting up PFFS accounts and interacting with brokers and call centers.

43.     Confidential Witness No. 8 ("CW8") is a former Compliance Specialist who was employed by Coventry from August 2006 through April 2007.  During 2007, CW8 assisted with creating a database for tracking complaints against brokers selling Coventry's PFFS plans.

44.     Confidential Witness No. 9 ("CW9") is a former supervisor in Coventry's San Antonio, Texas, call center.  CW9 was employed by Coventry from 2005 to August 2009.  CW9 began working in the call center in October 2007 and was responsible for handling PFFS enrollment and claims.

**SUBSTANTIVE ALLEGATIONS**

**The Company and Its Business**

45.     Defendant Coventry is a managed healthcare company which operates via health plans, insurance companies, and network rental and workers' compensation services companies. The Company offers a range of risk and fee-based managed care products and services to a broad cross section of individuals, employer and government-funded groups, government agencies, and other insurance carriers and administrators via a direct sales staff and a network of independent brokers.  The Company generated $9.88 billion in revenues in fiscal year 2007.

46.     Coventry's operations are organized into three business divisions: (1) the Commercial Business division; (2) the Individual Consumer & Government Business division, which includes its

Medicare Advantage ("MA") products, which are at issue in this litigation; and (3) the Specialty Business division.

47.     Coventry's Commercial Business division product line includes its health maintenance organization ("HMO"), preferred provider organizations ("PPO"), and point of service products.  This division also offers commercial management services products and consumer-directed benefit options, including health reimbursement accounts and health savings accounts.

48.     The Company's Individual Consumer and Government division offers health benefits to members participating in the Medicare Advantage HMO, Medicare Advantage PPO, Medicare PFFS, Medicare Prescription Drug (Medicare "Part D"), and Medicaid programs.  The division also provides fully-insured managed care services, as well as other products and services, such as pharmacy benefit management, clinical management, and fiscal intermediary services.

49.     Coventry's Specialty Business division offers various products, including access to provider network, pharmacy benefits management, field case management, telephonic case management, independent medical exam, and bill review capabilities; and network rental services and other managed care products through a PPO network to national, regional, and local third party administrators and insurance carriers.  This division also includes the Company's workers' compensation administration business, mental-behavioral health benefits business and dental benefits business.

## Background

## Overview of Medicare Advantage and PFFS

50.     Medicare is a federal government program that provides health insurance coverage to persons ages 65 and older.  Traditional Medicare provides members with a standard "fee-for-service" benefit package that covers medically necessary care received from nearly any hospital or doctor in the country.

51.     Medicare recipients may also elect to receive their Medicare benefits through health insurance plans offered by private companies such as Coventry, known as Medicare Advantage ("MA") plans.  Medicare Advantage plans offer enrollees additional coverage and benefits not provided by traditional Medicare, such as prescription drugs, dental care and vision.  In exchange for these extra benefits, enrollees typically pay additional monthly premiums and co-payments, and must utilize a specific network of providers.

52.     Both traditional Medicare and Medicare Advantage are administered and overseen by The Centers for Medicare and Medicaid Services ("CMS").  Companies such as Coventry that offer Medicare Advantage products contract with CMS to provide health insurance coverage to Medicare-eligible persons.  In exchange, they receive contractual reimbursements from CMS, in the form of a fixed payment per member, per month.

53.     PFFS is a type of Medicare Advantage health plan, offered by a private health insurance company, such as Coventry, pursuant to a yearly contract with CMS.  Unlike other Medicare Advantage plans, where enrollees must utilize a specific network of providers, PFFS plan members may receive care from any provider eligible to treat Medicare beneficiaries, as long as the provider agrees to accept the PFFS plan's terms and conditions.  The provider is typically "deemed" to have accepted the plan by treating a beneficiary who presents a PFFS membership card.

54.     While providers generally receive the same reimbursement as under traditional Medicare, the private health insurance companies offering PFFS plans are reimbursed by CMS at rates up to 19% higher than for traditional Medicare Advantage plans, making them a potentially rich source of profits for companies such as Coventry.

55.     Coventry began offering PFFS plans on January 1, 2007.  The Company's PFFS plans were sold to consumers under the brand name "Advantra Freedom."

### Coventry's Future Growth Prospects Were
### Highly Dependent on Its PFFS Initiative

56.     According to CW1, a former executive management-level employee, Coventry had traditionally focused on its commercial health insurance business. Under Defendant Wolf's leadership, however, the Company's business expanded rapidly to include more complex healthcare products, such as PFFS, with which the Company had no prior experience.

57.     CW1 explained that when Coventry first entered the PFFS market at the start of 2007, the Company viewed PFFS as an important initiative which would compensate for the lack of growth and rising healthcare costs that plagued Coventry's stagnant Commercial division. CW2, a former Medicare Underwriting Consultant, confirmed that Coventry initially viewed PFFS as a significant and profitable initiative, which Defendant Wolf strongly advocated. Accordingly, there was a significant amount of fanfare surrounding the introduction of PFFS.

58.     For example, prior to the beginning to the Class Period, at the Company's Investor Day with securities analysts and investors on December 6, 2006, Coventry's executive management explained that while the Commercial Business division had been the cornerstone of Coventry's business, going forward, much of the Company's growth would come from its Individual Consumer and Government division. Defendant Soistman announced that the Company had recently launched its PFFS initiative, stating, in pertinent part, as follows:

> Medicare Part D was the first time that Coventry embarked on a national Medicare initiative. And the success that we have realized thus far with Medicare Part D was the model that we replicated for Private-Fee-for-Service, which we launched three weeks ago.
>
> I would depict the Medicare business growth engine as one that has the capacity. It has the horsepower. It has a track record, both with the Medicare Advantage business of delivering consistent performance, both top line and bottom line. But, the Medicare Part D was, perhaps, the first time we really opened it up and showed you what we could do on a much larger scale. And obviously, we look to replicate that with Medicare Private-Fee-for-Service.

\*       \*       \*

Let's move on to the Private-Fee-for-Service product, our new product, again branded as Advantra Freedom. Well, let's start with taking success on the Part D side and replicating that on the Private-Fee-for-Service side. We learned a lot, we did a lot of things right on Part D and we'[v]e replicated that for Private-Fee-for-Service. . . . [W]e're very pleased with our readiness for private fee.

59.     Coventry's Form 10-K for the year ended December 31, 2006 contained the following description of the Company's PFFS product, stating, in pertinent part:

Commencing January 1, 2007, the Company will offer Medicare Advantage Private Fee for Service ("PFFS") plans in 43 states under the name Advantra Freedom. These plans are offered under a contract with [The Centers for Medicare & Medicaid Services] and provide enrollees with all benefits they receive under Original Medicare plus additional benefits such as preventive care and eyeglasses/hearing aid coverage and pharmacy benefits. Enrollees are not limited to network providers, but may utilize any provider willing to accept the plan's terms and conditions. Providers generally receive the same reimbursement as under original Medicare. The Company's products will be underwritten by its health insurance subsidiaries.

60.     Accordingly, heading into the Class Period, Coventry's future growth prospects were highly dependent on its new Medicare PFFS initiative. Indeed, in early 2007, securities analysts noted that the key theme for Coventry's outlook was its push into the Medicare PFFS market, since the membership and growth of its Commercial business had stalled. For example, in a February 2007 research report, JP Morgan Securities referred to Coventry's Commercial business as its "Achilles heel."

61.     Analysts were also intensely focused on the Company's MLR for Coventry's new PFFS business. MLR represents the ratio of expenses of providing healthcare services, expressed as a percentage of insurance premiums. MLR is a significant and closely watched financial indicator of healthcare companies. Generally, a low MLR is rewarded on Wall Street by higher stock prices, since it indicates that a lower fraction of revenues are spent paying healthcare claims, translating into greater profits.

**Coventry's Under-Pricing and Aggressive Marketing Enable the
Company to Generate Rapid Initial Growth of Its PFFS Business**

62.     Through a combination of under-pricing and over-selling by aggressive marketing

tactics, Coventry was able to rapidly gain market share in the PFFS business during the first half of

2007.

63.     According to CW2, when Coventry first entered the PFFS market at the start of 2007,

the Company deliberately under-priced its PFFS plan premiums in the annual bids which it

submitted to CMS in order to quickly grow its PFFS business.  CW2 explained that Coventry was

able to set aggressively low prices, while still obtaining CMS approval for its PFFS bids, by also

underestimating projected plan utilization – *i.e.*, the level of claims that Coventry expected to receive

for enrollee medical expenses.

64.     In addition to deliberately under-pricing its PFFS plans, Coventry was also able to

initially increase its PFFS market share by fostering overly-aggressive and improper marketing

practices.  For example, Coventry's PFFS plans were sold by insurance brokers who received a

commission from Coventry for enrolling new members.  Unbeknownst to investors, when Coventry

began its PFFS initiative, the Company was so intent on generating membership growth that it

turned a blind eye to deceptive, and even fraudulent, marketing tactics by brokers who sold the

plans, and allowed those practices to flourish.

65.     According to CW7, Coventry ordinarily utilized a pool of experienced brokers to sell

its products, but the Company hired a new group of brokers to sell its PFFS plans, who did not have

adequate experience selling health insurance.

66.     CW6 stated that Coventry paid the brokers selling its PFFS plans a commission of

$300 for every member they enrolled.  CW6 and CW7 explained that the high commissions created

an incentive for brokers to aggressively sell PFFS plans to as many seniors as possible, without

regard to whether PFFS was the cheapest or best plan for a particular person.  CW7 also noted that unlike Coventry's other health plans, where the Company reviewed whether the plan was appropriate for enrollees, there was no such review with Coventry's PFFS plans.  Instead, Coventry was concerned solely with gaining membership.

67.     According to CW6 and CW9, Coventry received numerous complaints during the Class Period from PFFS enrollees who claimed that they had been misled by brokers who misrepresented plan benefits.  For example, according to CW6, enrollees were told by brokers that a PFFS plan would cover the full cost of their prescriptions, only to find out later that this was not the case.  CW6 stated that the volume of complaints regarding PFFS was so great that Coventry had to set up a Business Retention Unit to field customer complaints.

68.     CW7, CW8 and CW9 each confirmed that the brokers selling Coventry's PFFS plans were engaging in widespread, improper, and often fraudulent, sales and marketing practices.  Those tactics included selling Coventry's PFFS plans door-to-door in violation of CMS guidelines (CW7), enrolling seniors without their knowledge or consent, including by forging their signatures (CW8 and CW9), and even enrolling deceased persons (CW8).  According to CW7, brokers were also aggressively marketing Coventry's PFFS plans to seniors who "should never have had it sold to them," because the PFFS plans were more expensive and provided less coverage than that senior would have received under traditional Medicare.

69.     During mid-2007, deceptive and improper marketing of PFFS plans came under Congressional scrutiny, following widespread complaints from senior citizens.  On May 16, 2007, hearings on the issue were held before the Senate Select Committee on Aging.  Defendant Soistman testified before Congress regarding Coventry's marketing of its PFFS plans on June 26, 2007.

- 17 -

70.     On June 15, 2007, Coventry announced that it had agreed to join six other healthcare companies in temporarily suspending marketing of PFFS plans to individuals until additional safeguards were implemented by CMS to protect Medicare beneficiaries.  Two months later, on August 16, 2007, Coventry announced that, following an on-site audit by CMS and the implementation of tougher marketing guidelines, the Company had received authorization to resume selling its PFFS plans.

### During the Summer of 2007, Coventry
### Submits Its 2008 PFFS Pricing Bids to CMS

71.     Also during the summer of 2007, Coventry submitted its premium price bids for its 2008 PFFS plans to CMS for approval.  CW1 explained that Coventry had to submit annual premium price bids for its PFFS plans to CMS during the summer of the prior year.  Thus, Coventry's bids for its 2008 PFFS plans were submitted to CMS during the summer of 2007.  Once the bids were approved by CMS, the pricing of the plans was fixed for the duration of the following year.  As a result, Coventry was locked into the premium prices that it could charge for its PFFS plans as far as 18 months in advance.  Therefore, in contrast to Coventry's Commercial business, where the Company could adjust premium prices if its MLR was being adversely impacted by premium prices that were too low (or claims levels that were too high), Coventry could not make such adjustments to the pricing of its PFFS plans.

### Unbeknownst to Investors, Coventry's PFFS Initiative Is
### Plagued by Significant Claims Processing Problems and Delays

72.     CW1 explained that since Coventry's PFFS business grew rapidly at first, it appeared successful on the surface.  By mid-2007 however, the surge in PFFS membership was overwhelming the Company, and creating a number of problems.  Defendants, however, failed to tell investors anything about the numerous problems that were plaguing Coventry's PFFS initiative until over a

year later – in June 2008.  Instead, they continued to tout the growth in PFFS membership and made numerous positive statements about the Company's prized new business.

73.     CW9, a former supervisor in Coventry's San Antonio, Texas call center responsible for handling PFFS enrollment and claims, stated that the Company had a number of difficulties keeping pace with the growth of PFFS, including problems enrolling new members in plans quickly enough, servicing those members, and in particular, processing provider claims in a timely manner.

74.     CW5, a former Technical Claims Specialist who reviewed and processed PFFS claims in Coventry's Houston, Texas claims center, stated that Coventry's Claims Department was overwhelmed since the inception of its PFFS business at the beginning of 2007.  CW5 explained that there was a constant backlog of claims that needed to be processed, which grew continuously throughout CW5's employment at Coventry.

75.     CW4, a former PFFS Claims Processor in Coventry's Claims Department who was hired specifically to deal with the backlog of PFFS claims, confirmed that there was a massive buildup of unprocessed claims when he/she began to work for Coventry in September 2008, which persisted through the end of the Class Period.  Both CW4 and CW5 characterized the backlog of PFFS claims as "outrageous."  CW4 likewise described the atmosphere in the Claims Department as "crazy" due to the buildup of PFFS claims.

76.     CW4 and CW5 explained that PFFS claims were categorized into "queues," such as claims for inpatient hospital care, home healthcare, and specific medical conditions.  CW4 indicated that all of these queues were "backed up," and some had a backlog of up to 90,000 claims.  CW5 confirmed that many of the claims queues were "out of control."

77.     According to CW4, it routinely took more than 45 days for a claim to be initially reviewed, let alone processed, and CW5 stated that it was not uncommon to encounter PFFS claims that were more than 100 days old.

78.     CW3, a former Provider Relations Inside Representative who assisted PFFS providers (such as doctors and hospitals) with claims resolution, corroborated these accounts, stating that shortly after he/she began working at Coventry in April 2007, the Provider Relations Department was tasked with the additional responsibility of assisting the Claims Department in tackling the massive "stack" of PFFS claims that had accumulated.  In fact, most of CW3's first year at Coventry (*i.e.*, from approximately April 2007 through April 2008) was spent dealing with the PFFS claims buildup.  CW3 and other employees in the Provider Relations Department reported the PFFS claims processing problems and delays to CW3's direct supervisor, Vice President and Operations Manager Eric Molitor, during monthly department meetings.

79.     CW5 similarly described the Houston claims office as constantly "swamped" throughout 2007 and 2008, and stated that management was aware of the claims overload.  CW5 stated that, in the beginning of 2008, Coventry opened an additional PFFS claims and customer service center in San Antonio, Texas, but the new center was unable to alleviate the backlog of PFFS claims, and the number of unprocessed claims continued to grow.

80.     CW3 stated that Coventry's Claims Processing Department suffered from understaffing, and CW5 stated that he/she and other employees in the Houston claims office frequently worked mandatory overtime.  CW4 also explained that Coventry hired a large number of claims processors in a short period of time, but provided minimal training that lasted only for a couple of days.  This lack of training amplified the problems with claims processing.

81.     According to CW4, the computer system used to process claims was severely outdated, and was DOS-based, as opposed to using a Windows-based platform.  CW4 stated that Coventry experienced periodic problems with the computer system, which exacerbated the claims processing delays.  CW5 confirmed that the computer system, called "IDX," was not Windows-based, and stated that the system was not user-friendly and required multiple steps and manual entries to process a claim.  In addition, CW5 explained that the computer system did not contain all of the CMS reimbursement rates, so processing claims often required researching and manually entering the proper rate.

82.     CW5 also explained that many of the PFFS claims were complex or old claims that required time-consuming manual input.  CW4 stated that these problems were further compounded by the fact that some claims were received and processed in paper format, while others were received and processed electronically.

83.     In addition, CW3 and CW5 stated that providers often submitted duplicate claims for the same service.  CW3 stated that this often occurred because the provider had been told by Coventry that the original claim was incorrect and instructed to resubmit the claim, only to have it denied again for the same reason.  According to CW3, when the original claim was finally reviewed, there was typically no underlying problem with the claim.

84.     CW3 indicated that providers did not receive any assistance from Coventry's Claims Department.  Further, CW3 stated that if a claim was denied because a provider had submitted it with an incorrect billing code, Provider Relations was instructed by management not to tell the provider the correct code.  As a result, CW3 routinely encountered PFFS claims that had repeatedly been improperly denied.  CW4 confirmed that while providers occasionally did not submit PFFS claims correctly, most of the problems occurred "in-house" at Coventry.

85.     CW3 explained that duplicate claims also occurred because providers would submit claims to Coventry expecting to be reimbursed within 30 days.  After 30 days had passed, the provider would call Coventry's Claims Department, which would merely instruct the provider to resubmit the claim.  CW5 stated that the queue for duplicate claims was particularly "outrageous."

86.     CW3 and CW4 stated that Coventry received a high volume of complaints from providers who had not been properly or timely reimbursed for PFFS claims that they had submitted. According to CW3, the delays in processing PFFS claims created by these problems were so severe that providers threatened to stop treating Coventry's PFFS plan members until their outstanding claims had been paid.

87.     In addition to Coventry's internal problems with processing PFFS claims in a timely manner, CW1 stated that the Company sometimes did not receive claims from providers for 90 to 120 days after the provider had treated a plan member.  CW1 stated that this issue became apparent in 2007, and CW2 confirmed that Coventry experienced delays in receiving claims throughout the Class Period.  These delays caused Coventry to under reserve for IBNR claims expenses in its PFFS business throughout the Class Period.

88.     According to CW1 and CW2, in addition to Coventry's difficulties in timely and accurately processing PFFS claims, the volume of PFFS claims that the Company was receiving was much greater than it initially anticipated.  CW2 stated that this issue was apparent by the beginning of 2008.  CW2 further indicated that many PFFS claims were coming in at higher than expected rates.  These factors meant that Coventry's PFFS plans were costing the Company significantly more than Defendants had estimated.

89.     Investors, however were left completely in the dark about the significant problems that were plaguing Coventry's PFFS business.

**Coventry's Failure to Adequately Reserve for PFFS Claims Liabilities**

90.     As alleged herein, prior to and during the Class Period, Coventry experienced severe difficulties with the processing of PFFS claims.  These difficulties, which at all relevant times were known to or recklessly disregarded by Defendants, rendered the Company's medical expense and related medical liability reserve calculations inherently unreliable and lacking in a reasonable basis.

91.     Since insurance companies (including health insurance companies such as Coventry) frequently pay claims after the end of a particular accounting period, they are required to establish a liability to account for insurance claim costs incurred by the company during an accounting period which remain unpaid at the end of the accounting period.  In determining its liability for expected claim costs, it is necessary for insurance companies to establish a reserve for those claims that are both reported to it but not paid, and those claims that have been IBNR by policyholders to the insurance company at the end of the accounting period.

92.     As a result of Coventry's deficient system of internal controls over claims processing methodology, the Company failed to timely and accurately process, quantify and record PFFS claims throughout the Class Period.  Since Coventry's IBNR calculations were based on incomplete and inaccurate data, the Company lacked a reasonable basis for estimating its IBNR reserves, and those reserves were inherently unreliable and understated.

93.     As CW1 explained, determining the appropriate level of IBNR reserves is heavily dependent upon accurately estimating the number of claims that a company will receive in a given quarter.  CW1 stated that the systematic delays with Coventry's PFFS claims caused the Company to underestimate its PFFS claim liabilities, and, in turn, to under-reserve for IBNR expenses.

94.     According to CW1, Coventry monitored its PFFS claims figures on a monthly basis, and would have compared the actual amount of claims received to projected claims levels.  CW1 stated it should have been apparent within three to four months that Coventry had initially

underestimated the level of PFFS claims, and had under-reserved for IBNR claims. CW1 further stated that Coventry's actuarial team should have analyzed the lag-time in receiving and processing PFFS claims, and should have made appropriate adjustments to IBNR reserves, to ensure that the reserves were still adequate after taking the delays into account.

95.     CW1 stated, however, that the numerous problems and delays with processing PFFS claims created an inaccurate representation of Coventry's claims liabilities for its PFFS plans, which the Company failed to timely recognize and make appropriate adjustments for. As a result, Coventry's calculation of IBNR reserves for its PFFS business was materially understated throughout the Class Period.

96.     CW2, a former Medicare Underwriting Consultant who worked at Coventry's corporate headquarters from March 2007 to May 2010, and was part of a small team responsible for underwriting Coventry's PFFS product, likewise attributed the shortfall in PFFS profits to Coventry's failure to set IBNR reserves high enough, while pricing its PFFS premiums too low.

97.     According to CW2, Coventry initially tried to absorb the higher than expected PFFS claim costs with its IBNR reserves, until it became evident that those reserves were significantly depleted and inadequate. CW1 and CW2 stated that it was apparent *by early 2008* that Coventry had had not adequately reserved for IBNR claims in its PFFS business.

98.     Ultimately, on June 18, 2008, Coventry announced a dramatic *$50 million* increase in IBNR reserves for Coventry's PFFS business, and disclosed that the adjustment included claims going back as far as the *first quarter of 2007*.

## By Early 2008, Defendants Were Aware that Coventry's PFFS Business Was Significantly Less Profitable than Expected

99.     The significant problems and delays with processing PFFS claims that Coventry experienced throughout 2007 continued and intensified during early 2008. Further, CW2 reported

that, by early 2008, it was evident that Coventry was receiving a much higher volume and expense level of PFFS claims than the Company had initially projected – meaning that Coventry's PFFS plans were costing the Company more than expected. Accordingly, CW1 and CW2 stated that it was apparent by early 2008 that Coventry had not adequately reserved for IBNR claims expenses in its PFFS business.

100.   Coventry's failure to accurately measure and adequately reserve for its PFFS claims expenses caused those expenses to be materially understated, and distorted the true MLR for Coventry's PFFS business. In reality, the MLR for Coventry's PFFS business was much higher than the Company was reporting to investors – meaning that PFFS was significantly less profitable.

101.   As a result of these factors, CW1 stated that, **by early 2008**, it was known by Coventry's executive management that "***profits were not what was expected***" for the Company's PFFS business.

102.   In fact, CW1 reported that the problems with PFFS were discussed among Coventry's executive management during its annual executive meeting, held in April 2008, in which CW1 participated.

103.   Critically, since Coventry had already submitted its 2008 PFFS plan bids to CMS during the summer of 2007, the Company was locked into the pricing of its PFFS plans for the remainder of 2008. Defendants therefore knew, or reasonably should have known, that Coventry's PFFS profits would continue to fall short for the rest of 2008.

104.   Accordingly, Defendants had no reasonable basis for their continued positive statements touting Coventry's PFFS business. Since Coventry's bullish 2008 earnings guidance was highly dependent upon the success of the Company's PFFS initiative, Defendants likewise had no reasonable basis for continuing to reaffirm Coventry's 2008 earnings projections.

105.     While Defendants were well aware by early 2008 that Coventry's PFFS business was, and would continue to be, significantly less profitable than expected, Defendants concealed that fact from investors during the first half of 2008, in order to buy time to undertake an "aggressive" internal initiative.  According to CW1, the initiative was spearheaded by Defendant Wolf, and was designed to shore up the Company's other business segments and compensate for the losses in PFFS, before Coventry was forced to announce the earnings revision that Defendants knew would be necessary.

106.     This initiative included executive management reviewing Coventry's other products "across the board," adjusting the pricing of non-Medicare products (since Coventry's PFFS prices were already fixed for 2008), and trying to slash medical costs.  CW2 also reported that prior to Coventry's June 18, 2008 earnings guidance revision, the Company began trying to transfer its PFFS enrollees to other Medicare Advantage products.

## Materially False and Misleading
## Statements Made During the Class Period

107.     The Class Period begins on February 9, 2007, when Coventry issued a press release announcing financial results for its fourth quarter and year ended December 31, 2006.  The Company also announced that it was increasing its 2007 Medicare PFFS membership growth expectations by 65%, to between 90,000 and 100,000 members.  That same day, during a conference call with securities analysts and investors, Defendants, commenting on Coventry's Medicare PFFS initiative, stated, in part:

Defendant Wolf:

On Private Fee-For-Service, our team has built a terrific new business for us.  We will likely wrap up January with something just over 70,000 new members.  We expect to exceed 85,000 new members by the end of the first quarter and somewhere between 90,000 and 100,000 members by year-end.

Defendant Guertin:

- 26 -

. . . [O]ur newest growth initiative, Medicare Private Fee-For-Service, is off to a roaring start.

\*       \*       \*

. . . [W]e are exceeding our expectations on Medicare Private Fee-For-Service, both in terms of the total membership and how quickly it is coming on board.

\*       \*       \*

From a business perspective, the most significant changes in the guidance are in the area of Medicare Private Fee-For-Service and commercial risk revenue. **_On Medicare Private Fee-For-Service, our previous guidance had assumed 50,000 to 65,000 members with associated revenue of approximately $500 million. We now believe that we will get to 90,000 to 100,000 members by year-end and produce revenue closer to $700 million._**

Partially offsetting this revenue gain is a reduced revenue outlook for commercial risk, based on the expected loss of risk membership in the first quarter of 2007. . . .

108.    During the call, when an analyst questioned Defendant Wolf about the design of

Coventry's new PFFS product, Wolf provided the following assurances:

Carl McDonald – CIBC - Analyst:

First question is on Private Fee-For-Service, and essentially, it is – does the much better-than-expected growth there make you nervous in the sense that my analysis of some of the benefit designs and rates in the Private Fee-For-Service would suggest that you guys are offering better benefits at a lower cost than many of the competitors. So, how much of that do you think is influencing the growth, as opposed to distribution or some other advantage that you think you have?

Defendant Wolf:

You know, when I was in my old job, Carl, I would have been nervous; now that I'm in my new job, I don't do nervous anymore; that's Shawn's job.

You know, all I can tell you is that I think we put a pretty attractive product on the market in Part D in 2006. It wasn't the most attractive product on the market, but it was a pretty attractive product, and it turned out we hit it just right in reaching balance between profitability and growth.

Can I ever been 100% sure that we didn't err slightly on one side or another? Of course not. But I have a high degree of confidence in our financial and actuarial teams who built this. We didn't take any different approach to it than we did in the Part D or any of our other businesses, frankly, and we are not confused about – **_in this Company about profitability comes first and growth comes second._**

- 27 -

109.    The statements referenced above in ¶¶107-08 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that Coventry was overwhelmed by the rapid initial growth in PFFS membership;

(b)     that Coventry was experiencing significant problems with timely and accurately processing PFFS claims, leading to a huge backlog of unpaid claims;

(c)     that Coventry was receiving significantly more PFFS claims than it had anticipated;

(d)     that Coventry failed to adequately reserve for IBNR claims expenses in its PFFS business;

(e)     that Coventry's failure to accurately estimate and adequately reserve for its PFFS claims expenses caused those expenses to be materially understated, and distorted the true MLR for Coventry's PFFS business;

(f)     that as a result, Coventry's PFFS business was and would be significantly less profitable than anticipated; and

(g)     that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Coventry's PFFS business, its prospects and growth.

110.    On February 28, 2007, Coventry filed with the SEC its Annual Report for the fiscal year ended December 31, 2006 on Form 10-K (the "2006 Form 10-K"), which was signed by Defendants Wolf and Guertin.  The 2006 Form 10-K contained the following representations about Coventry's claims processing infrastructure and its ability to process claims in a timely manner:

**Health Plan Information Technology**

- 28 -

We believe that integrated and reliable information technology systems are critical to our health plans' success. ***We have implemented advanced information systems*** to improve the operating efficiency of our health plans, support medical management, underwriting and quality assurance decisions and effectively service our employer customers, members and providers. ***Each of our health plans operates on a single financial reporting system along with a common, fully integrated application which encompasses all aspects of our commercial, government and non-risk business, including enrollment, provider referrals, premium billing and claims processing. Our centralized data center processes approximately 26.0 million claims annually.***

***We have dedicated in-house teams providing infrastructure and application support services to our members.*** Our data warehouse collects information from all of our health plans and uses it in medical management to support our underwriting, product pricing, quality assurance, rates, marketing and contracting functions. We have dedicated in-house teams that convert acquired health plans to our information systems as soon as possible following the closing of the acquisition.

In 2006, approximately 72.9% of our claim transactions were received from providers in a HIPAA compliant electronic data interface format. ***In 2006, our claims system auto adjudicated 80.9% of all claims.***

*       *       *

***We have typically paid 90% to 95% of medical claims within 6 months of the date incurred and approximately 99% of medical claims within 9 months of the date incurred.***

111.    The statements referenced above in ¶110 were materially false and misleading when made for the reasons stated in ¶109.

112.    On March 15, 2007, Coventry announced that it had been selected by the State of West Virginia Public Employees Insurance Agency to provide Medicare benefits pursuant to a 35,000 member PPFS employee-sponsored retiree contract, effective July 1, 2007.  As a result, Coventry announced that it was increasing its projected PFFS membership growth to 135,000 members by the end of 2007.

113.    On March 19, 2007, Defendant Guertin spoke at a Lehman Brothers Global Healthcare Conference, stating, in pertinent part:

*. . . [W]e'll exceed our expectations and probably just about anyone's expectations on private fee-for-service with 135,000 new members and new revenue in excess of $900 million this year.*

\*       \*       \*

[T]he year-over-year revenue growth of the Individual Consumer and Government Division is around 50% and this is obviously driven by the private fee-for-services business, mainly.

\*       \*       \*

*Again, this tremendous growth is also happening profitably.*

114.    The statements referenced above in ¶¶112-13 were materially false and misleading when made for the reasons stated in ¶109.

115.    On April 27, 2007, Coventry issued a press release announcing its financial results for its first quarter of 2007, the period ended March 31, 2007.  For the quarter, the Company reported operating revenues of $2.24 billion and net earnings of $121.7 million, or $0.76 per diluted share.  The press also release reported a total of 105,000 new Medicare Advantage members since the prior quarter.  In addition, Coventry reported an MLR of 82.3% for its Medicare Advantage business, which included the MLR for PFFS.  Defendant Wolf, commenting on the results, stated:

> We are right on track for another year of strong growth in revenue and earnings per share.  In the first three months of the year we announced a meaningful acquisition, repurchased four million shares, refinanced debt at favorable rates, and successfully launched Medicare PFFS.  We were able to accomplish all of these things while continuing to deliver the strong operational and financial results you have come to expect.

116.    During a conference call held later that day, Defendants commented on Coventry's PFFS business, in pertinent part, as follows:

Defendant Wolf:

*We also made significant progress in a number of areas in the first quarter.  We added almost 100,000 members in our new private fee-for-service program*.

\*       \*       \*

*On the topic du jour, MLR performance, we also did very well.*

Defendant Guertin:

. . . *Our most significant growth initiative for 2007, Medicare Private Fee for Service, is off to a roaring start*, and while still early, appears headed for a super year.

*      *      *

. . . Part D continues to be a great success story, producing both top-line and bottom-line results consistent with our expectations. *Our newest product, Private Fee for Service, appears to be positioned to follow suit.* The volume story here is pretty well understood at this stage. *We are expecting 135,000 members by year end and almost $1 billion of new revenue.* While it is still too early to declare victory on the bottom line, *the early indicators appear to be on track at this point with the MLR in the 86% to 87% range for the first quarter.*

117.    During the call, analysts asked the following questions about Coventry's new PFFS

business, and Defendants gave the following responses:

Scott Fidel – Deutsche Bank – Analyst:

And then just a quick follow-up, one just around initial utilization you're seeing in the Private Fee products, how that's looking relative to expectations and I guess relative to your other network-based MA products?

Defendant Guertin:

Yes, Scott, obviously it's still early, so it's difficult to really be definitive. *The way I've characterized that in looking at the claims submission, the claim payments, some of the other things that we can track real time, there have not been any red flags yet and so it actually appears to be tracking very well with our expectations.* Again, having said that, we are only almost four months in. So you have to be a little bit cautious. *But there is nothing that I have seen in analyzing the data that would lead me to think that we are off track.*

*      *      *

Carl McDonald – CIBC World Markets – Analyst:

Okay. And then a follow-up mechanical question on Private Fee for Service . . . . *Just trying to get a sense for what the claims lag is in that business, if it's any different than some of the other lines you're in?*

Defendant Guertin:

- 31 -

. . . *So Medicare does typically run a little bit longer lag then commercial because of the preponderance of facility claims.* And I think when we get into a steady state, *we would expect this product to run more like our Medicare product.* So that was a long way round to say, *we're probably two to three months before we have good color*, but it's a little more difficult when you're starting from zero too.

*          *          *

Josh Raskin – Lehman Brothers – Analyst:

Okay, and then just a follow-up to one of the previous questions. . . . *When would you expect to start booking in terms of quarterly report more off of claims experience as opposed to sort of actuarial estimations?*

*          *          *

Defendant Guertin:

Josh, I just want to be clear.  I mean, again, I know I'm hedging myself, but *we have spent a lot of time looking at the claim payment patterns and trying to do some other things*, and so certainly to your point, *while you're still booking largely off estimates, it is important to say that with that information set, everything has still appeared to be on track.*

118.    The statements referenced above in ¶¶115-17 were materially false and misleading when made for the reasons stated in ¶109.

119.    Coventry's financial results for its 2007 first quarter were repeated in the Company's Form 10-Q filed with the SEC on or about May 10, 2007 (the "1Q07 Form 10-Q"), which was signed by Defendants Wolf and Guertin.  With regard to Coventry's operating results, the 1Q07 Form 10-Q represented, in part:

Managed care premium revenue increased as a result of growth in our Individual Consumer and Government Business division.  This growth is primarily a result of new membership from our new Medicare Private-Fee-For-Service products and additional members in both our Medicare Part D and Medicare Advantage products. . . .

*          *          *

Medical costs increased almost exclusively as a result of new business in our Individual Consumer and Government Business division discussed above.  Medical costs as a percentage of premium revenue [*i.e.*, MLR] increased 0.3% compared with the prior year quarter.  This increase is primarily a result of the change in mix of

- 32 -

business over the prior year quarter, predominantly in our higher yield and higher medical loss ratio Medicare products driven by our new Private-Fee-For-Service members.

\*       \*       \*

Individual Consumer & Government Business Division

Government revenue increased as a result of increased Medicare-Private-Fee-For-Service membership, Medicare Part D membership, and Medicaid membership.

\*       \*       \*

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, given our individually distributed PFFS products generally do not include a pharmacy benefit.

\*       \*       \*

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare risk medical costs as a percentage of premium revenue [*i.e.*, MLR] increased over the prior year quarter as a result of the addition of new Medicare Private-Fee-For-Service business, which has a higher medical loss ratio given our individually distributed Private-Fee-For-Service products generally do not include a pharmacy benefit.

120.     With regard to Coventry's outlook for its PFFS business, the 1Q07 Form 10-Q

represented, in part:

Individual Consumer & Government Division - ***our new product for 2007, Private-Fee-For-Service, is off to a very robust start and is being offered in 43 states. By year-end, we are expecting 135,000 new members and almost $1 billion of new revenue.***

121.     The 1Q07 Form 10-Q also represented:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief

- 33 -

Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended March 31, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

122.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 1Q07 Form 10-Q.

123.    The statements referenced above in ¶¶119-22 were materially false and misleading when made for the reasons stated in ¶109.

124.    On July 31, 2007, Coventry issued a press release announcing its financial results for its second quarter of 2007, the period ended June 30, 2007.  For the quarter, the Company reported operating revenues of $2.33 billion and net earnings of $151.3 million, or $0.96 per diluted share. With respect to Coventry's Medicare Advantage business, the press release reported an increase in membership to 133,000 members, and MLR of 79.3% for the business, an improvement of 20 basis points over the prior year quarter.

125.    Later that day, Coventry held a conference call with analysts and investors, during which Defendant Guertin commented, in pertinent part, as follows:

As you have heard this morning, the second quarter of 2007 was yet another outstanding quarter for Coventry Healthcare.  While we justifiably spend a great deal of time on calls like this focusing on the bottom-line, I think it's important to keep in perspective just how strong and successful our top-line growth has been as well.  Q2 was certainly no exception to this with revenue up 20% from the same quarter a year ago.  As has always been the Coventry way, *we have produced this growth in a disciplined and profitable fashion.*

*No metric encapsulates this better than the consolidated medical loss ratio for the second quarter, which is actually down from the same quarter a year ago.  Our biggest growth initiative for 2007, Medicare Private Fee-For-Service, it is a great example of this as well.  This business performed exceptionally well in the second*

- 34 -

*quarter and is poised for a great year, exceeding our initial expectations from both a top and bottom-line perspective.*

\*      \*      \*

*More specifically, Private Fee-for-Service performance in the quarter was great and exceeded our previous expectations. We now have good visibility on membership for the year and, maybe more importantly, on first-quarter medical costs. With this visibility, we now believe that the full-year results will exceed our previous expectations from both a top-line and bottom-line perspective.*

As a reminder, *we had previously expected 135,000 members by year-end, a little less than $1 billion of revenue, and a low to mid 80s MLR.* As I stated at the outset, *this is obviously tremendous top-line growth. But this is growth produced with our usual attention to the underwriting and actuarial details, and the financial discipline we bring to all our endeavors.*

126.    During the conference call, the following exchange with securities analysts took place:

Scott Fidel – Deutsche Bank – Analyst:

*Okay. Shawn, just thinking about the better PFFS MLR guidance, can you talk about some of the specific drivers there, maybe in terms of utilization or was it more pricing actions that are driving the better results there?*

Defendant Guertin:

No, it's actually, Scott, mainly claim cost base. *For the most part, the revenue stream has come in actually extremely close to our projections, so this is really nothing more than getting a complete quarter of run-out and looking at overall utilization levels and having confidence in that with three full months of run-out. So it is primarily a better-than-expected claim cost result in the quarter.*

127.    The statements referenced above in ¶¶124-26 were materially false and misleading when made for the reasons stated in ¶109.

128.    Coventry's financial results for its 2007 second quarter were repeated in the Company's Form 10-Q filed with the SEC on or about August 8, 2007 (the "2Q07 Form 10-Q"), which was signed by Defendants Wolf and Guertin. With regard to Coventry's operating results, the 2Q07 Form 10-Q represented, in part:

- 35 -

Managed care premium revenue increased as a result of growth in our Individual Consumer and Government Business division described above. . . . Partially offsetting the increase was a decline of managed care premium revenue in our Commercial Business division, also described above.

*       *       *

Medical costs increased almost exclusively as a result of new business in our Individual Consumer and Government Business division discussed above. Medical costs as a percentage of premium revenue [*i.e.*, MLR] were unchanged from prior year period.

Medical expenses for the six months ended June 30, 2007, include approximately $111.8 million of favorable medical cost development related to prior calendar years. The favorable development in 2007 is a result of $94.8 million of lower than anticipated medical cost increases and $17.0 million higher than expected completion factors.

*       *       *

Individual Consumer & Government Business Division

Quarters and Six Months Ended June 30, 2007 and 2006

*       *       *

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. . . .

*       *       *

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business.

129.    With regard to Coventry's outlook for its PFFS business, the 2Q07 Form 10-Q represented, in part:

Individual Consumer & Government Division - *for our new product for 2007, Private-Fee-For-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end.*

130.    The 2Q07 Form 10-Q also represented as follows:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule

- 36 -

13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended June 30, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

131.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 2Q07 Form 10-Q.

132.    The statements referenced above in ¶¶128-31 were materially false and misleading when made for the reasons stated in ¶109.

133.    On September 10, 2007, Defendant Wolf, speaking at the Bear Stearns & Co. Healthcare Conference, told investors that Coventry now expected to grow its PFFS business to over 150,000 members by the end of 2007.  Wolf stated, in pertinent part, as follows:

Medicare has been a very strong organic growth business for us the last two years – 2006 in a meaningful way because of Part [D] and *in 2007 in a very meaningful way – not exclusively, but certainly No. 1 on the list – is the private fee for service growth that we have had.  Our number in the guidance is 150,000 members by year end; I think it's fairly obvious at this point that we will exceed that* . . . .

*The revenue from this business will exceed $1 billion on a runway basis, and so far so good in terms of the cost of care; we expect med loss ratios on this business for the year to be somewhere in the low to mid-80s.  By every measure, a very successful entrée [sic] for us into a business that we participated in only effective January 1 of this year.*

\*       \*       \*

*[I]t is likely that 2008 will be a year of good growth in the Medicare program.  We expect our private fee certainly to grow in a not-insignificant way in 2008.*

\*       \*       \*

- 37 -

Then just a quick couple of minutes before I close on longer-term objectives.  *We have been* quietly, or maybe not so quietly, *working to diversity this company's revenue earnings and cash flow streams for the last three years.  It has been a systematic and purposeful process of diversifying* away from pure insurance into self-funded business, *away from commercial business into government business, and so on and so forth.  That will continue.*

134.    The statements referenced above in ¶133 were materially false and misleading when made for the reasons stated in ¶109.

135.    On October 26, 2007, Coventry issued a press release announcing its financial results for its third quarter of 2007, the period ended September 30, 2007.  For the quarter, the Company reported operating revenues of $2.52 billion and net earnings of $168.7 million, or $1.08 per diluted share.  In addition, Coventry initiated full year 2008 guidance, projecting diluted GAAP earnings per share of $4.42 to $4.58, an increase of 11% to 15% over 2007.  The press release also reported a total increase of 45,000 members in Coventry's Medicare Advantage business, and a Medicare Advantage MLR of 80.7% during the quarter.  Defendant Wolf, commenting on the results and Coventry's 2008 guidance, stated:

I am pleased to present another quarter of impressive top and bottom line growth from our well-diversified portfolio of businesses.  Seeking and seizing organic and acquisition opportunities should enable Coventry to grow operating revenue by more than 25% in 2007 and approaching 30% in 2008.  This positions us well for another year of steady and reliable earnings growth in 2008.

136.    Later that day, Coventry held a conference call with analysts and investors, during which Defendants commented, in pertinent part, as follows:

Defendant Wolf:

We had another great quarter in Medicare in every respect. . . .  Overall it was just a wonderful quarter with revenues up 32% over the prior year and earnings per share up 17%.  And for the year, we will see revenue growth in excess of 25% and earnings per share increased about 15% with notable accomplishments on the strategy, finance and operation sides as well.  My compliments to the entire Coventry team on their contributions to an outstanding 2007.

\*        \*        \*

*In Medicare, our second growth driver for '08, we have now surpassed the 1 million mark in senior customers.  Clearly Medicare has been a big driver of our growth the last two years and will indeed be again in 2008.*  We will have four additional MA-PD markets among our existing health plans, *as well as continue to push private fee*, Part D, and some additional special-needs programs.  *We will undoubtedly have another terrific year in Medicare in 2008.*

Defendant Guertin:

. . . [T]he third quarter of 2007 was yet another outstanding quarter and, in fact, a record-setting quarter for Coventry Healthcare, setting marks for both quarterly revenue and earnings per share.  These results have been produced with all of the typical hallmarks of strong overall earnings quality – strong cash flow generation coupled with an increase in the days and claims payable.  *The fundamental drivers behind the quarter are also solid with revenue up over 30% from the same quarter last year and the consolidated medical loss ratio down 60 basis points sequentially. All-in-all a very strong quarter for Coventry Healthcare*.

\*          \*          \*

*The performance of our Medicare business continues to be exceptional. The favorable results we saw on the private fee-for-service business earlier this year continue to play out as we had expected.*  As a reminder, this was the first quarter for PEIA, the West Virginia state retiree account which was effective July 1.  This is the majority of the MA membership increase you see in the quarter.

\*          \*          \*

*Now turning to 2008, we are providing our initial guidance for 2008 of $4.42 to $4.58 per diluted share, a GAAP increase of 11% to 15% from our projected 2007 earnings*.

\*          \*          \*

*On Medicare we expect to add approximately 100,000 new Medicare Advantage members in 2008.*  We expect 15,000 to 20,000 in our HMO programs and *80,000 to 85,000 new private fee-for-service members, bringing our total private fee-for-service membership to 250,000*.

\*          \*          \*

*From an MLR perspective, we expect our Medicare Advantage MLR to be up approximately 200 basis points*.

137.    The statements referenced above in ¶¶135-36 were materially false and misleading when made for the reasons stated in ¶109.

- 39 -

138.     Coventry's financial results for its 2007 third quarter were repeated in the Company's Form 10-Q filed with the SEC on or about November 9, 2007 (the "3Q07 Form 10-Q"), which was signed by Defendants Wolf and Guertin.  With regard to Coventry's operating results, the 3Q07 Form 10-Q represented, in part:

> Managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions.  The growth resulted primarily from sales of new products, growth in existing products and from acquisitions. . . . Increasing membership in both our Part D and Medicare Advantage products contributed to our managed care premium growth as well.

> \*        \*        \*

> Medical costs increased almost exclusively as a result of new business discussed above.  Medical costs as a percentage of premium revenue [*i.e.*, MLR] increased 0.4% compared with the prior year quarter.  This change is discussed in detail in the segment disclosures below.

> \*        \*        \*

> Individual Consumer & Government Division

> Quarters and Nine Months Ended September 30, 2007 and 2006

> \*        \*        \*

> The increase in gross margin was driven by the increased business discussed above and was offset by the increased medical costs associated with this increased business.

> \*        \*        \*

139.     The 3Q07 Form 10-Q also represented:

> We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

> There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended September 30, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

140.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 3Q07 Form 10-Q.

141.    The statements referenced above in ¶¶138-40 were materially false and misleading when made for the reasons stated in ¶109.

142.    On November 27, 2007, speaking at the Merrill Lynch Health Services Investor Conference, Defendant Guertin told investors that Coventry's PFFS initiative would continue to generate growth for the Company in 2008, and that Coventry expected to add a total of 100,000 new Medicare Advantage Members in 2008, including 80,000 new PFFS members.  Guertin stated, in pertinent part, as follows:

> The second part of the formula was seizing on organic growth initiatives. In 2006, that was Part D.  *In 2007, that was Medicare private fee-for-service. That has been a spectacular success so far this year*.
>
> \*       \*       \*
>
> *Looking at 2007 – I touched on this – Medicare private fee-for-service has been extremely successful.  It's not often in business that you have a chance to develop a new revenue source that in its first year produces over $1 billion of revenue*.  You do that with an investment in the prior year of about $7 million or $8 million.
>
> *So on the top line, this has exceeded our initial expectations, and most importantly, it has also performed on the bottom line as well for us this year. So this is great. This is something that we think the momentum will continue into 2008 as well.*
>
> \*       \*       \*
>
> Looking at the growth drivers [for 2008], government programs is expected to continue to be a significant growth driver.  *We expect to add over about 100,000 new Medicare Advantage members next year.  About 20,000 of those we'd expect to be in our Medicare HMO products, and the balance coming in the Medicare private fee-for-service arena*.
>
> \*       \*       \*
>
> Long-term outlook – what does this all mean for you?  We hope, and we think with where we are now, that this will lead to a stable and predictable outcome at the end of the day in terms of EPS.  *You've heard us talk for a long time about being very*

*price-disciplined, pricing at least to medical cost trend.  That continues to be our philosophy, and our ability not to chase membership and hold margin as the better economic play, and I think those two things fuel the stability and predictability.*

143.    The statements referenced above in ¶142 were materially false and misleading when made for the reasons stated in ¶109.

144.    On January 7, 2008, in two separate press releases, Coventry re-affirmed its earnings expectations of $4.42 to $4.58 per diluted share for full year of 2008, and announced that the Company had been selected by the Pennsylvania Employee Benefit Trust Fund to provide Medicare benefits pursuant to a 50,000 member PFFS employee-sponsored retiree contract, effective April 1, 2008.  Coventry also affirmed its projected growth of 100,000 new Medicare Advantage members in 2008.

145.    Later that day, speaking at the JP Morgan Investor Conference, Defendant Wolf continued to make positive statements about the growth and future potential of Coventry's PFFS business:

> *. . . [C]ertainly the noteworthy event of 2007 was the Private-Fee-for-Service Business, where we grew from zero to in excess of 150,000 members. So, very successful launch for us in Private-Fee-for-Service.*
>
> *        *        *
>
> *Private Fee will have another terrific year for us in 2008.*
>
> *        *        *
>
> In the interest of giving everybody an update relative to our Medicare enrollment expectations for 2008, just a refresher.  *We expect or built into guidance about 100,000 members net growth in Medicare Advantage lines*, not Part D – excluding Part D, but the core Medicare Advantage lines, split between Coordinated Care, Medicare, Private-Fee-for-Service, both on the Individual and Employer side.
>
> *We are reaffirming with confidence but not changing that [100,000] at this point*, so let me update you on just some of the trends.
>
> First, most notably, and I'm delighted that this happened.  You may recall last year that the first state to provide for its retirees a replacement Private-Fee-for-Service

offering was West Virginia, and – about 35,000 retirees – and we were awarded that business on a sole-source basis.

**The second state that I know of has moved.  It is Pennsylvania, and we have newly been awarded that business as well.  It represents about 50,000 employer-based Medicare members, and it will be effective on 4/1.**

*        *        *

**. . . Obviously, as this demonstrates, as we have said all along, the Employer pipeline for Medicare, Private-Fee-for-Service remains robust.**

146.    The statements referenced above in ¶¶144-45 were materially false and misleading when made for the reasons stated in ¶109.

147.    On February 8, 2008, Coventry issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2007.  The Company reported operating revenues of $2.79 billion and net earnings of $184.3 million, or $1.18 per diluted share, during the fourth quarter of 2007 and total revenues of $9.88 billion and net earnings of $626.1 million, or $3.98 per diluted share, for the year ended December 31, 2007.  Coventry also reported Company-wide membership growth of 566,000 members from the prior year, a 13.8% increase.  With respect to Coventry's Medicare Advantage business, the press release reported an MLR of 80.1% for the quarter, and 80.5% for the full year 2007.  For the full year 2008, Coventry affirmed its projected earnings per share of $4.42 to $4.58, and projected consolidated revenues of $12.35 billion to $12.90 billion and Company-wide consolidated MLR of 80.0% to 80.5%.  Defendant Wolf commented, in pertinent part, as follows:

> Coventry's 2007 results were characterized by strong financial and operational performance, with the fourth quarter as no exception.  Our 2007 organic growth initiatives and capital deployment activities have positioned us well for another year with industry-leading revenue growth and steady and reliable earnings results.

148.     During a conference call held that day, Defendant Wolf commented on the

membership growth of Coventry's Medicare Advantage business, including its PFFS business, as

follows:

Defendant Wolf:

On the Medicare Advantage side . . . *we've added approximately 23,000 net members in early January across private fee-for-service and Medicare coordinated care products. In addition, we know of 5,000 to 10,000 more net adds since the cutoff of that data. And these, in conjunction with the large group sale for April 1, bring us to approximately 80,000 known net adds against our target of 100,000*.

149.     Wolf also offered the following characterizations of Coventry's business model:

Thirdly about our company, and lastly, is the *financial discipline and execution. Whether it's our motto about best margins and acceptable growth, or low-cost wins, or the strong financial control over our underwriting processes, we remain committed to the same kind and levels of discipline, stability and predictability we have demonstrated for many, many years*.

150.     Also during the conference call, Defendant Guertin discussed Coventry's claims

processing and reserving with respect to its PFFS business, stating, in pertinent part, as follows:

*The other Medicare related item pertains to the receipt and processing of claims in the private fee-for-service business. As a result of our rapid membership growth* during the first two quarters of the year, and then the addition of 35,000 PEIA members at the beginning of the third quarter [of 2007], *we were incurring medical expense faster than the rate of claims submission and claim payment. The result of this was a buildup of reserves during this period, and is evident in looking at our DCP [Days in Claims Payable] metric for the previous couple of quarters. During the fourth quarter, the receipt of claims began to catch up with the increased membership, and we made a concerted effort to increase our overall claim processing speed through both a substantial reduction in claim inventory and accelerating the rate at which we paid new claims once we received them. The result of this effort led to significantly more paid claims in the current quarter, impacting both cash flow from operations and the needed reserve level on private fee-for-service*. . . .

\*          \*          \*

*You can also see in the press release that the ratio of cash flow from operations to net income for the fourth quarter is lower than usual.* I would point out that quarterly numbers can bounce around a bit, both good and bad. *But in this case it is*

- 44 -

*almost entirely explained by the private fee-for-service claim push in the quarte*. . . .

\*       \*       \*

. . . *[W]e still expect to add 100,000 Medicare Advantage members during 2008.*

\*       \*       \*

In conclusion, fourth quarter 2007 was yet another strong, record-setting quarter for Coventry Healthcare.  At the core, our businesses continue to perform very well, as evidenced by the updates to the operating elements of our guidance. *We are affirming our earnings guidance for 2008*, and continue to feel good about our positioning and the many, many different growth drivers we have at work.

151.    During the call, an analyst directly questioned Defendants about the claims processing and reserve issues in Coventry's PFFS  business.  The following exchange took place:

Carl McDonald – Oppenheimer – Analyst:

Thank you.  *The question is on the private fee-for-service claims payment acceleration.  As you actually paid those claims, how did that compare to the reserves that you estimated, and was there any intra-year development?*

Defendant Guertin:

*It wasn't material.  And that's why actually I took a lot of comfort in it, in that we went through that and our reserves were fine, kind of even post that payment.  So when we look out the back window now, obviously, we have pretty good clarity on that, looking at the first nine months of the year.  And that still looks good, and I think that's sort of evidenced by looking at our overall MA loss ratio for the quarter.*

Defendant Wolf:

Let me just elaborate on one part about that. I know it's underlying your question. As most people will remember, we only provide roll forward once or twice a year, and not on a quarterly basis.  But I think I would feel comfortable in making the statement, as we have other times before, that our prior period and roll forward experience has been consistent for a long, long time, and hasn't changed.

152.    The statements referenced above in ¶¶147-51 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

- 45 -

(a)     that due to Coventry's failure to accurately measure and adequately reserve for its PFFS claims expenses, those expenses were materially understated;

(b)     that since the first quarter of 2007, Coventry had not adequately reserved for IBNR claims expenses in its PFFS business, and would be forced to materially shore up those reserves;

(c)     that the true MLR for Coventry's PFFS business was significantly higher than reported;

(d)     that Coventry's PFFS business was less profitable than expected;

(e)     that since Coventry was locked into its 2008 PFFS premium prices, the PFFS business would continue to fall short of profitability expectations for the remainder of 2008;

(f)     that Coventry's 2008 earnings guidance was heavily dependent upon the success and profitability of PFFS; and

(g)     that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Coventry's PFFS business, its prospects and growth.

153.    Coventry's financial results for its 2007 fourth quarter and fiscal year were repeated in the Company's Form 10-K filed with the SEC on or about February 28, 2008 (the "2007 Form 10-K"), which was signed by Defendants Wolf and Guertin.  In the 2007 Form 10-K, Coventry continued to make positive representations about the Company's claims processing infrastructure and its ability to process claims in a timely manner:

**Information Technology**

We believe that integrated and reliable information technology systems are critical to our success. ***We have implemented advanced information systems to improve our operating efficiency***, support medical management, underwriting and quality assurance decisions and effectively service our customers, members and providers. ***Each of our health plans operates on a single financial reporting system along with a common, fully integrated application which encompasses all aspects of our***

*commercial, government and non-risk business, including enrollment, provider referrals, premium billing and claims processing.*

*We have dedicated in-house teams providing infrastructure and application support services to our members.* Our data warehouse collects information from all of our health plans and uses it in medical management to support our underwriting, product pricing, quality assurance, rates, marketing and contracting functions. We have dedicated in-house teams that convert acquired companies to our information systems as soon as possible following the closing of the acquisition.

In 2007, approximately 71.7% of our claim transactions were received from providers in a Health Insurance Portability and Accountability Act of 1996 ("HIPAA") compliant electronic data interface format. In 2007, our claims system auto adjudicated 81.7% of all claims.

*       *       *

*We have typically paid 90% to 95% of medical claims within six months of the date incurred and approximately 99% of medical claims within nine months of the date incurred.*

154.    With regard to Coventry's operating results, the 2007 Form 10-K represented, in part:

Medical costs increased almost exclusively as a result of new business in both our Individual Consumer & Government Division and Commercial Division discussed above. Medical costs as a percentage of premium revenue ("medical loss ratio") increased 0.3% from the prior year as a result of slightly higher medical loss ratios, associated with acquired businesses and from our new Medicare PFFS business which has a slightly higher medical loss ratio than our overall business.

155.    The 2007 Form 10-K also represented:

Coventry's management, including the principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting (as defined in Rule 13a-15(f) under the U.S. Securities Exchange Act of 1934) is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (3)

- 47 -

provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Coventry's management has performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Controls - Integrated Framework, and believes that the COSO framework is a suitable framework for such an evaluation. Management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

\*       \*       \*

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 ), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer.  Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

156.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 2007 Form 10-K.

157.    The statements referenced above in ¶¶153-56 were materially false and misleading when made for the reasons stated in ¶152.

158.    In a March 17, 2008 press release, Coventry announced a slight downward revision of its 2008 EPS guidance, due to influenza-related medical costs in the first quarter of 2008, and lower investment returns due to Federal Reserve interest rate cuts.  For 2008, Coventry projected diluted earnings per share of $4.39 to $4.50, consolidated revenues of $11.99 billion to $12.49 billion, and Company-wide consolidated MLR% of 79.9% to 80.3%.  The press release emphasized the

continued positive outlook and performance for Coventry's business, stating, in pertinent part, as

follows:

> BETHESDA, Md.–(BUSINESS WIRE)–March 17, 2008–Coventry Healthcare, Inc. (NYSE: CVH) today announced that, after completing an analysis of financial results through February 2008 and a thorough review of each of the Company's lines of business, the Company expects full year GAAP earnings per share (EPS) on a diluted basis of $4.39 to $4.50, or growth of 10% to 13% from 2007.  While still early in the year, the Company is pleased to report that all lines of business are performing well and that **the underlying fundamentals continue to be sound.**

> *    *    *

>     – **The Company has experienced positive development on the December 2007 medical claims reserves at a level consistent with the Company's expectations.  Therefore, based upon data from the first two months of 2008, the Company's estimates of medical costs incurred in 2007 appear to have been accurate.**

> *    *    *

>     –  The Company has added approximately 29,000 Medicare Advantage members in the first two months of 2008 and forecasts Medicare Advantage performance consistent with previous expectations, excluding the impact of influenza-related costs in Q1 2008 as  discussed below.

> *    *    *

> Accordingly, the Company is providing revised consolidated guidance for full year 2008 as follows:

> *    *    *

> – Consolidated revenues of $11.99 billion to $12.49 billion

> – Consolidated MLR% of 79.9% to 80.3%

> – Cost of sales expense of $160.0 million to $180.0 million

> *    *    *

> – GAAP EPS on a diluted basis of $4.39 to $4.50

159.   Defendant Guertin commented, in pertinent part, as follows:

Not withstanding the downward adjustment to our full year EPS range, we are very pleased with the consistent performance and strong, fundamentally sound positioning

of our on-going businesses.  We continue to feel confident about each of our business lines, the results of our recent acquisitions, the success of our organic growth initiatives and our long term strategic positioning.

160.     The next day, on March 18, 2008, Defendant Guertin spoke at the Lehman Brothers 10th Annual Global Healthcare Conference.   At the conference, Guertin affirmed Coventry's positive outlook for its Medicare Advantage business:

> *. . . . Our fundamental outlook on Medicare Advantage is unchanged. We are tracking well, toward 100,000 member growth target, and when you look at the medical costs on this line, and you tease out some of the effects of the flu you see, the trend line, the medical loss ratio looks just fine here on Medicare Advantage.*
>
> \*        \*        \*
>
> *Medicare Advantage as I mentioned, we're on target for 100,000 member growth target.  We are up 29,000 members through February.* . . .  Most of you are probably aware that the Pennsylvania State retiree account is coming on line on 5/1, and between those two, we should be right around 80,000 members if I don't even add anything else in for the rest of the year towards our target.  So that continues to feel good.  No new surprises there and all in all a good story.  Likewise, similar to commercial, *we have gone ahead and looked at the forecast for the timing during the year of new sales.  We have looked at the premium per member yields that are coming in for the first two months and have ripped that through our guidance as well*, and you will see in that there.  As I mentioned the flu, to no surprise those pressures are a little more pronounced in Medicare but when you tease that out again, *the cost trends here in the MLR are still entirely consistent with the expectations that we had two months ago.*

161.     The statements referenced above in ¶¶158-60 were materially false and misleading when made for the reasons stated in ¶152.

162.     On April 25, 2008, Coventry issued a press release announcing its financial results for its first quarter of 2008, the period ended March 31, 2008.  For the quarter, the Company reported operating revenues of $2.94 billion and net earnings of $125 million, or $0.81 per diluted share.  Coventry also reiterated its 2008 guidance.  In addition, the Company reported an increase of 36,000 members Medicare Advantage members, and a Medicare Advantage MLR of 82.8% during the quarter.  Defendant Wolf, commenting on the results, stated:

Consistent with our comments in mid-March, *we are pleased to confirm that our businesses continue to perform well and are fundamentally sound.* We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future.

163.     Later that day, during a conference call with analysts and investors, Defendants made

the following positive representations about Coventry's business:

Defendant Wolf:

So, why so confident, at least with respect to Coventry? *First, we have the operational controls, low-cost position, financial discipline and organizational backbone to continue to grow operating earnings. . . . Variations in medical cost trends generally do not happen quickly and given the progress in analytics within the industry, will be pretty closely anticipated in pricing.*

*      *      *

*It makes no economic sense to chase market share at the expense of pricing discipline.* I'm reasonably confident that that's understood across the industry, *but I'm absolutely certain that it's understood at Coventry. . . . [W]e will not sacrifice margin at the expense of market share. . . .*

*      *      *

*At Coventry, Medicare revenue now exceeds 30% of the Company's revenue. We are committed to this business for the long run, and most importantly, as in all our businesses, committed to be a low-cost provider of these products* and services to seniors. Wherever the twists and turns go *as a low-cost provider, we will be competitively advantaged, both as to growth and/or profitability.*

Defendant Guertin:

. . . *On Medicare Advantage, our goal was to add 100,000 members this year, and with 36,000 members in the first quarter and the state of Pennsylvania account coming on in May, we are well on our way towards achieving this objective.*

Bottom-line performance continues to be strong as well. Part D has come in more or less right on where we expected in Q1, as has Medicare Advantage. I won't belabor them, but similar to my remarks on commercial, *there are many attributes of how we approach this business that have led to our consistent level of high-performance in this area – a single operating system and data warehouse behind our risk business; the consistency of the people and the process over time; having realistic financial expectations and guidance from year-to-year; and most importantly, an unrelenting focus on the details and fundamentals behind these products.*

164.    The statements referenced above in ¶¶162-63 were materially false and misleading when made for the reasons stated in ¶152.

165.    Coventry's financial results for its 2008 first quarter were repeated in the Company's Form 10-Q filed with the SEC on or about May 12, 2008 (the "1Q08 Form 10-Q"), which was signed by Defendants Wolf and Guertin.

166.    With regard to Coventry's operating results, the 1Q08 Form 10-Q represented, in part:

> Managed care premium revenue increased in both our Individual Consumer & Government and Commercial Divisions. . . .
>
> *       *       *
>
> Medical costs increased almost exclusively as a result of new business in both our Individual Consumer & Government Division and Commercial Division discussed above.  Total medical costs as a percentage of premium revenue ("medical loss ratio") increased 0.6% from the prior year quarter as a result of a higher medical loss ratio in the current quarter for our Commercial and Medicare Part D businesses.
>
> *       *       *
>
> Individual Consumer & Government Division
>
> Individual Consumer & Government Division revenue increased from the prior year quarter as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.
>
> *       *       *
>
> The increase in gross margin was driven by the membership growth, both organic and acquired, as discussed above, partially offset by the increased medical costs associated with this membership growth.

167.    With regard to Coventry's outlook, including the outlook for its PFFS business, the 1Q08 Form 10-Q represented, in part:

> We are forecasting growth in diluted earnings per share of 10% to 13% in 2008.
>
> *       *       *

- 52 -

Individual Consumer & Government Division - This division is expected to have another year of strong growth.  We expect continued growth in Medicare Advantage in 2008 and we are expecting 100,000 new members in 2008, including a large group effective May 1, 2008.

168.    The 1Q08 Form 10-Q also represented:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended March 31, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

169.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 1Q08 Form 10-Q.

170.    The statements referenced above in ¶¶165-69 were materially false and misleading when made for the reasons stated in ¶152.

171.    On May 21, 2008, Defendant Guertin, speaking at the Citigroup Healthcare Conference, once again praised the growth of Coventry's Medicare Advantage business:

> ***Starting with Medicare, this has obviously been an area of focus and great success for Coventry, and 2008 is absolutely no exception. . . .  [Y]ou can see that we're well on our way with 90,000 net adds in Medicare Advantage to achieving our goal this year of adding 100,000 Medicare Advantage members.***

172.    The statements referenced above in ¶171 were materially false and misleading when made for the reasons stated in ¶152.

**The Truth Begins to Emerge**

173.   On June 18, 2008, Defendants finally began to reveal that, in contravention to their positive statements, Coventry's key PFFS initiative was significantly less profitable than expected, and would not be able to generate the future growth that Coventry and its investors had been counting on.   That day, Coventry issued a press release announcing that it was lowering its full year 2008 earnings guidance by 17%, from $4.39 to $4.50 per share, to $3.65 to $3.75 per share.   The Company also reduced its second quarter earnings guidance.   The press release disclosed, in pertinent part:

> Based upon trends that have been observed during the second quarter, as detailed below, the Company expects second quarter diluted earnings per share (EPS) in the range of $0.55 to $0.57 and full year diluted EPS in the range of $3.65 to $3.75.
>
> *        *        *
>
> Based upon a review of each line of business, the Company has observed and quantified the following developments contributing to the revised expectations and guidance:
>
> – Medicare Advantage Medical Loss Ratio (MLR).   ***The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-Service (PFFS) business.   The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-based Medicare Advantage products.   As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million.   The Company is forecasting the overall Medicare Advantage MLR to be between 87.2% and 87.6% for the first half of 2008, inclusive of the negative development outlined above and a revised view on 2008 PFFS performance.   The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008.   The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.***
>
> *        *        *
>
> – Other Modifications. The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%.   The reduction

- 54 -

in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and ***an anticipation of Medicare Advantage membership growth in 2008 of approximately 90,000 members compared to a previous forecast for growth of 100,000 members.***

*      *      *

The following table summarizes the estimated impact of these items as measured against the midpoint of previously provided Company guidance:

| | |
|---|---|
| Previous Midpoint of 2008 diluted EPS guidance range: | $ 4.44 |
| **Revised view of Medicare Advantage MLR (midpoint up 320 bps)** | **($ 0.42)** |
| Commercial Group Risk MLR estimate increased from 78.8% to 80.3% | ($0.32) |
| Net impact of other operating modifications | ($ 0.09) |
| Change in non-operating items | $ 0.09 |
| Revised Midpoint of 2008 diluted EPS guidance range: | $ 3.70 |

174.    Defendant Wolf, commenting on the earnings revision, stated:

We are very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year.  We have implemented corrective actions that we anticipate will put us back on an acceptable EPS growth path for 2009 and beyond.

175.    Later that day, Defendants held a conference call with analysts and investors to discuss the downward revision in guidance.  During the call, Defendants attributed the spike in MLR and the huge $50 million reserve increase in Coventry's PFFS business to delays in receiving claims from providers, stating, in pertinent part, as follows:

<u>Defendant Guertin:</u>

I'll start off my comments related to our Medicare private fee-for-service business. ***The issue here, to a large extent, starts and ends with the fact that the lag in claims submission on this product is substantially longer than we had assumed at the end of 2007 and, for that matter, substantially longer than what we experienced on our Medicare Advantage HMO business.***  By no means do I intend to minimize the issue or my disappointment in the outcome, but it's important to understand that, at its heart, ***this is more an issue about reserving and internal operations than it is about core product fundamentals.***  Having said that, this is an area where we have historically performed very well, and we should have done much better than we did. To no surprise, a part of the issue here has to do with better education and

coordination with both providers and members.  Let me give you an example of what I mean here.

*We've discovered that, too many times, our members go to a provider and present their traditional Medicare card as opposed to their Coventry private fee-for-service card.  This creates a chain of events whereby the provider incorrectly submits the claim to the Medicare fiscal intermediary.  The Medicare fiscal intermediary rejects the claim and tells the provider – This member is covered by an MA plan. Providers have told us that this can take 30 to 60 days to get this notice.  To make matters worse, this notice doesn't tell the provider which MA plan the member is covered by.  And then the provider has to track down the member, get the correct information, and only then finally submit the claim to us for processing.  In total, issues like this can add months, as opposed to days, to the claims submission and processing timeline.*

Member and provider education is an area we have worked on since the inception of the product but, clearly, an area we will need to continue to work on going forward.

*In the spirit of full disclosure, we have also found a number of things that we could do better as well.  Not entirely surprising for a new product, but, over the past few weeks, we have discovered some issues regarding our own processing that were not only creating delays in the claim payment process but also creating some gaps in our analytics around understanding the true claim lag on this product.* Needless to say, we have already moved to put these fixes in place.

Let me now turn to the financial details behind this issue.  *The first implication of this is that we expect to experience $50 million of unfavorable reserve development in 2008 that is related to calendar year 2007, the majority of which developed in the first two months of the second quarter.  The second implication of this is that, since 2007 now appears $50 million worse than we previously expected, the run rate medical loss ratio coming into 2008 is higher than we had previously assumed.*

*As a result of these two factors, our outlook for the 2008 GAAP MLR on private fee-for-service is up approximately 600 basis points from prior guidance.  This result, when combined with our Medicare Advantage HMO business, where our MLR outlook is unchanged from prior guidance, results in the total Medicare Advantage MLR being up 300 to 340 basis points from prior guidance, expecting this to settle out between 85.5% and 85.9% for full year 2008.*

*I'd like to give you a bit more insight into the run rates on Medicare Advantage going forward.  As mentioned previously, we expect the combined Medicare Advantage MLR for 2008 to be between 85.5% and 85.9% on a reported basis.  If you back the $50 million of unfavorable development out of the current year, you'd get a loss ratio a little over 84% as the run rate going forward.  Within this run rate, you would see that the HMO business is performing in the low 80's, and the private fee-for-service business is performing in the high 80's.  Finally, it's*

- 56 -

*important to keep in mind that private fee-for-service is still a fundamentally sound and profitable product at this loss ratio level.*

\*      \*      \*

Again, by no means do I intend to minimize these two issues; nor can I express the level of my disappointment related to these two developments. In fact, both of these are in areas that are near and dear to me personally. Having said that, *I believe we have taken the prudent approach here to prevent these items from being a drag in the future and get us back on track for EPS growth in 2009 and beyond.*

\*      \*      \*

Defendant Wolf:

*First, on private fee, there's really nothing here about the performance of the business or its prospects.  It is performing even after these adjustments at a level at or better than our pricing assumptions.  It is simply not as good as we thought it was, and we didn't know that until now, due to the elongated claim patterns*, as Shawn outlined.

\*      \*      \*

So, in terms of what we're doing about it, three things need to happen here.  *One, we need to improve the timeliness of our claim recognition on private fee.  We have and will work more on the external piece. But there is a limited ability to influence the perfection of the ID card process among beneficiaries and providers.  And we will fix the internal piece.*  Second, we will adjust commercial pricing.  As we said, some is done; more to follow.  And, third, given these developments, we need to further strengthen our management of our own G&A within the Company.  Just before this call, we implemented actions across the Company in both the staffing and non-salary areas to further tighten our already leading cost positions.

Overall, we take the need for immediate corrective actions very seriously, and we believe we have acted as such. Fundamentally, however, let me be clear – our businesses our sound, our market positions are strong, and execution remains solid. We remain optimistic for the future.

176.    During the call, analysts pressed Defendants about their explanations for the newly-revealed claims delays.  The following exchanges took place:

Justin Lake – UBS – Analyst:

Okay.   And just a quick question on private fee-for-service and the claims recognition.  I think you did mention that some of your processes need to be improved there as far as bringing those claims and getting them processed.  But *you talked a little bit about the provider recognition and getting the process and being*

*kind of 30 to 60 days behind as they find out where these guys are actually insured.*
Why would that –?  *Given that you were in private fee-for-service for the full 12 months in 2007, why would that be a late-year event?  Wouldn't your completion factors kind of have seen that type of issue before the end of the year?* . . .

Defendant Guertin:

A couple of things there.  *The problem is that, in the first year of a product, especially when you're rapidly adding membership, and, as you guys remember, we had some ups and downs in inventory, the claim lag factors are very difficult to use and, frankly, don't have a lot of credibility.*  Your point is valid, though.  I share the example with you not to, per se, explain the problem as much as to sort of explain some of the factors behind the length of the lag.  *At the end of the day, this comes down to the fact that the lag was longer than we were sort of estimating it by both looking at the factors and looking at some other metrics.  And I mentioned there are some internal things that not only have to do with claim processing speed but have to do with our insight into the claim processing of this and the analytics around that that we've discovered needed to be improved.  And, in my ways, that is equally as important an issue in terms of how we found ourselves in the position that we were in.*

* * *

Charles Boorady – Citigroup – Analyst:

*I just want to be clear on the delayed cycle time.  Is that something you were already aware of, but it took you longer to identify the higher cost trend because of it?  Or did you just discover recently that the difference between the incurred date and the pay date was a lot longer on private fee-for-service than you previously thought?*

Defendant Guertin:

I want to be clear.  *There's not a cost trend problem in the private fee book.*  I would think of it more as sort of a recognition of sort of where we really were performing last year.  *We have certainly always been building in longer cycle times on the product.  It has just proven to be even longer than, I think, we even imagined that it could be.  And, again, I don't want to blame everything on the cycle time because, to some extent, to your point of your question, we were aware of that.  There are some things internally that we discovered over the last few weeks that were sort of an analytic gap that we had in terms of understanding the cycle time better.*

Charles Boorady – Citigroup – Analyst:

*Can you be more specific about that?  Was it related to the change in your technology, or was it just somebody not looking at a report that was already being produced?*

Defendant Guertin:

*It actually – It had to do, Charles, with claims –* As you know, in the product, we are required to pay just as Medicare does. *And what we had discovered is that a sizeable number, in dollar amount of claims, had been denied because certain Medicare-required elements were missing from the claim. But they weren't denied because we weren't going to ultimately be liable for them; they were just denied because they had come in without that. Well, the simplest way to think about it is they sort of went in and out of our system and looked like a denied claim, and we never saw them as inventory. And so, when we kept assessing the reserve, we sort of didn't know that this liability was out there is the best way to think about it. And we've sort of torn this apart, needless to say and have discovered and now have been able to quantify what that potential liability is and have built that into our estimates. So, again, that's an interesting problem, because, per se, nobody was doing anything wrong in operations; they were doing what they were supposed to do. But where it sort of broke down was making sure that we had an understanding of that potential liability in the reserve-setting process.*

Charles Boorady – Citigroup – Analyst:

I see. And the fix to this?

Defendant Guertin:

Well, the fix is we know – *The fix is that you can be assured that we know more about the private fee-for-service claim processing than we ever wanted to know. But we now have very detailed analytics about all of the claims that are denied for this reason.*

I want to point out, too, that this is not something new on private fee-for-service. We have administrative denials all the time on commercial, on Medicaid, on Medicare Advantage HMO. *It was really the level of administrative denials here was much higher than we had on our other products. And then, to some extent, we developed a blind spot in sort of assessing the potential liability on this until we tore this apart.*

Defendant Wolf:

I'll just add to that. *Because your lag factors, Charles – They anticipate, if you will, the same level or proportion of administrative denials as you have had on your other products and processes over time – And so, if you get a new product, which, for whatever reason, has a higher level of denials, unless you make a specific adjustment for that, your lag factors will understate it.*

\*     \*     \*

Charles Boorady – Citigroup – Analyst:

- 59 -

*And based on the longer cycle time, are you changing any assumptions on reserving, such as booking a higher contingency for adverse developments?*

                \*       \*       \*

<u>Defendant Guertin</u>:

*I would actually say that the best estimate we have right now is that we will be higher than our sort of typical product is at the end of the second quarter.*

                \*       \*       \*

<u>Charles Boorady – Citigroup – Analyst</u>:

Got it.  Okay. Just a last question.  *How are your assumptions on private fee-for-service for . . . '08 changing now as a result of what you learned about '07?*  Are you just bumping up the baseline trend assumptions based on how much higher '07 was than you thought?  Or is there–?  Is it prudent to throw in some additional contingency, considering the change in lives this year from last year?

<u>Defendant Guertin</u>:

We pushed up the base, and we added some contingency for deterioration.  And, obviously, there were multiple factors that went into our thinking on that.  And that was sort of what we observed on the MS-DRGs, for example.

<u>Charles Boorady – Citigroup – Analyst</u>:

. . . *How far back did the $50 million go into '07?  Was that all third and fourth quarter?*

<u>Defendant Guertin</u>:

No.  It's more weighted there, but *we are still paying and receiving claims back into the first quarter of '07.  So there is movement all the way back through the quarters.*

     177.    Also during the call, an analyst asked Defendant Guertin about the increase in MLR attributed to the PFFS claims problems, and the Company's expectations for MLR going forward:

<u>Matthew Borsch  – Goldman Sachs – Analyst</u>:

. . . And your outlook on the – Turning to the private fee-for-service product with the outlook for high 80s M[L]R, my understanding is that that's where a few of your competitors have been for a while.  In retrospect, is that now the right run ratio to be for this product rather than the numbers that you guys had assumed earlier?

Defendant Guertin:

I think that's right.  As Dale mentioned, ***even with the $50 million of restatement, this product probably performed in the mid 80's.  In '08, to your point, we are now forecasting it up in the high 80's, and that is very consistent with our pricing target.  So I think that is a fair way to think about where this product will be going forward.***

178.    In response to these announcements, the price of Coventry common stock declined by more than 22%, from $40.00 to $31.30 per share, on very heavy trading volume.

179.    These announcements began to apprise investors of the shortfall in profitability in Coventry's PFFS business.  Defendants, however, continued to downplay the severity of the problems, *inter alia*, by attributing the $50 million increase in IBNR reserves and higher MLR in Coventry's PFFS business to delays in claims being received from providers, which had purportedly led to an influx of claims during the quarter.  In contrast to Defendants' proffered explanation, however, as detailed herein, Coventry was experiencing in-house delays and problems with processing PFFS claims throughout the Class Period.  Further, Coventry's MLR for its PFFS business continued to be understated.  As a result, investors still did not know the full truth about the failure of Coventry's PFFS initiative.

180.    On July 25, 2008, Coventry issued a press release announcing its financial results for its second quarter of 2008, the period ended June 30, 2008.  For the quarter, the Company reported operating revenues of $2.98 billion and net earnings of $83.2 million, or $0.55 per diluted share. Coventry also reported a significant spike in MLR for its Medicare Advantage business, reporting MLR of 93.2% for the quarter.  With respect to 2008 guidance, Coventry affirmed its revised full year 2008 projections of diluted earnings per share of $3.65 to $3.75, and projected Company-wide consolidated MLR of 81.75% to 82.10%.

181.    Later that day, Coventry held a conference call with analysts and investors to discuss the Company's quarterly results, during which Defendant Guertin stated, in pertinent part, as follows:

Defendant Guertin:

*Let me now turn to Medicare private fee for service. The story related to prior-year reserve development is unchanged from June. As we told you then, we've experienced approximately $50 million of unfavorable reserve development year to date, the majority of which was experienced in April and May, and that is still the situation as of the end of the second quarter. As you have seen in the press release, the total Medicare Advantage MLR for the quarter is a little higher than the range we estimated in June. The driver here is the decision to continue taking a prudent approach in booking current-year expense based on what we observed in the June paid claims.*

The big picture story here is still the same. *The Medicare private fee for service business is still a fundamentally sound and profitable product expected to produce a run-rate medical loss ratio in the high 80s for 2008. When combined with the Medicare Advantage HMO MLR in the low 80s, this results in a run-rate MLR in the mid 80s for Medicare Advantage in total.*

*        *        *

*The other item has to do with all the moving parts in private fee for service this quarter.* The short story here is that with all the prior-period paid claim expense recognized in the current quarter. This metric is artificially depressed because the incurred expense on the income statement is inflated above normal levels. This situation depressed the DCP [days in claims payable] by about a day in the current quarter.

An alternative vantage point on this is to recognize that the private fee for service IBNR on an apples-to-apples basis versus last quarter is up over $50 million in the absolute terms and up around 20% on a per-member basis.

*        *        *

So, in closing, I'd summarize by saying that *we have our arms around and are on track regarding both of the items we discussed last month.*

182.    During the call, analysts continued to question Defendants about the problems with Coventry's PFFS business and the resulting significant spike in the MLR ratio. The following exchanges took place:

<u>Josh Raskin – Lehman Brothers – Analyst</u>:

On the MLR on the Medicare side, the Medicare Advantage side, it came in, I think you said, a little bit higher than you were expecting in June, you know, the update a month ago. So I'm not sure I heard what the driver was for that.

*     *     *

<u>Defendant Guertin</u>:

. . . *As you would suspect given earlier events, we're doing everything in our power to pay private fee for service claims as promptly as we can. To no surprise, our customer service organization is succeeding at this, and so the average cycle time is decreasing steadily.*

*When cycle times are decreasing, most IBNR models tend to over-project incurred claims for a period until cycle times stabilize. Given where we've been on private fee for service, we've just let this be, even though we can clearly see we are clearly decreasing claim payment cycle time.*

<u>Josh Raskin – Lehman Brothers – Analyst</u>:

Okay, so it's all about the private fee for service?

<u>Defendant Guertin</u>:

Oh, yes, absolutely, 100%.

*     *     *

<u>Matthew Borsch – Goldman Sachs – Analyst</u>:

. . . Just to understand, on the Medicare and the [MLR], so I understand why it was a bit higher than what you had talked about on June 18, but, since your outlook is unchanged, are you rolling through an assumption, to some degree, for a better number in the back half of the year than what you talked us through on June 18?

<u>Defendant Guertin</u>:

No. *I still feel good about the range, and at this point I don't have any different view on the MLR for the back of the year*. If it turns out that the additional expense we booked in June was warranted, *we should still land around the high end of our existing guidance range.*

183.    Coventry's financial results for its 2008 second quarter were repeated in the Company's Form 10-Q filed with the SEC on or about August 7, 2008 (the "2Q08 Form 10-Q"), which was signed by Defendants Wolf and Guertin.

184.    With regard to Coventry's operating results, the 2Q08 Form 10-Q represented, in part:

Managed care premium revenue increased in both our Individual Consumer & Government Division and Commercial Division.  The increase is a result of growth in existing products as well as from our acquisitions described herein.  Partially offsetting the increase was a decline in same store Commercial risk membership over the prior year quarter.

*      *      *

Medical costs increased as a result of new business in both our Individual Consumer & Government Division and Commercial Division discussed above.  Medical costs also increased due to increased Commercial medical cost trend as well as *unfavorable IBNR reserve development on our Medicare Private-Fee-For-Service ("PFFS") business.*  Total medical costs as a percentage of premium revenue ("medical loss ratio") increased 6.2% from the prior year quarter as a result of our Commercial and Medicare businesses. . . . *The increase in the Medicare PFFS medical loss ratio is a result of receiving a much higher than expected level of PFFS claims related to prior periods*, as well as a resulting higher outlook for the current year.  We expect the Medicare Advantage medical loss ratio to be in the mid 80's for the last six months of 2008.

*      *      *

Individual Consumer & Government Division

Quarters and Six Months Ended June 30, 2008 and 2007

Individual Consumer & Government Division revenue increased for the quarter and six months ended June 30, 2008 from the same periods in 2007 as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.

Medicare Advantage risk premium yields, excluding the effect of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for our Medicare Advantage products.  With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month for the six

month period ending June 30 decreased to $747.36 in 2008 from $802.97 in 2007. The decrease is a result of a larger portion of our Medicare PFFS business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings and risk factor scores noted above.

\*     \*     \*

The decrease in gross margin for the quarter ended June 30, 2008 was driven by increased medical costs associated with our Medicare PFFS business in 2008. This decrease is partially offset by higher gross margins for our Medicaid HMO and Individual businesses associated with the membership growth, both organic and acquired, as discussed above.

185.    The 2Q08 Form 10-Q also represented:

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

There have been no significant changes in our internal control over financial reporting (as defined in Rule 13a-15(f) promulgated under the Securities and Exchange Act of 1934) during the quarter ended June 30, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

186.    These disclosure and internal control representations were then certified by Defendants Wolf and Guertin, and such certifications were filed with the SEC in Coventry's 2Q08 Form 10-Q.

187.    The statements referenced above in ¶¶180-86 were materially false and misleading when made for the reasons stated in ¶179.

## The Truth Is Revealed

188.    Then, on October 21, 2008, after the close of the markets, Coventry stunned investors by issuing a press release slashing the Company's full year 2008 EPS guidance for a second time, from $3.65 to $3.75 per share to $2.53 to $2.57 per share – an additional 31% downward revision.

- 65 -

The press release attributed the revision in part to a higher-than-expected MLR in Coventry's Medicare Advantage business, due to another significant spike in MLR for its PFFS plans.   The press release disclosed, in pertinent part:

Reconciliation of Previous 2008 EPS Guidance to Current 2008 EPS Guidance

The following table summarizes the changes in 2008 guidance as compared with the EPS midpoint of previously provided Company guidance:

| | |
|---|---|
| Previous midpoint of 2008 GAAP diluted EPS guidance range: | $ 3.70 |
| Operating Items: | |
| **Full year Medicare Advantage MLR (88.7% estimate, up 300 bps from prior estimate)** | **($ 0.39)** |
| Full year commercial group risk MLR (81.7% estimate, up 140 bps from prior estimate) | ($0.30) |
| Lower than expected business volumes (risk revenue, workers' compensation fees) | ($ 0.19) |
| Higher level of SG&A spending, including Medicare growth and network initiatives | ($0.19) |
| Non-operating Items: | |
| Investment impairments and realized losses recorded in Q3 2008 | ($0.15) |
| Lower investment yields from movement to Treasuries and increased interest expense from credit facility borrowings | ($0.05) |
| Current midpoint of 2008 GAAP diluted EPS guidance range | $ 2.55 |

The primary drivers of the change in 2008 guidance are outlined below:

\*        \*        \*

Medicare Advantage MLR.  *The Company expects the 2008 Medicare Advantage MLR to be approximately 88.7%, an increase of 300 bps from the Company's prior estimate, relating primarily to Medicare Advantage PFFS.  Although there was no further 2007 negative prior period development during the third quarter in the Company's Medicare Advantage PFFS business, the second half of 2008 run-rate MLR is projected to be in the low to mid 90%'s, higher than the Company's previous expectations in the high 80%'s.* . . .

Defendant Wolf, commenting on the results, stated:

Our results for 2008 are unacceptable, and a great disappointment to me and the entire Company.  However, we have identified and understand the issues that have affected our results.  We have implemented a corrective action plan which we expect will increasingly be reflected in the Company's results throughout 2009 and fully

realized in 2010.  Most importantly, I continue to have confidence in our future prospects, both strategically and financially.

189.    Later that day, Coventry held a conference call with analysts and investors to discuss the Company's disappointing announcements.  During the call, Defendants commented on the continued problems and increased MLR in Coventry's PFFS business, stating, in pertinent part, as follows:

<u>Defendant Guertin</u>:

Make no mistake here, we have identified the areas pressuring operating results this year, and have implemented action plans to improve our performance.  What we cannot change here is the calendar, which impacts the timing of when we see the positive impacts of all of our actions, nor can we control the unprecedented economic factors that seem to impact the landscape each and every day.

\*        \*        \*

Let me start out on Medicare Private Fee for Service by clarifying what this is and isn't as it pertains to the third quarter developments.  ***This is not an issue that has anything to do with any additional reserve development back to 2007, nor is it any issue with any internal claim payment practices.  Those issues were identified and fully corrected in the second quarter.  It is an issue about current year 2008 performance on this product.***  To no surprise, revenue per member in 2008 is largely as expected.  ***The problem, therefore, is being driven on the medical expense side and in particular on our individual products as opposed to our group products.***

We are experiencing trends in 2008 of around 9% on the individual business versus a comparable expected trend in the 5% range.  You will recall that on this product we pay Medicare rates to providers, so with the exception of the implementation of MS-DRGs in the fourth quarter of 2007, ***the variances from expected results are largely driven by higher than expected utilization***, with the biggest variance being observed in the outpatient category.  ***Looking deeper into this, we can also see that one of our particular individual plan offerings is the real culprit here.***  In essence our individual membership is primarily distributed across three plans; one is a richer premium bearing product, while the other two are leaner plan designs with zero premiums.

***In 2008 this richer premium bearing product is running a loss ratio in the mid to upper 90s, while the zero premium products are running in the mid to upper 80s.***  In our 2009 bids we have made some meaningful redesigns of this particular product in terms of where it is offered, the benefit plan design, and the corresponding premiums.  The ultimate impact of these specific changes, as well as ***the refinement***

- 67 -

*of our view on 2009 performance of Private Fee for Service in total, will clearly be front and center over the next couple of months.*

<u>Defendant Wolf:</u>

To say that we are disappointed by our performance in 2008 doesn't do it justice. On the other hand, it's also regrettable that the underperformance in two large areas, our commercial risk and Private Fee businesses, masks the many outstanding results in other areas of our company, our continued growth, and our opportunities for the future.

190.     In response to these announcements, the price of Coventry common stock declined from $28.49 per share to $13.93 per share, or more than 51%, on very heavy trading volume.

191.     Thereafter, the stunned analyst community that closely followed Coventry issued reports that downgraded the Company's stock and lowered their expected price targets.   For example, an October 22, 2008 Credit Suisse analyst report contained the following commentary:

*On the Medicare Advantage business, performance has gone from "worse than expected" to a cataclysmic collapse with the 2008 MLR now expected to be 88.7%, up 300 bps from the prior guidance and 820bps above the 2007 reported level.* Not surprisingly, the company deferred providing earnings guidance for 2009 with the third quarter earnings release and will do so in January 2009.  The company also cancelled its December investor day.   In summary, *the deterioration in fundamentals in Coventry's largest segments intensified this quarter with the prospects for recovery in 2009 less clear.*

\*        \*        \*

In summary, we are surprised, disappointed and humbled by Coventry's profit shortfall.   *Perhaps most disappointing is the fact that it took so long for the company to identify and communicate the issues.*  We have not gone back and checked yet but *we are struggling to remember a previous instance where a company profit warned this far into a quarter, much less the year.*  With that, we acknowledge that *our confidence in Coventry's underwriting discipline, operational controls and medical management efficacy is somewhat shaken.*

192.     Analysts also understood Coventry's announcement of further increases in MLR for its PFFS plans to mean that the Company's PFFS would continue to be significantly less profitable than expected.   For example, an October 22, 2008 Oppenheimer analyst report commented, in pertinent part:

Beyond the obvious, Coventry's pre-announcement of much worse than expected 3Q earnings is bad news, mostly because it's happening in mid-October, which means the lower results weren't fully reflected in Coventry's 2009 pricing.  As a result, *2009 becomes essentially a throwaway year, with the first hope of a meaningful recovery not occurring until January 2010*, when the . . . Medicare business is re-priced.

\*       \*       \*

. . . *[W]e expect the biggest driver of the decline in earnings to come from the Medicare Advantage business.*  For one thing, *it seems apparent that Coventry did not catch its issues in the private fee for service business early enough to adequately price in the higher cost trends with their June 2008 bid with CMS.*

\*       \*       \*

Unlike the commercial business, if you misprice a Medicare product, there is little that can be done to fix the problem.

\*       \*       \*

*Coventry's Medicare Advantage product will continue to be underpriced in 2009.* One of the most important things to keep in mind heading into year end is that Coventry's Medicare Advantage problems are unlikely to get much better until 2010. The reason is that *the company found out that it had mispriced its products too late in the bidding process to fully incorporate updated pricing when it submitted its bids to CMS for the 2009 plan year.  As a result, 2009 plans will be underpriced relative to the company's medical cost experience for 2008.*  We are projecting a full-year 2009 Medicare Advantage MLR of 88.9%, up 840 basis points from 2007, when the MLR came in at 80.5%.

193.    Likewise, an October 22, 2008 JP Morgan analyst report commented:

Sharply higher M[L]Rs were the main factor, with the PFFS book again leading.

\*       \*       \*

. . . Most acutely here, it is increasingly difficult to believe that the company saw nearly enough of the poor Medicare experience when it submitted its 2009 bids back in June.  As a result, margin recovery in this book is highly questionable.

194.    The markets for Coventry common stock were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and material omissions of fact, Coventry common stock traded at artificially inflated prices during the Class

Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Coventry common stock relying upon the integrity of the market price of Coventry common stock and market information relating to Coventry, and have been damaged thereby.

195.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Coventry common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

196.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Coventry's business, prospects and operations.  These material misstatements and omissions of fact had the cause and effect of creating in the market an unrealistically positive assessment of Coventry and its business, prospects and operations, thus causing Coventry common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Coventry common stock at artificially inflated prices, thus causing the damages complained of herein.

## COVENTRY'S FINANCIAL REPORTING DURING THE
## CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING

197.    At all relevant times during the Class Period, Defendants represented that Coventry's financial results were fairly presented in conformity with GAAP.  These representations were

- 70 -

materially false and misleading because Coventry's financial statements violated GAAP during the Class Period.[3]

198.    Indeed, Coventry's dramatic $50 million increase in its medical claim reserves during the third quarter of 2008 further evidences Defendants' recklessness in representing that the Company's financial reporting during the Class Period was fairly presented in conformity with GAAP, as detailed below.  Indeed, Defendants have effectively admitted that Coventry's enormous increase in its PFFS claims reserves, which primarily relate to claims incurred in prior periods, was due to an artificial overstatement of the Company's pre-tax earnings during the Class Period.

199.    As alleged herein, during the Class Period, Coventry did not possess adequate internal claims processing controls and procedures associated with its Medicare PFFS product line. As a result, Coventry's PFFS claims were not timely processed and the Company accumulated a significant backlog of unpaid claims.  These facts, which were known to, or recklessly disregarded, by Defendants, rendered the Company's reported PFFS liabilities and medical expense inherently unreliable.

200.    GAAP and SEC accounting regulations require that financial statements account for and disclose existing uncertainties as to probable losses.  *See, e.g.*, Statement of Financial Accounting Standard No. 5.  With respect to a healthcare company such as Coventry, medical costs are to be accrued as medical expenses are incurred.  Since healthcare companies frequently pay medical claims after the end of a particular accounting period and a fundamental precept of

---

[3]     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Generally Accepted Auditing Standard ("GAAS") §AU 411.02.  Regulation S-X [17 C.F.S. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.01-01.

accounting requires that expenses be matched with their related revenues, a healthcare company is required to establish a liability to account for medical expenses that are incurred during an accounting period which remain unpaid at the end of that accounting period.  In determining liability for incurred but unpaid medical expenses, it is necessary for healthcare companies to establish a reserve for those claims that have been both reported and unreported to the company by medical service providers at the end of the accounting period.  *See, e.g.*, AICPA's Audit and Accounting Guide for Health Care Organizations.

201.    Defendants knew or recklessly disregarded that Coventry violated GAAP by failing to adequately reserve for its unpaid but incurred medical expenses during the Class Period, thereby rendering its financial statements during the Class Period materially false and misleading because: (i) Coventry's system of internal controls associated with its Medicare PFFS product line was materially deficient; (ii) Coventry failed to timely and accurately process reported Medicare PFFS claims; and (iii) as a result of the foregoing, Coventry lacked a reasonable basis for estimating its IBNR reserve.

202.    Under Section 13(b)(2) of the Exchange Act, public companies are required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  Adequate financial controls and systems are of paramount importance to the financial reporting process, particularly where, as in Coventry's case, its Medicare PFFS product was experiencing a rapid rate of growth.

203.    The representations by several CWs make clear that material deficiencies in Coventry's system of internal control caused it to be unable to timely and accurately perform its claims payment function.  As a result, Medicare PFFS claims were not accurately recorded or

documented, which led to payment inaccuracies and delays.  This inability caused Coventry to improperly account for its claim expenses.

204.    Defendants knew or recklessly disregarded that Coventry's failure to timely and accurately process its reported PFFS claims caused it to issue materially false and misleading financial statements during the Class Period, as Coventry's Medicare PFFS liabilities and expenses materially understated its medical costs payable and its healthcare services expense, in violation of GAAP.

205.    Defendants also knew or recklessly disregarded that, during the Class Period, Coventry's materially deficient and/or non-existent system of internal controls over its PFFS claims processing, as well as its inability to timely and accurately process, quantify and record reported PFFS claims, caused the Company to issue financial statements that failed to comply with GAAP and were materially false and misleading.  These matters, which independently materially overstated Coventry's operating results during the Class Period, also distorted the Company's calculation of its IBNR reserve.

206.    Generally, in order to properly calculate an IBNR reserve, healthcare companies, such as Coventry, utilize reported claims data. As noted by the AICPA's Statement on Auditing Standards No. 57, the process of developing an accounting estimate, such as IBNR, requires the accumulation of sufficient and *reliable* data on which to base the estimate.  In fact, in its Statement of Position 92-4, the AICPA notes that historical data is generally the primary source of information on which loss reserve estimates, such as IBNR, are based.

207.    As set forth herein, Defendants, at all relevant times, knew or recklessly disregarded that Coventry's reported PFFS claims were not accurately or timely processed, quantified or recorded.  As such, Defendants knew or recklessly disregarded that the data upon which to base

Coventry's PFFS IBNR reserve during the Class Period was unreliable.  In fact, Coventry's PFFS IBNR calculations were based on incomplete and inaccurate data.  Thus, Coventry's calculations of both its PFFS liabilities and expenses, which were reported in its financial statements during the Class Period, were materially false and misleading.

208.    As a result of Coventry's: (i) lack of adequate internal controls over its PFFS claims processing; (ii) inability to accurately process reported PFFS claims; (iii) inability to timely process reported Medicare claims; and (iv) inability to quantify its reported Medicare claims – all of which Defendants knew or recklessly disregarded – Coventry lacked the sufficiently reliable historical data necessary to reasonably estimate the Company's PFFS IBNR reserve.  Thus, Coventry's calculation of its PFFS IBNR reserve was grossly understated and made without a reasonable basis.

209.    As a result, Coventry's reported medical liabilities and expenses in its financial statements during the Class Period were materially false and misleading, as the Company's true operating results were materially inflated.

210.    Ultimately, on June 18, 2008, Coventry announced a dramatic $50 million increase in IBNR reserves for its PFFS business "related to 2007," and disclosed that the adjustment included claims going back as far as the first quarter of 2007.

211.    As a result of these facts and other facts alleged herein, which were known to or recklessly disregarded by Coventry, Defendants Wolf and Guertin also had no reasonable basis for issuing certifications of the effectiveness of Coventry's disclosure and internal controls over financial reporting, which were incorporated in Coventry's SEC filings throughout the Class Period.

212.    Defendants' attempt to deceive investors during the Class Period is further evidenced by the failure of Coventry to disclose its significant risks and uncertainties, as required by GAAP. Indeed, GAAP requires that financial statements disclose significant risks and uncertainties

associated with an entity's business.  *See, e.g.*, AICPA's Statement of Position No. 94-6.  In violation of this provision of GAAP, Coventry's Class Period financial statements failed to disclose the contingent liabilities and risks and uncertainties associated with its inability to effectively process PFFS claims.

## ADDITIONAL SCIENTER ALLEGATIONS

213.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Coventry, their control over, and/or receipt and/or modification of Coventry's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Coventry, participated in the fraudulent scheme alleged herein.

214.    Because of their executive and managerial positions at Coventry, the Individual Defendants had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

215.    In addition, CW2 reported that every aspect of Coventry's PFFS business ultimately required approval by the Company's executive management.  For example, CW2 stated that while Coventry's actuarial team was involved with determining PFFS IBNR reserves, the reserve levels were ultimately set by Defendant Guertin and approved by Defendant Wolf.

216.    Since the Company's executive management had responsibility for Coventry's activities during the Class Period, their knowledge of the wrongful conduct alleged herein can be imputed to Coventry.

217.    In addition, Defendants had knowledge of the significant problems that made Coventry's PFFS business less profitable than Defendants were communicating to the market. Specifically:

- By mid-2007, Coventry was overwhelmed by the surge in PFFS membership;

- CW3, CW4 and CW5 reported that Coventry experienced a constant backlog of PFFS claims beginning in early 2007, which continued throughout the Class Period;

- According to CW2, by early 2008, it was further evident that Coventry was receiving a much higher level of PFFS claims than anticipated, meaning that Coventry's PFFS business was costing the Company more than expected;

- These problems in turn caused Coventry to underestimate its PFFS claims expenses. According to CW1 and CW2, it was clear that Coventry had not adequately reserved for IBNR claims in its PFFS business by early 2008; and

- Coventry's failure to accurately measure and adequately reserve for its PFFS claims expenses caused those expenses to be materially understated, and distorted the true MLR for Coventry's PFFS business.  In reality, the MLR for Coventry's PFFS business was much higher than the Company was reporting to investors – meaning that PFFS was significantly less profitable.

218.    As a result of these factors, CW1 stated that, by early 2008, it was known by Coventry's executive management that "***profits were not what was expected***" for the Company's PFFS business.

219.    CW1 reported that the problems with PFFS were discussed among Coventry's executive management during its annual executive meeting, held in April 2008, in which CW1 participated.

220.    Because Coventry had already submitted bids to CMS for its 2008 PFFS plans, the Company could not adjust pricing to account for the higher expenses that had become apparent. Defendants therefore knew, or reasonably should have known, that the Company's profits would fall short for the remainder of 2008, and the Company would not be able to achieve its 2008 earnings guidance.

221.    Defendants monitored and were aware of these significant adverse developments in Coventry's PFFS business.  With full knowledge of this significant adverse information, Defendants continued to: (i) tout the growth in PFFS membership; (ii) make positive statements about the supposed success and profitability of PFFS; and (iii) issue bullish 2008 earnings guidance which was heavily dependent upon the PFFS, while concealing the problems that were plaguing the PFFS initiative.

222.    Defendants were motivated to conceal these adverse facts from investors during the first half of 2008, according to CW1, in order to buy time to shore up the Company's other business segments to compensate for the losses in PFFS, before Coventry was forced to announce the earnings revision that Defendants knew would be necessary.

223.    Defendants were further motivated to engage in this course of conduct in order to allow the Individual Defendants and other Company insiders, while in possession of materially adverse information, to sell more than 800,000 shares of their personally-held Coventry common stock for gross proceeds in excess of $46 million.  The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| E CREASEY | 6/11/2007 | 1,500 | $60.27 | $90,405 |
| Senior Vice | | 1,500 | | $90,405 |
| President of | | | | |
| National | | | | |
| Network | | | | |
| Management | | | | |
| | | | | |
| PATRISHA | 6/7/2007 | 9,112 | $60.00 | $546,720 |
| DAVIS | 6/7/2007 | 4,000 | $59.84 | $239,360 |
| Senior Vice | 6/14/2007 | 967 | $60.33 | $58,339 |
| President & | 6/15/2007 | 1,908 | $60.40 | $115,243 |
| Chief Human | | 15,987 | | $959,662 |
| Resources | | | | |
| Officer | | | | |
| | | | | |
| HARVEY | 5/31/2007 | 12,454 | $59.15 | $736,654 |
| DEMOVICK | 6/14/2007 | 20,000 | $60.51 | $1,210,200 |
| Executive Vice | 6/15/2007 | 10,000 | $60.75 | $607,500 |
| President of | 6/26/2007 | 20,000 | $58.50 | $1,170,060 |
| Customer | 6/26/2007 | 20,000 | $58.76 | $1,175,200 |
| Service & Chief | 6/27/2007 | 12,500 | $59.50 | $743,750 |
| Information | | | | |
| Officer | | 94,954 | | $5,643,364 |
| | | | | |
| EMERSON | 12/11/2007 | 3,800 | $58.25 | $221,350 |
| FARLEY | 12/11/2007 | 822 | $58.28 | $47,906 |
| Board | 12/11/2007 | 300 | $58.26 | $17,478 |
| of Directors | 12/11/2007 | 61 | $58.31 | $3,557 |
| Member | 12/11/2007 | 17 | $58.29 | $991 |
| | 12/12/2007 | 4,000 | $58.75 | $235,000 |
| | | 9,000 | | $526,282 |
| | | | | |
| DAVID | 6/14/2007 | 967 | $60.33 | $58,339 |
| FINKEL | 9/13/2007 | 5,000 | $60.08 | $300,400 |
| Senior Vice | 9/13/2007 | 5,000 | $60.06 | $300,300 |
| President of | 9/13/2007 | 3,438 | $60.06 | $206,486 |
| Customer | 9/13/2007 | 1,562 | $60.06 | $93,814 |
| Service | | | | |
| Operations | | 15,967 | | $959,339 |
| | | | | |
| **DEFENDANT** | | | | |
| **GUERTIN** | 6/14/2007 | 1,665 | $60.33 | $100,449 |
| | | 1,665 | | $100,449 |
| | | | | |
| | | | | |

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| LAWRENCE KUGELMAN Audit Committee Chair | 9/24/2007 | 2,250 | $61.22 | $137,745 |
| | | 2,250 | | $137,745 |
| | | | | |
| BERNARD MANSHEIM Executive Vice President & Chief Medical Officer | 6/4/2007 | 2,934 | $59.70 | $175,160 |
| | 6/4/2007 | 893 | $59.61 | $53,232 |
| | 6/4/2007 | 186 | $59.65 | $11,095 |
| | 6/5/2007 | 5,987 | $59.60 | $356,825 |
| | 6/14/2007 | 1,439 | $60.33 | $86,815 |
| | 7/6/2007 | 22,500 | $59.91 | $1,347,975 |
| | 7/6/2007 | 11,250 | $59.91 | $673,988 |
| | | 45,189 | | $2,705,089 |
| | | | | |
| THOMAS MCDONOUGH President | 5/21/2007 | 50,000 | $59.92 | $2,996,000 |
| | 6/14/2007 | 7,913 | $60.33 | $477,391 |
| | 9/6/2007 | 21,000 | $57.80 | $1,213,800 |
| | 9/6/2007 | 17,000 | $57.75 | $981,750 |
| | 9/6/2007 | 11,000 | $57.70 | $634,700 |
| | 9/6/2007 | 8,500 | $57.65 | $490,025 |
| | 9/6/2007 | 7,500 | $57.76 | $433,200 |
| | 9/6/2007 | 6,500 | $57.78 | $375,570 |
| | 9/6/2007 | 6,000 | $57.79 | $346,740 |
| | 9/6/2007 | 5,500 | $57.74 | $317,570 |
| | 9/6/2007 | 5,000 | $57.68 | $288,400 |
| | 9/6/2007 | 4,000 | $57.64 | $230,560 |
| | 9/6/2007 | 4,000 | $57.72 | $230,880 |
| | 9/6/2007 | 3,000 | $57.77 | $173,310 |
| | 9/6/2007 | 3,000 | $57.63 | $172,890 |
| | 9/6/2007 | 2,500 | $57.73 | $144,325 |
| | 9/6/2007 | 2,500 | $57.60 | $144,000 |
| | 9/6/2007 | 2,500 | $57.55 | $143,875 |
| | 9/6/2007 | 2,500 | $57.58 | $143,950 |
| | 9/6/2007 | 2,500 | $57.81 | $144,525 |
| | 9/6/2007 | 2,000 | $57.59 | $115,180 |
| | 9/6/2007 | 2,000 | $57.82 | $115,640 |
| | 9/6/2007 | 2,000 | $57.83 | $115,660 |
| | 9/6/2007 | 1,500 | $57.67 | $86,505 |
| | 9/6/2007 | 1,500 | $57.62 | $86,430 |
| | 9/6/2007 | 1,500 | $57.57 | $86,355 |
| | | 182,913 | | $10,689,231 |
| | | | | |
| | | | | |

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| JAMES | 5/30/2007 | 10,000 | $60.00 | $600,000 |
| MCGARRY | 6/14/2007 | 992 | $60.33 | $59,847 |
| Senior | | 10,992 | | $659,847 |
| Vice President | | | | |
| of Workers | | | | |
| Compensation | | | | |
| | | | | |
| ROBERT | 5/1/2007 | 8,700 | $57.57 | $500,859 |
| MOREY | | 8,700 | | $500,859 |
| Board of | | | | |
| Directors | | | | |
| Member | | | | |
| | | | | |
| **DEFENDANT** | 6/14/2007 | 1,665 | $60.33 | $100,449 |
| **SOISTMAN** | 5/14/2008 | 5,921 | $43.40 | $256,971 |
| | 5/14/2008 | 5,500 | $43.39 | $238,645 |
| | 5/14/2008 | 2,991 | $43.30 | $129,510 |
| | 5/14/2008 | 2,900 | $43.38 | $125,802 |
| | 5/14/2008 | 1,625 | $43.32 | $70,395 |
| | 5/14/2008 | 1,600 | $43.31 | $69,296 |
| | 5/14/2008 | 1,512 | $43.34 | $65,530 |
| | 5/14/2008 | 1,444 | $43.33 | $62,569 |
| | 5/14/2008 | 1,100 | $43.43 | $47,773 |
| | 5/14/2008 | 872 | $43.41 | $37,854 |
| | 5/14/2008 | 800 | $43.40 | $34,720 |
| | 5/14/2008 | 700 | $43.29 | $30,303 |
| | 5/14/2008 | 700 | $43.41 | $30,387 |
| | 5/14/2008 | 600 | $43.28 | $25,968 |
| | 5/14/2008 | 428 | $43.37 | $18,562 |
| | 5/14/2008 | 400 | $43.39 | $17,356 |
| | 5/14/2008 | 307 | $43.42 | $13,330 |
| | 5/14/2008 | 100 | $43.43 | $4,343 |
| | 5/14/2008 | 100 | $43.32 | $4,332 |
| | 5/14/2008 | 100 | $43.36 | $4,336 |
| | 5/14/2008 | 100 | $43.40 | $4,340 |
| | 5/14/2008 | 100 | $43.41 | $4,341 |
| | 5/14/2008 | 100 | $43.42 | $4,342 |
| | | 31,665 | | $1,401,455 |
| | | | | |
| ELIZABETH | 5/3/2007 | 1,500 | $58.67 | $88,005 |
| TALLETT | 11/1/2007 | 1,100 | $60.01 | $66,011 |
| Audit | 11/1/2007 | 700 | $60.03 | $42,021 |
| Committee & | 11/1/2007 | 450 | $60.02 | $27,009 |
| Board of | | 3,750 | | $223,046 |

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Directors Member | | | | |
| | | | | |
| ALLEN | 6/14/2007 | 75,000 | $60.46 | $4,534,500 |
| WISE | 6/25/2007 | 25,000 | $58.65 | $1,466,250 |
| Chairman of | 9/27/2007 | 5,816 | $62.12 | $361,290 |
| Board of Directors | | 105,816 | | $6,362,040 |
| | | | | |
| **DEFENDANT WOLF** | 5/3/2007 | 12,300 | $58.30 | $717,090 |
| | 5/3/2007 | 6,900 | $58.31 | $402,339 |
| | 5/3/2007 | 6,300 | $57.95 | $365,085 |
| | 5/3/2007 | 4,300 | $58.27 | $250,561 |
| | 5/3/2007 | 4,145 | $58.25 | $241,446 |
| | 5/3/2007 | 3,800 | $58.00 | $220,400 |
| | 5/3/2007 | 3,700 | $57.97 | $214,489 |
| | 5/3/2007 | 3,400 | $57.96 | $197,064 |
| | 5/3/2007 | 3,400 | $57.99 | $197,166 |
| | 5/3/2007 | 3,000 | $58.19 | $174,570 |
| | 5/3/2007 | 2,700 | $58.32 | $157,464 |
| | 5/3/2007 | 2,400 | $58.06 | $139,344 |
| | 5/3/2007 | 2,100 | $58.18 | $122,178 |
| | 5/3/2007 | 1,700 | $58.26 | $99,042 |
| | 5/3/2007 | 1,655 | $58.16 | $96,255 |
| | 5/3/2007 | 1,655 | $58.24 | $96,387 |
| | 5/3/2007 | 1,600 | $58.13 | $93,008 |
| | 5/3/2007 | 1,600 | $58.20 | $93,120 |
| | 5/3/2007 | 1,600 | $58.22 | $93,152 |
| | 5/3/2007 | 1,400 | $58.17 | $81,438 |
| | 5/3/2007 | 1,400 | $58.28 | $81,592 |
| | 5/3/2007 | 1,300 | $58.35 | $75,855 |
| | 5/3/2007 | 1,245 | $58.15 | $72,397 |
| | 5/3/2007 | 1,227 | $58.09 | $71,276 |
| | 5/3/2007 | 1,200 | $58.01 | $69,612 |
| | 5/3/2007 | 1,200 | $58.07 | $69,684 |
| | 5/3/2007 | 1,100 | $58.11 | $63,921 |
| | 5/3/2007 | 1,000 | $57.94 | $57,940 |
| | 5/3/2007 | 1,000 | $58.21 | $58,210 |
| | 5/3/2007 | 900 | $57.92 | $52,128 |
| | 5/3/2007 | 900 | $58.47 | $52,623 |
| | 5/3/2007 | 873 | $58.10 | $50,721 |
| | 5/3/2007 | 800 | $58.28 | $46,624 |
| | 5/3/2007 | 800 | $58.67 | $46,936 |

- 81 -

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| | 5/3/2007 | 600 | $58.08 | $34,848 |
| | 5/3/2007 | 500 | $58.23 | $29,115 |
| | 5/3/2007 | 500 | $58.38 | $29,190 |
| | 5/3/2007 | 500 | $58.42 | $29,210 |
| | 5/3/2007 | 400 | $58.04 | $23,216 |
| | 5/3/2007 | 400 | $58.46 | $23,384 |
| | 5/3/2007 | 400 | $58.49 | $23,396 |
| | 5/3/2007 | 300 | $57.98 | $17,394 |
| | 5/3/2007 | 300 | $58.12 | $17,436 |
| | 5/3/2007 | 300 | $58.34 | $17,502 |
| | 5/3/2007 | 300 | $58.41 | $17,523 |
| | 5/3/2007 | 200 | $58.33 | $11,666 |
| | 5/3/2007 | 200 | $58.36 | $11,672 |
| | 5/3/2007 | 100 | $58.02 | $5,802 |
| | 5/3/2007 | 100 | $58.14 | $5,814 |
| | 5/3/2007 | 100 | $58.17 | $5,817 |
| | 5/3/2007 | 100 | $58.24 | $5,824 |
| | 5/3/2007 | 100 | $58.31 | $5,831 |
| | 5/16/2007 | 12,500 | $60.00 | $750,000 |
| | 5/16/2007 | 4,476 | $59.90 | $268,112 |
| | 5/16/2007 | 2,355 | $59.92 | $141,112 |
| | 5/16/2007 | 1,800 | $59.97 | $107,946 |
| | 5/16/2007 | 1,545 | $59.93 | $92,592 |
| | 5/16/2007 | 1,200 | $60.01 | $72,012 |
| | 5/16/2007 | 1,100 | $60.02 | $66,022 |
| | 5/16/2007 | 824 | $59.91 | $49,366 |
| | 5/16/2007 | 800 | $59.99 | $47,992 |
| | 5/16/2007 | 800 | $60.00 | $48,000 |
| | 5/16/2007 | 800 | $60.04 | $48,032 |
| | 5/16/2007 | 600 | $59.96 | $35,976 |
| | 5/16/2007 | 400 | $59.88 | $23,952 |
| | 5/16/2007 | 300 | $59.94 | $17,982 |
| | 5/16/2007 | 300 | $59.95 | $17,985 |
| | 5/16/2007 | 200 | $59.98 | $11,996 |
| | 6/29/2007 | 22,413 | $57.77 | $1,294,799 |
| | 8/6/2007 | 15,000 | $57.40 | $861,000 |
| | 11/1/2007 | 3,639 | $59.95 | $218,158 |
| | 11/1/2007 | 3,075 | $59.92 | $184,254 |
| | 11/1/2007 | 2,709 | $59.91 | $162,296 |
| | 11/1/2007 | 2,400 | $59.96 | $143,904 |
| | 11/1/2007 | 1,967 | $59.93 | $117,882 |
| | 11/1/2007 | 1,765 | $59.89 | $105,706 |
| | 11/1/2007 | 1,758 | $59.97 | $105,427 |
| | 11/1/2007 | 1,661 | $59.94 | $99,560 |

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| | 11/1/2007 | 995 | $59.87 | $59,571 |
| | 11/1/2007 | 935 | $59.90 | $56,007 |
| | 11/1/2007 | 805 | $59.85 | $48,179 |
| | 11/1/2007 | 700 | $59.88 | $41,916 |
| | 11/1/2007 | 500 | $59.65 | $29,825 |
| | 11/1/2007 | 500 | $59.66 | $29,830 |
| | 11/1/2007 | 500 | $59.71 | $29,855 |
| | 11/1/2007 | 500 | $59.73 | $29,865 |
| | 11/1/2007 | 400 | $59.77 | $23,908 |
| | 11/1/2007 | 300 | $59.86 | $17,958 |
| | 11/1/2007 | 200 | $59.67 | $11,934 |
| | 11/1/2007 | 200 | $59.70 | $11,940 |
| | 11/1/2007 | 200 | $59.84 | $11,968 |
| | 11/1/2007 | 100 | $59.62 | $5,962 |
| | 11/1/2007 | 100 | $59.63 | $5,963 |
| | 11/1/2007 | 100 | $59.68 | $5,968 |
| | 11/1/2007 | 100 | $59.69 | $5,969 |
| | 11/1/2007 | 100 | $59.74 | $5,974 |
| | 11/1/2007 | 100 | $59.75 | $5,975 |
| | 11/1/2007 | 100 | $59.78 | $5,978 |
| | 11/1/2007 | 100 | $59.80 | $5,980 |
| | 2/19/2008 | 3,200 | $54.66 | $174,912 |
| | 2/19/2008 | 2,795 | $54.47 | $152,244 |
| | 2/19/2008 | 2,700 | $54.85 | $148,095 |
| | 2/19/2008 | 2,500 | $55.00 | $137,500 |
| | 2/19/2008 | 1,900 | $54.38 | $103,322 |
| | 2/19/2008 | 1,600 | $54.40 | $87,040 |
| | 2/19/2008 | 1,590 | $54.49 | $86,639 |
| | 2/19/2008 | 1,500 | $54.35 | $81,525 |
| | 2/19/2008 | 1,200 | $54.44 | $65,328 |
| | 2/19/2008 | 1,160 | $54.42 | $63,127 |
| | 2/19/2008 | 1,155 | $54.41 | $62,844 |
| | 2/19/2008 | 1,000 | $54.57 | $54,570 |
| | 2/19/2008 | 999 | $54.45 | $54,396 |
| | 2/19/2008 | 901 | $54.46 | $49,068 |
| | 2/19/2008 | 900 | $54.83 | $49,347 |
| | 2/19/2008 | 800 | $54.43 | $43,544 |
| | 2/19/2008 | 800 | $54.79 | $43,832 |
| | 2/19/2008 | 700 | $54.37 | $38,059 |
| | 2/19/2008 | 600 | $54.34 | $32,604 |
| | 2/19/2008 | 600 | $54.48 | $32,688 |
| | 2/19/2008 | 500 | $54.39 | $27,195 |
| | 2/19/2008 | 500 | $54.71 | $27,355 |
| | 2/19/2008 | 400 | $54.28 | $21,712 |

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 2/19/2008 | 300 | $54.23 | $16,269 |
| | 2/19/2008 | 300 | $54.29 | $16,287 |
| | 2/19/2008 | 300 | $54.50 | $16,350 |
| | 2/19/2008 | 300 | $54.55 | $16,365 |
| | 2/19/2008 | 300 | $54.65 | $16,395 |
| | 2/19/2008 | 300 | $54.69 | $16,407 |
| | 2/19/2008 | 300 | $54.73 | $16,419 |
| | 2/19/2008 | 300 | $54.86 | $16,458 |
| | 2/19/2008 | 200 | $54.30 | $10,860 |
| | 2/19/2008 | 200 | $54.31 | $10,862 |
| | 2/19/2008 | 200 | $54.32 | $10,864 |
| | 2/19/2008 | 200 | $54.36 | $10,872 |
| | 2/19/2008 | 200 | $54.20 | $10,840 |
| | 2/19/2008 | 200 | $54.51 | $10,902 |
| | 2/19/2008 | 200 | $54.72 | $10,944 |
| | 2/19/2008 | 200 | $54.74 | $10,948 |
| | 2/19/2008 | 200 | $54.76 | $10,952 |
| | 2/19/2008 | 100 | $54.24 | $5,424 |
| | 2/19/2008 | 100 | $54.26 | $5,426 |
| | 2/19/2008 | 100 | $54.27 | $5,427 |
| | 2/19/2008 | 100 | $54.38 | $5,438 |
| | 2/19/2008 | 100 | $54.63 | $5,463 |
| | 2/19/2008 | 100 | $54.64 | $5,464 |
| | 2/19/2008 | 100 | $54.68 | $5,468 |
| | 2/19/2008 | 100 | $54.75 | $5,475 |
| | | 218,922 | | $12,687,870 |
| | | | | |
| THOMAS ZIELINSKI Executive Vice President & General Counsel | 5/31/2007 | 13,042 | $59.50 | $775,999 |
| | 5/31/2007 | 4,958 | $59.95 | $297,232 |
| | 6/14/2007 | 2,285 | $60.33 | $137,854 |
| | 11/16/2007 | 6,000 | $59.60 | $357,600 |
| | 11/16/2007 | 5,500 | $59.64 | $328,020 |
| | 11/16/2007 | 5,000 | $59.61 | $298,050 |
| | 11/16/2007 | 4,800 | $59.61 | $286,128 |
| | 11/16/2007 | 4,000 | $59.61 | $238,440 |
| | 11/16/2007 | 3,500 | $59.60 | $208,600 |
| | 11/16/2007 | 1,200 | $59.61 | $71,532 |
| | 11/16/2007 | 1,000 | $59.61 | $59,610 |
| | 11/16/2007 | 500 | $59.64 | $29,820 |
| | | 51,785 | | $3,088,885 |
| | | | | |
| | **Total:** | **801,055** | | **$46,735,570** |

224.    The timing and amount of these insider sales is highly suspicious.  In particular, on May 14, 2008, Defendant Soistman, the Executive Vice President of Coventry's Individual Consumer and Government Business Division, who was in charge of the Company's PFFS business, sold 30,000 of his personally-held shares for proceeds of over $1.3 million.  The timing of Soistman's sales was highly suspicious because they occurred: (i) after the April 2008 annual executive meeting, at which CW1 stated that Coventry executive management discussed the problems with the PFFS business; and (ii) just one month before Coventry first revealed the problems with its PFFS initiative and took a $50 million charge to shore up its IBNR reserves, on June 18, 2008.  Soistman's May 14, 2008 sales were also highly unusual in comparison to his prior trades because they accounted for approximately 95% of his Class Period sales.  In fact, Soistman's only other Class Period sale was the sale of 1,665 shares on June 14, 2007, for proceeds of only $100,449.

## LOSS CAUSATION/ECONOMIC LOSS

225.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Coventry common stock and operated as a fraud or deceit on Class Period purchasers of Coventry common stock by, *inter alia*: (i) touting the growth in PFFS membership; (ii) making positive statements about the supposed success and profitability of PFFS; and (iii) issuing bullish 2008 earnings guidance which was heavily dependent upon PFFS, while improperly concealing the problems that were plaguing the PFFS initiative.

226.     When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Coventry common stock fell precipitously as the prior artificial inflation came out of the price of Coventry securities.  As a result of their purchases of Coventry common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

227.     Defendants' false and misleading statements and omissions had the intended effect and caused Coventry common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $62.36 per share on September 26, 2007.

228.     On June 18, 2008, Defendants announced a 17% reduction in Coventry's full year 2008 earnings guidance, and reported a significant spike in the MLR for its PFFS business. Defendants also announced a dramatic $50 million increase in IBNR reserves for its PFFS business "related to 2007," and disclosed that Coventry was still processing claims going back as far as the first quarter of 2007.  This announcement was only a partial disclosure of the shortfall in profitability in Coventry's PFFS business, however, because Defendants downplayed the severity of the problems by misleadingly blaming them on delays in claims being received from providers, and the MLR for Coventry's PFFS business continued to be distorted.  In response to these disclosures, the price of Coventry's stock fell by more than 22%, from $40.00 per share to $31.30 per share, on very heavy trading volume.  This decline removed a portion of the artificial inflation from Coventry's stock price.

229.     Then, on October 21, 2008, Coventry stunned investors by slashing its 2008 earnings guidance for a second time, due in part to continued increases in MLR for Coventry's PFFS business, which the Company attributed to "higher than expected [plan] utilization" – *i.e.*, claims expenses.  The clear import of these disclosures, and the message that the market understood, was

the Coventry had not resolved the problems with its PFFS business, and PFFS would continue to be more costly and less profitable for the Company and would be unable to generate the future growth that Coventry and its investors had been counting on. These disclosures removed the last of the artificial inflation from Coventry's share price, causing its common stock to plummet an additional 51%, from $28.49 per share to $13.93 per share on October 22, 2008, the last day of the Class Period, on extremely heavy trading volume of more than 19 million shares traded.

230. The precipitous decline in the price of Coventry common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Coventry common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Coventry common stock and the subsequent significant decline in the value of Coventry common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

231. At all relevant times, the market for Coventry common stock was an efficient market for the following reasons, among others:

(a) Coventry common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, Coventry filed periodic public reports with the SEC and the NYSE;

(c)     Coventry regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Coventry was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

232.    As a result of the foregoing, the market for Coventry common stock promptly digested current information regarding Coventry from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Coventry common stock during the Class Period suffered similar injury through their purchase of Coventry common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

233.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of Coventry who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### Against and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

234.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set

forth herein.

235.   During the Class Period, Defendants disseminated or approved the materially false

and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

236.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the purchasers of the Company common stock during the Class Period.

237.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for Coventry common stock.  Plaintiffs and the Class

would not have purchased Coventry common stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading

statements.

238.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the

other members of the Class suffered damages in connection with their purchases of Coventry

common stock during the Class Period.

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Promulgated Thereunder
### Against All Defendants

239.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

240.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that any of Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

241.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price of Coventry common stock; and (iii) cause Plaintiffs to purchase Coventry common stock at artificially inflated prices.

242.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Coventry common stock, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78 j(b), and Rule 10b-5(a) and (c), 17 C.F.R. §240-10b-5, promulgated thereunder.

243.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or deliberately reckless suppression and concealment of information regarding Coventry's failure to timely and accurately process PFFS claims, which caused Coventry to understate its IBNR reserves and distorted its MLR, and rendered Defendants' statements regarding the purported success and profitability of PFFS and Coventry's 2008 earnings

guidance each materially false and misleading when made.  Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Coventry's investors during the Class Period.

244.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which Coventry common stock traded.

245.    During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Coventry common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

246.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Coventry common stock during the Class Period.

247.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Coventry common stock during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

248.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

249.    The Individual Defendants acted as controlling persons of Coventry within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as

officers and/or directors of Coventry, and their ownership of Coventry stock, the Individual Defendants had the power and authority to cause Coventry to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

DATED:  May 28, 2010                                **Respectfully Submitted,**

_____
                                */s/ David A. Rosenfeld*
                         DAVID A. ROSENFELD (admitted phv)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com

*Lead Counsel for Plaintiffs*

BROWN, GOLDSTEIN & LEVY LLP
DANIEL F. GOLDSTEIN (01036)
DANA W. MCKEE (04447)
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone:  410/962-1030
410/385-0869 (fax)
dwm@browngold.com
dfg@browngold.com

*Liaison Counsel*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

SCHWARZWALD McNAIR & FUSCO LLP
EBEN O. McNAIR IV
616 Penton Media Building
1300 East Ninth Street
Cleveland, OH  44114-1503
Telephone:  216/566-1600
216/566-1814 (fax)

*Additional Counsel for Plaintiffs*

- 93 -

## <u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that, on this 28th day of May 2010, I filed the foregoing Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws through the Court's ECF case filing system, which will serve copies on all counsel of record in this case.

<u>     /s/ David A. Rosenfeld     </u>
David A. Rosenfeld
