# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **IN RE COVENTRY HEALTHCARE, INC., SECURITIES LITIGATION** | : : : : : | **Master File: 8:09-cv-2337 (AW)** |
|  |  | **ORAL ARGUMENT REQUESTED** |
| **This Document Relates to:** | : : |  |
| **ALL ACTIONS.** | : : : |  |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Dated: July 22, 2010

Marc J. Sonnenfeld (admitted *pro hac vice*)
Karen Pieslak Pohlmann (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001

Grace E. Speights
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  202.739.3000
Fax:  202.739.3001

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL ALLEGATIONS ............................................................................... 4

    A.   Coventry's Business.................................................................................... 4

    B.   Coventry's Private Fee-For-Service Plan ................................................... 6

        1.   The 2007 Introduction Of PFFS ..................................................... 6

        2.   The PFFS Plan In The First Half Of 2008 ...................................... 7

    C.   The June And October 2008 Disclosures.................................................... 8

III.  ARGUMENT ..................................................................................................... 10

    A.   The Confidential Witnesses On Which Plaintiffs Base All Of Their
        Factual Claims Fail To Meet The Standards For Such Sources ................ 10

    B.   The Complaint Does Not Set Forth A Materially False Statement ........... 13

        1.   Plaintiffs Repeatedly Fail To Identify What Aspect Of A Given
            Statement Is False ........................................................................ 14

        2.   Accurate Statements Of Fact Cannot Form The Basis Of Liability ........ 17

        3.   Statements Regarding Reserves And Claims Delays Are
            Inactionable................................................................................... 18

            a.   The Reserves Claims Are Inadequately Pleaded ......................... 19

            b.   No Statements Regarding Claims Processing Are
                Sufficiently Alleged To Be False.................................................. 22

        4.   Numerous Statements Are Inactionable Because They Are Merely
            Predictions Of Future Events ........................................................ 23

            a.   Plaintiffs Do Not Allege That Any Of The 2007 Predictions
                Were False .................................................................................... 24

            b.   Guidance Or Predictions Regarding Earnings Are
                Inactionable Because They Were Not Worded As
                Guarantees.................................................................................... 24

            c.   To The Extent Plaintiffs' Claims Are Based On Failure To
                Estimate Necessary Future Reserves, Their Claims Are
                Inactionable For The Same Reasons............................................. 26

            d.   Earnings Guidance And Projections Are Protected By The
                PSLRA Safe Harbor And The Bespeaks Caution Doctrine......... 28

        5.   There Are No Allegations Establishing That Any Statement Was
            False Because Of Errors In Premium Pricing ............................... 30

        6.   No Statements Regarding Coventry's IT System Were False ................. 31

i

# TABLE OF CONTENTS
### (continued)

**Page**

7.    Plaintiffs Impermissibly Rely On Group Pleading And Attribute No Statements To Two Defendants ........................................................... 33

C.    The Complaint Does Not Set Forth A Strong Inference Of Scienter .................. 34

1.    There Are No Adequate Allegations Of Intentional Or Reckless Conduct .......................................................................................... 34

a.    The Complaint Does Not Attempt To Plead Any Scienter As To 2007 .................................................................................. 35

b.    The Allegations Of Actual Knowledge Or Recklessness In 2008 Are Too Vague To Proceed ................................................. 35

c.    There Are No Allegations Establishing That Any Defendant Knew That The Reserves Were Understated At Any Particular Time ........................................................................ 38

2.    There Are No Allegations Identifying A Motive For Any Defendant To Engage In Wrongful Conduct ........................................... 40

3.    The Most Plausible Inference Is That Defendants Underestimated The Reserves Necessary And Claims Expenses For A New Product And Provided Information To The Public As They Became Aware Of It .......................................................................................... 42

D.    There Is No Basis For Scheme Liability ............................................................. 45

E.    The Control Person Claims Should Be Dismissed ............................................. 46

IV.    CONCLUSION ............................................................................................................. 47

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ....................................18, 37

*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833 (N.D. Cal. 2000)............................16

*In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749 (E.D. Va. 2004)..............34

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ...................................................................................................... passim

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004)..............22, 28, 30

*Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618 (4th Cir. 2008).....................5, 10, 34, 43

*In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461 (M.D.N.C. 2004)...................................11

*In re Cryomedical Sciences, Inc. Sec. Litig.*, 884 F. Supp. 1001 (D. Md. 1995) ........15, 19

*Delta Holdings, Inc. v. Nat'l Distillers and Chem. Corp.*, 945 F.2d 1226 (2d Cir. 1991) .................................................................................................................39

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).....................................................43

*In re E.Spire Commc'ns Inc. Sec. Litig.*, 127 F. Supp. 2d 734 (D. Md. 2001) ...........40, 42

*In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 (W.D.N.C. 2001)..........16, 17, 37

*Hess v. Am. Physicians Capital Inc.*, No. 04-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005) ...............................................................................................39

*Higginbotham v. Baxter Int'l*, 495 F.3d 753 (7th Cir. 2007)............................................38

*Hillson Partners Ltd. P'Ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994)........................32

*In re Humana Sec. Litig.*, No. 08-162, 2009 WL 1767193 (W.D. Ky. June 23, 2009) .................................................................................................................17

*In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675 (D. Md. 2002) ........................................................................................25, 26, 29, 30

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571 (E.D. Va. 2006) ........................................................................................ passim

# TABLE OF AUTHORITIES
(continued)

**Page**

In re John Alden Fin. Corp. Sec. Litig., 249 F. Supp. 2d 1273 (S.D. Fla. 2003)...............38

Keeney v. Larkin, 306 F. Supp. 2d 522 (D. Md. 2003) ......................................................32

In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724 (W.D. Ky. 2004) .....26, 27

In re Lab. Corp. of Am. Holdings Sec. Litig., No. 03-591, 2006 WL 1367428
    (M.D.N.C. May 18, 2006) ..................................................................................28, 30

Lautenberg Found. v. Madoff, No. 09-816, 2009 WL 2928913 (D.N.J. Sept. 9,
    2009) ..........................................................................................................................45

Malin v. XL Capital Ltd., 499 F. Supp. 2d 117 (D. Conn. 2007).............................. passim

Marsh Group v. Prime Retail, Inc., 46 F. App'x 140 (4th Cir. 2002)...............................25

Mathews v. Centex Telemgmt., Inc., No. 92-1837, 1994 WL 269734 (N.D. Cal.
    June 8, 1994)..............................................................................................................44

Matrix Capital Mgmt. Fund, LP v. Bearingpoint, Inc., 576 F.3d 172 (4th Cir.
    2009) ...........................................................................................................10, 44, 46

In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953 (D. Md. 1995) ...............................17

Morse v. McWhorter, 200 F. Supp. 2d 853 (M.D. Tenn. 2000), vacated on other
    grounds, 290 F.3d 795 (6th Cir. 2002)......................................................................44

In re Mut. Funds Inv. Litig., 566 F.3d 111 (4th Cir. 2009), cert. granted sub nom.
    Janus Capital Group, Inc. v. First Derivative Traders, No. 09-525, 2010 WL
    2555208 (U.S. June 28, 2010) .......................................................................45, 46, 47

Nolte v. Capital One Fin. Corp., 390 F.3d 311 (4th Cir. 2004) ...................................34, 35

In re NutriSystem, Inc. Sec. Litig., 653 F. Supp. 2d 563 (E.D. Pa. 2009)........................41

Osher v. JNI Corp., 256 F. Supp. 2d 1144 (S.D. Cal. 2003) .............................................16

In re PEC Solutions Sec. Litig., No. 03-331, 2004 WL 1854202 (E.D. Va. May
    25, 2004), aff'd, 418 F.3d 379 (4th Cir. 2005) ...........................................................37

In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379 (4th Cir. 2005)..................5, 33, 36, 37

Pugh v. Tribune Co., 521 F.3d 686 (7th Cir. 2008)..........................................................38

# TABLE OF AUTHORITIES
(continued)

**Page**

Raab v. Gen. Physics Corp., 4 F.3d 286 (4th Cir. 1993) .........................................1, 24, 25

In re Refco, Inc. Sec. Litig., 609 F. Supp. 2d 304 (S.D.N.Y. 2009) .................................46

In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334 (D. Md. 2004).........33

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ......................................27

Slayton v. Am. Express Co., 604 F.3d 758 (2d Cir. 2010)................................................37

Stephens v. Nat'l Distillers and Chem. Corp., 6 F.3d 63 (2d Cir. 1993)..........................26

Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148 (2008) .................45, 46

Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162 (4th Cir. 2007)......................... passim

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) .....................10, 34, 42

In re Tibco Software, Inc. Sec. Litig., No. 05-2146, 2006 WL 1469654 (N.D. Cal. May 25, 2006)............................................................................................................44

In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d 560 (W.D. Va. 2006)................24, 25, 26

In re USEC Sec. Litig., 190 F. Supp. 2d 808 (D. Md. 2002).................................5, 26, 30

In re Vantive Corp. Sec. Litig., 283 F.3d 1079 (9th Cir. 2002)........................................42

In re Visual Networks, Inc. Sec. Litig., 217 F. Supp. 2d 662 (D. Md. 2002)...................25

## FEDERAL STATUTES

15 U.S.C. § 78j....................................................................................................................1

15 U.S.C. § 78t(a) ...............................................................................................................1

15 U.S.C. § 78u-4(b)...........................................................................................13, 14, 34

15 U.S.C. § 78u-5(c)..........................................................................................................28

15 U.S.C. § 78u-5(i)...........................................................................................................28

## I.      INTRODUCTION

The Consolidated Amended Class Action Complaint ("Complaint") attempts to hold Coventry Healthcare, Inc. ("Coventry" or the "Company") and four of its current or former officers liable for securities fraud based on the fact that a new insurance product was ultimately underpriced and incurred more medical claims than defendants had predicted.  In January 2007, Coventry, a national managed health care company, introduced a new Medicare insurance product—the Private Fee-for-Service ("PFFS") product—that permitted Medicare-eligible individuals to use a wider range of providers than was permissible in other pre-existing plans.  As required by Medicare regulations, Coventry submitted its premium bids many months before the product was even available to the market.  Accordingly, Coventry based its premium pricing and its predictions of the estimated reserves needed to cover medical claims anticipated to be incurred under PFFS policies on the information available to it before even one policy had been sold.  By mid-2008, however, Coventry announced that it had received a much higher than expected level of PFFS claims relating to prior periods, specifically 2007.  It twice downgraded its guidance for 2008, once in June in part because of 2007 reserves-related issues and once in October in part because of the higher than anticipated medical costs of paying PFFS claims in 2008.  In short, Coventry's actual experience turned out to be different than anticipated in its predictions.

This Complaint attempts to transform Coventry's forecasting error into a federal securities claim, contrary to the Fourth Circuit's admonition that "prediction[s] of success that fail[] to materialize cannot create on that account an action for securities fraud."  Raab v. Gen. Physics Corp., 4 F.3d 286, 291 (4th Cir. 1993).  Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j ("Section 10(b)"), and 15 U.S.C. § 78t(a) ("Section 20(a)") on behalf of a putative class that purchased the publicly traded securities

of Coventry between February 9, 2007 and October 22, 2008. ¶ 1.[1] These claims are asserted against Coventry; Dale B. Wolf, Coventry's President, Chief Executive Officer, and a director during the putative class period; Shawn M. Guertin, Coventry's Executive Vice President, Chief Financial Officer, and Treasurer during the putative class period; John J. Ruhlmann, Coventry's Senior Vice President and Corporate Controller; and Francis S. Soistman, Jr., Coventry's Executive Vice President of Individual Consumer and Government Business Division during the putative class period. ¶¶ 18-22.[2] As set forth below, the allegations in the Complaint fall short of what is required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and should be dismissed for at least the following reasons:

First, the only factual bases for these claims are allegations by "confidential witnesses"—anonymous sources consisting of former Coventry employees. None of these purported witnesses meet the standards necessary for their assertions to be given any weight. Some witnesses were not employed during the relevant period and thus can have no personal knowledge of the issues about which they spoke. As to those who were employed by Coventry during the relevant time, plaintiffs attribute only generalized allegations about the Company without setting forth any basis on which the witnesses would have known this information. For example, although plaintiffs claim that Coventry wrongfully failed to maintain sufficient reserves, the sources who address this issue are not alleged to have any knowledge of or role in evaluating or setting reserves. Still other sources are coupled to blanket assertions regarding the Company overall, again without providing any reason to believe these individuals would have such information.

---

[1]    All citations to "¶ ____" refer to the Complaint.

[2]    Mr. Wolf, Mr. Guertin, and Mr. Soistman resigned, respectively, in January 2009, November 2009, and March 2009. ¶¶ 19, 20, 22.

Second, plaintiffs do not plead particularized, materially false statements as required by the PSLRA.  The Complaint contains sixty paragraphs purporting to identify false statements made during the putative class period, many of which consist of lengthy excerpts of conference calls or other communications.[3]  Plaintiffs repeatedly fail to allege what aspects of these statements are false, much less provide particularized facts supporting the claim.  Moreover, although a securities fraud claim cannot be based on an accurate representation of historical factual information, plaintiffs frequently quote just such information in reproducing the purportedly "false statement."  As to the two main claims in this action—that Coventry underpriced its premiums and failed to set sufficient reserves to pay claims—there are no allegations in this Complaint that identify with particularity when any specific claims processing or reserve problems occurred, much less connect them with a specific "false statement."  Further, plaintiffs do not properly allege that any of Coventry's predictions regarding future earnings or growth or the adequacy of reserves were materially false statements because those statements were not worded as guarantees and given the inherently predictive nature of these estimates.

Finally, plaintiffs fail to set forth the requisite strong inference of scienter.  The allegations of intentional or reckless conduct are generalized, conclusory assertions that uniformly fail to establish that <u>any</u> defendant had reason to believe that any specific problem existed at any well-identified point in time, much less that such problems rendered any particular statement false.  Plaintiffs also fail to set forth a motive for any defendant to engage in wrongful behavior.  They attempt to plead such a motive by simply listing various stock sales by defendants during the putative class period, but these decontextualized snippets of information do not establish the suspicious circumstances required for executive stock sales to show a motive

---

[3]    Most notably, the Complaint does not allege that defendants Soistman or Ruhlmann made even a single challenged statement during the putative class period.

to commit securities fraud.  Particularly given the Company's 2008 disclosure of information identifying problems as well as its long-term repurchase of its own stock, the most plausible explanation for the conduct plaintiffs challenge is that defendants genuinely and reasonably believed that the PFFS product was performing as represented and that the Company had adequate reserves to cover PFFS claims.  The mere fact that these beliefs were ultimately proven wrong is insufficient to establish securities fraud.

## II.     FACTUAL ALLEGATIONS

### A.     Coventry's Business

Coventry is a managed health care company, headquartered in Maryland, that operates "health plans, insurance companies, network rental/managed care services companies, and workers' compensation services companies."  ¶¶ 18, 45.  Coventry is organized into three business divisions:  the Commercial Business division, the Specialty Business Division, and the Individual Consumer and Government Business division.  ¶ 46.

The Individual Consumer and Government Business division includes various Medicare-related insurance products.  ¶¶ 46, 48.  Medicare is the federal government program that provides health insurance to individuals sixty-five years and older.  ¶ 50.  Although recipients can receive benefits directly through the Medicare program, they can also receive benefits through insurance plans offered by private companies—the so-called Medicare Advantage plans.  Medicare Advantage plans include all ordinarily applicable Medicare benefits but also offer additional coverage (for example, dental care) that is not available under traditional Medicare.  ¶¶ 50-51.  Both Medicare and Medicare Advantage are administered by the Centers for Medicare and Medicaid Services ("CMS").  ¶ 52.  Coventry contracts with CMS to provide insurance coverage to Medicare beneficiaries through private plans and, in exchange, receives contractual reimbursements from CMS in a fixed payment per member each month.  Id.

Two components of Coventry's business are relevant to this action.  First, as do all insurance companies, Coventry maintains reserves for payment of claims—"medical liabilities," including incurred but not yet reported ("IBNR") claims.  ¶¶ 5, 91.  "Medical liabilities consist of actual claims reported but not paid and estimates of health care services incurred but not reported."  Ex. 1 at 34 (2006 Form 10-K filed Feb. 28, 2007).[4]  Coventry's reserves models are prepared by a team of actuaries and use a "consistent methodology," but the Company will adjust its reserves from time to time based on trends that it observes.  Ex. 1 at 35.[5]  Second, Coventry analyzes and discloses the so-called "Medical Loss Ratio" ("MLR"), which is "the ratio of [medical] expenses of providing healthcare services, expressed as a percentage of insurance premiums."  ¶ 5.  A higher MLR percentage means that a relatively high percentage of premium payments taken in by Coventry is being paid out to health care providers or other payees; a lower MLR percentage, conversely, means that Coventry is retaining relatively more of the premium payments and thus making greater profits.  See, e.g., ¶ 61.  Accordingly, any given product offered by Coventry can affect its finances in at least two ways—in the amount of reserves it carries to cover past claims and in the amount of premiums it actually expends in payment of current year claims.

---

[4]    This Court may properly consider the full text of documents cited in or relied on by the Complaint, as well as other publicly-filed documents, the authenticity of which cannot reasonably be challenged.  See, e.g., Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 625 (4th Cir. 2008); In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 389 n.7 (4th Cir. 2005); In re USEC Sec. Litig., 190 F. Supp. 2d 808, 812-13 (D. Md. 2002).  All of the documents attached as exhibits hereto were cited in the Complaint or are required public filings.

[5]    The Complaint refers to Coventry's "incurred but not reported ('IBNR') reserve."  ¶ 5.  Coventry's reserve models "do not calculate separate amounts for reported but not paid and incurred but not reported, but rather a single estimate of medical claims liabilities."  Ex. 1 at 35.

B.      **Coventry's Private Fee-For-Service Plan**

1.      **The 2007 Introduction Of PFFS**

This litigation centers around one of Coventry's Medicare Advantage products, the PFFS product, also known as "Advantra Freedom," which Coventry first offered in January 2007. ¶¶ 2, 55.  Unlike most Medicare Advantage plans, PFFS plan members are "not limited to network providers, but may utilize any provider willing to accept the plan's terms and conditions."  ¶¶ 53, 59 (quoting Coventry 2006 Form 10-K filed Feb. 28, 2007); see also ¶¶ 51, 53 (describing other Medicare Advantage plans).  Although Coventry first offered this PFFS product in January 2007, ¶¶ 2, 55, the premiums for all of calendar year 2007 had to be submitted to and approved by CMS during the summer of 2006.  ¶¶ 7, 71 (describing how annual bids are submitted during the summer prior to calendar year for which they apply).   Coventry is reimbursed for PFFS by CMS.  ¶ 54.  The Complaint alleges that the PFFS product was important to Coventry's future growth prospects.  ¶¶ 56-61.

From January 2007 through June 15, 2007 and then from August 16, 2007[6] through the end of the year, Coventry enrolled many new PFFS members.  See, e.g., ¶¶ 107, 116, 120, 125, 129 (quoting various public statements on this point); see also, e.g., ¶ 145 (quoting statement at investor conference that PFFS membership grew from "zero to in excess of 150,000 members" in 2007).  For example, in March 2007, Coventry announced that it would increase its PFFS membership by 35,000 members after receiving a contract from the State of West Virginia Public Employees Insurance Agency effective July 1, 2007.  ¶ 112.  Indeed, many of the public statements plaintiffs challenge as false from 2007 simply recount the numbers of new members,

---

[6]      As did six other companies, Coventry temporarily suspended marketing of PFFS plans for two months in 2007. ¶ 70.

the medical loss ratio at that time, and revenues received from the PFFS product.  See, e.g., ¶¶ 116, 119.  Plaintiffs do not claim that this data was factually inaccurate.

Notwithstanding the success it had in bringing in new members, Coventry consistently acknowledged that the PFFS product had relatively higher costs than did its other plans.  See, e.g., ¶ 119 (explaining that the PFFS business has a "lower premium yield than our existing Medicare Advantage business" and stating that increases in gross margin driven by "increased business . . . is offset by the increased medical costs associated with this increased business"), see also ¶¶ 128, 138 (same).  Moreover, in response to an April 2007 analyst question regarding "claims lag"—i.e., the time between the date a claim is made and the claim is paid—Mr. Guertin stated that PFFS would likely be analogous to Medicare rather than commercial business and that Medicare "does typically run a little bit longer lag th[a]n commercial." ¶ 117.

### 2.     The PFFS Plan In The First Half Of 2008

At the beginning of 2008, Coventry acknowledged that it had experienced delays in processing PFFS claims.  Mr. Guertin explained on February 8, 2008:

> As a result of our rapid membership growth during the first two quarters of the year, and then the addition of 35,000 . . . members [from the West Virginia contract] at the beginning of the third quarter[], we were incurring medical expense faster than the rate of claims submission and claim payment.  The result of this was a buildup of reserves during this period . . . . During the fourth quarter, the receipt of claims began to catch up with the increased membership, and we made a concerted effort to increase our overall claim processing speed through both a substantial reduction in claim inventory and accelerating the rate at which we paid new claims once we received them. . . . [T]his effort led to significantly more paid claims in the current quarter, impacting both cash flow from operations and the needed reserve level on private fee-for-service.

¶ 150 (quoting statements from February 8, 2008 conference call).  In responding to questions, Mr. Guertin expressed his belief that, following an analysis of the delay issues, Coventry had adequate reserves to cover all claims.  ¶ 151.

Just as with the 2007 statements, virtually all of Coventry's statements from the first half of 2008 that are quoted in the Complaint (with the exception of the February 2008 announcement) merely identify the number of enrolled customers and similar factual information.  See, e.g., ¶¶ 148, 158, 160, 163, 166.  Plaintiffs do not allege that this data was inaccurate.

### C.    The June And October 2008 Disclosures

On June 18, 2008, Coventry issued a press release announcing a reduction in full year 2008 and quarterly guidance because of the performance of several business segments.  Part of this reduction was because the Company expected the overall Medicare Advantage program's medical loss ratio to be higher than previously estimated.  This revision was attributed to the PFFS business, as to which Coventry "received a much higher than expected level of PFFS claims related to prior periods [2007], which is inconsistent with claims submission patterns of network-based Medicare Advantage products."  ¶ 173.  Although plaintiffs quote only a portion of the press release, that document reveals that almost half the reduction in guidance was attributable to the performance of other parts of Coventry's business, i.e., its commercial group, and other operating modifications.  Ex. 2 at 1-2 (June 18, 2008 Press Release); see also ¶ 173 (quoting portion of press release attributing $0.41 reduction to commercial group and other operating modifications and $0.42 to Medicare Advantage medical loss ratio).[7]

As to PFFS, Mr. Guertin explained in a conference call that "[t]he issue here, to a large extent, starts and ends with the fact that the lag in claims submission on this product is substantially longer than we had assumed at the end of 2007 and, for that matter, substantially

---

[7]    Similarly, while the Complaint devotes over five pages to citing statements made in the conference call after the press release was issued, ¶¶ 175-77 (Compl. pp. 55-61), it ignores the extensive questions relating to the Company's commercial group.  Ex. 3 at 4-14 (June 18, 2008 Tr.).  Indeed, many of the analysts focused their questions on the commercial group and raised relatively few questions regarding PFFS.  See, e.g., Ex. 3 at 4-8.

longer than what we experienced on our Medicare Advantage HMO business. . . . [I]t's important to understand that, at its heart, this is more an issue about reserving and internal operations than it is about core product fundamentals."  ¶ 175; see also ¶¶ 176-77 (answering additional questions about PFFS and noting that "in the first year of a product . . . the claim lag factors are very difficult to use").  Mr. Guertin also stated that some of the problem was caused by delays and errors made by providers and intermediaries but nonetheless acknowledged that Coventry had, "over the past few weeks . . . discovered some issues regarding our own processing that were not only creating delays in the claim payment process but also creating some gaps in our analytics around understanding the true claim lag on this product." ¶ 175 (also noting issue relating to claims that were denied because Medicare-required elements were not submitted, not because of lack of liability).  Mr. Wolf and Mr. Guertin emphasized that Coventry's efforts to analogize PFFS to existing Medicare products had ultimately underestimated unique aspects of this new product.  ¶¶ 175-77.  Coventry's stock declined after the June 2008 announcement.  ¶ 178.

On July 25, 2008, the Company reaffirmed its June 2008 revised guidance, ¶ 180, and Mr. Guertin reiterated in a conference call that "[t]he story related to prior-year reserve development is unchanged from June." ¶ 181; see also ¶¶ 182 (additional statements by Mr. Guertin about Medicare MLR), 184 (reiterating point in August 7, 2008 10-Q).

On October 21, 2008, however, Coventry reduced its guidance, disclosing that it would decrease its 2008 earnings per share guidance from $3.65-$3.73 to $2.53-$2.57 per share.  ¶ 188. The total $1.27 reduction in guidance was attributed to numerous factors.  For example, twenty cents was attributed to investment impairments (namely, Lehman holdings), lower investment yields, and increased interest expense from credit facility borrowings.  Id.  Although thirty cents

was attributed to the commercial risk group, plaintiffs emphasize the thirty-nine cents

attributable to the Medicare Advantage program.  Id.  Coventry reduced guidance by thirty-nine

cents per share to reflect the worsening medical loss ratio for these products—i.e., the relatively

high expenses in proportion to the premiums collected.  Id.  Coventry emphasized that these

problems were unrelated to those identified in June:

> This is not an issue that has anything to do with any additional reserve
> development back to 2007, nor is it any issue with any internal claim payment
> practices.  Those issues were identified and fully corrected in the second quarter.
> It is an issue about current year 2008 performance on this product. . . . The
> problem . . . is being driven on the medical expense side and in particular on our
> individual products as opposed to our group products.

¶ 189.  After announcement of the decreased guidance and the various factors contributing to that

change, Coventry's share price fell, ¶ 190, and this suit followed almost a year later.

## III.    ARGUMENT

To set forth a Section 10(b) claim, plaintiff must plead a material misrepresentation or

omission made with scienter relating to the purchase or sale of a security on which investors

reasonably relied to their detriment.  Matrix Capital Mgmt. Fund, LP v. Bearingpoint, Inc., 576

F.3d 172, 181 (4th Cir. 2009); Cozzarelli, 549 F.3d at 623.  Because of the risk that securities

actions "can be employed abusively to impose substantial costs on companies and individuals

whose conduct conforms to the law," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308,

313 (2007), the PSLRA imposes stringent pleading standards regarding both the supposedly false

statement and defendants' state of mind.  Cozzarelli, 549 F.3d at 623.  Plaintiffs here fail to meet

those standards.

### A.    The Confidential Witnesses On Which Plaintiffs Base All Of Their Factual
       Claims Fail To Meet The Standards For Such Sources

Plaintiffs attempt to meet their heightened pleading burdens by relying exclusively on

nine anonymous sources to set forth the underlying facts establishing their claims.  ¶ 35.

Quantity, however, does not make up for quality.  "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 174 (4th Cir. 2007) (citation, punctuation omitted); see also In re Cree, Inc. Sec. Litig., 333 F. Supp. 2d 461, 472 (M.D.N.C. 2004) (stating that sources must "relay[ ] first-hand knowledge" and not be "merely speculating").  Given the complete absence of any documentary sources supporting plaintiffs' claims, plaintiffs' obligation to describe these sources assumes a "heightened importance."  Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 148 (3d Cir. 2004).  The nine sources here fall short, and none of them is a reliable source for the statements attributed to him or her for reasons described below.[8]

First, several alleged confidential witnesses or "CWs" (CW2, CW3, CW4 and CW9) were not employed at Coventry for the entire putative class period and thus cannot provide reliable personal knowledge relating to events during the time periods when they were not working for the Company.  Teachers' Ret. Sys., 477 F.3d at 177 (rejecting allegations from a source who was not an officer during the class period and who otherwise provided no facts establishing how he "could have had any access to this information").  For example, CW2 did not begin working at Coventry until March 2007, ¶ 37, but 2007 bids for pricing for PFFS were submitted in 2006.  See, e.g., ¶¶ 7, 71 (alleging that 2008 bids were made during the summer of

---

[8]    Regardless of particularity issues, all the statements the Complaint attributes to CW6, CW7, and CW8 and the statements attributed to CW9 in paragraphs 67-68 relate only to Coventry's marketing practices in early 2007. ¶¶ 64-68 (claiming Coventry used improper tactics to market health plans).  No claims, however, are based on this conduct.  Thus, the allegations on this issue, as well as conclusory comments that Coventry engaged in "over-selling," e.g., ¶ 3, are legally irrelevant.  See, e.g., Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 586-87 (E.D. Va. 2006) ("'Defendant's conduct does not establish a Rule 10b-5 violation unless Defendants made a misleading statement in conjunction with the conduct'"; finding that "even if [defendant's] commission practices were improper, Plaintiff has no claim for securities fraud on that basis alone") (citation omitted).  Allegations in paragraphs 69-70 should also be disregarded for the same reasons.

2007).  Thus, CW2 can have no personal knowledge with respect to the claim attributed to him

or her that "when Coventry first entered the PFFS market at the start of 2007, the Company

deliberately under-priced its PFFS plan premiums in the annual bids which it submitted to CMS

in order to quickly grow its PFFS business."  ¶ 63.  Similarly, CW3 did not begin working at

Coventry until April 2007, ¶ 38, and CW9 did not begin working in the San Antonio call center

until October 2007.  ¶ 44.  Therefore, neither is a reliable source as to any events during earlier

time periods.  Most notably, CW4, to whom plaintiffs attribute numerous statements regarding

Coventry's computer system and claims process, did not begin working at Coventry until

September 2008—over a year-and-a-half after the putative class period began and at most, seven

weeks before the putative class period ended and conceivably as few as three weeks.  ¶ 39.  CW4

simply has no personal knowledge of any events at Coventry during virtually all of the putative

class period, and allegations based on CW4 in particular should be rejected.  Chubb, 394 F.3d at

154.  ¶ 39.[9]

        In addition, several CWs are low-level employees (CW3, CW4, CW5 and CW9), as to

whom the Complaint offers no basis to believe that they could have possessed the company-level

knowledge they purport to provide to plaintiffs.  CW3 is alleged to be a provider relations

representative who "was tasked with helping Coventry's Claims Department tackle the huge

backlog of PFFS claims."  ¶ 38.  CW4 and CW5 are, respectively, a Claims Processor and a

Technical Claims Specialist, and each was "responsible for reviewing and processing PFFS

claims."  ¶¶ 39, 40.  Plaintiffs do not identify where CW3 or CW4 worked, but CW5 was

employed at the Company's Houston, Texas claims center, not its corporate headquarters.  ¶¶ 38-

40.  CW9 is alleged to have been a "supervisor in Coventry's San Antonio, Texas call center

---

[9]     For the same reason, even if allegations based on CW8 were relevant, they should be disregarded because
        CW8 left Coventry in April 2007.  ¶ 43.

responsible for handling PFFS enrollment and claims." ¶ 73. Although according to plaintiffs these CWs purportedly experienced problems and delays in processing claims, none states the nature or magnitude of any such problems on a company-wide basis. Indeed, these lower-level CWs plainly lack any basis to know such matters. Chubb, 394 F.3d at 149 (rejecting claims based on statements by "low-level, locally sited former employees" that failed to "alleg[e] how or why such employees would have knowledge that expanded beyond what the vague descriptions suggest"), 153 ("It is far from clear how a branch manager would have knowledge of what senior . . . executives knew."). Accordingly, their statements are insufficient to establish problems on a company-wide basis, much less to establish that anyone at the executive level was aware of such issues.[10]

Therefore, this Court should disregard the statements attributed to the CWs on the grounds that they are unreliable sources.[11]

**B.      The Complaint Does Not Set Forth A Materially False Statement**

Plaintiffs generally allege that all of defendants' statements regarding PFFS were false because they failed to address supposed delays in claims processing that, in turn, meant that Coventry had insufficient reserves and because Coventry failed to address the underpricing of the PFFS plan that led to higher than anticipated medical loss ratios. This general theory does not, however, plead a particularized false statement as required by the PSLRA. 15 U.S.C. § 78u-4(b)(1). A complaint cannot withstand a motion to dismiss unless it states "sufficient facts to permit a reasonable person to find" that defendants made a false statement. Teachers' Ret. Sys., 477 F.3d at 173 (emphasis in original). Courts should consider the "number and level of detail

---

[10]    Even if the allegations from CW6, CW7, or CW8 were relevant, these individuals are also low-level employees (a Senior Customer Communications Specialist, a Service Operations Manager and a Compliance Specialist, respectively). ¶¶ 41-43.

[11]    The statements relating to reserves that are attributed to CW1 and CW2 suffer from particular flaws that are discussed infra at 19-21.

of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading." Id. at 174. Considered under these standards, this Complaint does not plead the existence of a materially false statement.

### 1.    Plaintiffs Repeatedly Fail To Identify What Aspect Of A Given Statement Is False

It is impossible to tell what particular aspect of the numerous statements quoted in the Complaint is supposedly inaccurate. This facially violates the PSLRA and requires dismissal of the action. Teachers' Ret. Sys., 477 F.3d at 173 (citing 15 U.S.C. § 78u-4(b)(1) and requiring plaintiffs to identify each false statement and "the reasons why they were misleading").

Rather than identifying what aspect of each challenged statement is supposedly false and the reasons why it is false, the 93-page, 249-paragraph Complaint simply quotes lengthy excerpts of Coventry's statements from February 9, 2007 through October 22, 2008[12] and then lists various—usually repetitive—reasons why each statement is false. For example, paragraph 175 consists of two pages of single-spaced excerpts from a June 18, 2008 conference call containing statements from Mr. Guertin and Mr. Wolf regarding numerous topics. Likewise, paragraph 176 quotes almost three pages of single-spaced questions and answers from the same call. Paragraph 179, however, states only that these "statements" were false because they "downplay[ed] the severity of the problems," failed to state that Coventry had experienced claims problems during

---

[12]    Indeed, plaintiffs appear to have included paragraphs identifying every statement—a total of approximately 60 statements on 22 different dates—made by Coventry regarding PFFS during the entire putative class period and contended that it is, in some way, false. There are twenty-five paragraphs quoting supposedly false statements in 2007. ¶¶ 107-08 (Feb. 9, 2007), 110 (Feb. 28, 2007), 112 (Mar. 15, 2007), 113 (Mar. 19, 2007), 115-17 (Apr. 27, 2007), 119-22 (May 10, 2007), 124-26 (July 31, 2007), 128-31 (Aug. 8, 2007), 133 (Sept. 10, 2007), 135-36 (Oct. 26, 2007), 138-40 (Nov. 9, 2007), and 142 (Nov. 27, 2007). There are thirty-one paragraphs quoting supposedly false statements in 2008. ¶¶ 144-45 (Jan. 7, 2008), 147-51 (Feb. 8, 2008), 153-56 (Feb. 28, 2008), 158-59 (Mar. 17, 2008), 160 (Mar. 18, 2008), 162-63 (Apr. 25, 2008), 165-69 (May 12, 2008), 171 (May 21, 2008), 173-77 (June 18, 2008), 180-82 (July 25, 2008), and 184-86 (Aug. 7, 2008).

the entirety of the class period, and the "MLR for its PFFS" was still understated.  Based on

these general assertions, it is impossible to tell what particular statement within these five pages

of text was purportedly "false" when made.  In re Cryomedical Sciences, Inc. Sec. Litig., 884 F.

Supp. 1001, 1013 (D. Md. 1995) (Williams, J.) (stating that lengthy quotations do "'not satisfy

rule 9(b)'s edict in the securities fraud context'") (citation omitted).

In other paragraphs, the quoted statement does not correlate with the supposed reasons

that the statement was false.  For example, paragraph 107 recounts positive February 9, 2007

statements by Mr. Wolf and Mr. Guertin about the start of PFFS.  Although paragraph 107 says

nothing about claims processing, reserves set aside for PFFS claims, or the medical loss ratio,

paragraph 109 contends that the February 9, 2007 statement was false because Coventry was

supposedly overwhelmed by rapid growth in PFFS membership; it had experienced "significant

problems" with "timely and accurately processing PFFS claims, leading to a huge backlog of

unpaid claims"; it was receiving significantly more claims than it had anticipated; it failed to

reserve adequate IBNR claims expenses and thus distorted the true MLR; the PFFS business

"was and would be significantly less profitable than anticipated"; and defendants lacked a

reasonable basis for positive statements about PFFS's business prospects and growth.  No

allegations, however, establish that, as of February 9, 2007, a mere month after the PFFS

program was on the market, there was or could have been rapid growth overwhelming the

Company, receipt of significantly more claims than anticipated, or a claims process backlog; nor

do allegations show that, at that point, the product was "less profitable" or reserves were

inadequate.

Plaintiffs must plead fraud on a statement-by-statement basis, and "they may not evade

that requirement by relying on this Court and the Defendants to try to match particular

15

allegations scattered through a [lengthy] complaint." In re First Union Corp. Sec. Litig., 128 F.

Supp. 2d 871, 887 (W.D.N.C. 2001) (criticizing allegations that were not connected to particular

time periods or that attempted to claim falsity based on events that had not yet occurred); see

also Teachers' Ret. Sys., 477 F.3d at 175 (agreeing that plaintiffs failed to comply with their

burden of pleading specific facts identifying why each challenged statement was false).

Plaintiffs' approach, which places on defendants and the Court the burden of identifying what is

false and why, is contrary to their PSLRA pleading obligations. Osher v. JNI Corp., 256 F.

Supp. 2d 1144, 1153-54 (S.D. Cal. 2003) (criticizing plaintiffs when "the court is left to

speculate which portions of the block-quoted passages are alleged to be false or misleading");

see also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 841-42 (N.D. Cal. 2000) (cited in

Osher; criticizing similar approach).

Plaintiffs also may not meet their burdens simply by contending that, because there were

problems with claims processing, for example, every positive or even factual statement by

defendants regarding PFFS was necessarily false. "'It is not the law that a 10b-5 complaint is to

be judged on the basis of the general flavor derived from an issuer's collective statements over a

long period of time.'" First Union Corp., 128 F. Supp. 2d at 886 (citation omitted, emphasis in

original); see also id. at 893 n.21 (rejecting theory that statements containing "'positive themes

and suppressed negative information'" could articulate basis for liability) (citation omitted).

Such an approach would nullify the PSLRA and allow plaintiffs to proceed based on

impermissibly general and conclusory bases. Teachers' Ret. Sys., 477 F.3d at 175 (affirming

dismissal of complaint that, after each misleading statement, simply listed a "formulaic" set of

reasons why it was false; proceeding to analyze each separate statement and the facts supposedly

establishing falsity).

16

This Complaint should be dismissed because plaintiffs have not identified what parts of each challenged statement were false and why.

### 2.    Accurate Statements Of Fact Cannot Form The Basis Of Liability

Numerous statements quoted in the Complaint merely recount numbers of customers enrolled, state that PFFS was a new and significant initiative for Coventry, or report earnings and other financial results.  Plaintiffs do not contend that any of these representations were false, and thus the great majority of the claims in this Complaint are facially inactionable.

Virtually all of the twenty-five statements quoted from 2007 and many statements in 2008 contain such factually unchallenged statements.  See, e.g., ¶¶ 107 (identifying commencement of PFFS and estimates of new customers), 110 (stating that Coventry typically paid 90-95% of claims within six months of date incurred and 99% within nine months of date incurred), 119, 125, 128, 147 (recounting financial results), 158 (describing results and numbers of new customers).[13]  Both before and after the PSLRA's enactment, courts have regularly held that factually accurate statements cannot form the basis of a securities claim. In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953, 965 (D. Md. 1995) (finding inactionable allegations that "simply report[ed], accurately as it happens," factual events); In re Humana, Inc. Sec. Litig., No. 08-162, 2009 WL 1767193, at *15-16 (W.D. Ky. June 23, 2009) (rejecting various claims regarding defendants' activities and historical fact when no allegations specifically showed that the factual statements were false).  That other problems may or may not have existed does not render such factual information "false."  First Union, 128 F. Supp. 2d at 891 ("Plaintiffs' allegations about continuing customer service problems cannot render inaccurate the historical fact that First Union actually completed the conversion of particular customer accounts.").

---

[13]    The following paragraphs also contain unchallenged statements of fact:  ¶¶ 112, 115, 116, 120, 124, 126, 133, 135-36, 138, 144-45, 148, 150, 153-54, 158, 160, 162-63, 165-66, 171, 173, 175-76, 180-81, 183-84.

Moreover, the accurate description of current customer numbers or revenues does not constitute a representation that such trends will continue.  Iron Workers, 432 F. Supp. 2d at 586 ("Plaintiff must point to more than revenue figures implicitly representing to investors that such results would continue."); see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").  None of plaintiffs' claims regarding the number of customers enrolled, financial results, descriptions of actions actually taken by Coventry, or similar information can proceed because plaintiffs do not allege that these statements were inaccurate.

### 3. Statements Regarding Reserves And Claims Delays Are Inactionable

Plaintiffs' claims apparently hinge on the theory that every statement made by Coventry was false because Coventry failed to set adequate reserves for PFFS medical liabilities.  See, e.g., ¶¶ 5, 109(d)-(f), 118, 123, 152(a)-(b), 157, 161, 164, 170, 179.  As a corollary to this point, plaintiffs contend that part of the reason that reserves were inadequate was that Coventry underestimated the number of claims that would be owed due to pervasive delays in claims processing.  See, e.g., ¶ 4.  These claims fail at the very least because none of the CWs on whom plaintiffs rely to show that problems with reserves or claims delays resulted in materially false statements is a legally reliable source.  Specifically, neither of the sources who address reserves have any identified basis for knowledge, nor do they pinpoint any particular statement that was supposedly false.  In addition, the contentions regarding delays in processing are anecdotal accounts by low-level employees who have no basis for making assertions about the Company's practices overall.  At best, these claims plead fraud by hindsight based on the fact that the PFFS reserves ultimately proved insufficient, but this does not establish that any particular statement

was false when made.[14]  "[F]raud by hindsight is not actionable."  <u>Cryomedical</u>, 884 F. Supp. at

1015.  "[A]n inability to foresee the future does not constitute fraud."  <u>Id.</u> at 1014 (citation,

punctuation omitted).

### a.        The Reserves Claims Are Inadequately Pleaded

At the outset, it is important to note that plaintiffs do not challenge Coventry's

representation that its "[m]edical liabilities estimates are developed using actuarial principles and

assumptions that consider, among other things, historical claims payment patterns, provider

reimbursement changes, historical utilization trends, current levels of authorized inpatient days,

other medical cost inflation factors, membership levels, benefit design changes, seasonality,

demographic mix change, and other relevant factors."  Ex. 1 at 34 (2006 Form 10-K filed Feb.

28, 2007); Ex. 4 at 30 (2007 Form 10-K filed Feb. 28, 2008).   Nor do plaintiffs contest

Coventry's statement that it employs a "team of actuaries" for these purposes that use particular

types of reserve models that consider "moderately adverse conditions."  Ex. 1 at 34-35.[15]

Given these undisputed descriptions of Coventry's actuarial processes, the first fatal flaw

in plaintiffs' reserves claims is that the only two sources who speak to supposed errors in

reserves analysis—CW1 and CW2—are not described in a way that gives them any credence as

to these issues.  The Complaint alleges that CW1 was an "executive management-level

employee," ¶ 36, but does not identify his or her responsibilities.  Importantly, CW1 is not

alleged to have had any responsibility or expertise in setting reserves, or in determining what

---

[14]     These claims are also independently inactionable to the extent that plaintiffs are making claims based on
predictions of future reserves.  <u>See</u> infra at 26-28.

[15]     Plaintiffs' failure to challenge this description of Coventry's underwriting process also makes it impossible for
them to support any theory that Coventry did <u>not</u> have a disciplined underwriting process.  <u>See, e.g.</u>, ¶¶ 125,
142, 149, 163.  There is certainly no claim that the process identified in Coventry's public filings was not
followed <u>or</u> that this would not constitute "disciplined" underwriting.  Again, the only basis for plaintiffs'
claim that the process was not "disciplined" is the fact that the reserves ultimately proved inadequate, a classic
case of pleading based on impermissible fraud by hindsight.

level of delays in claims processing required adjustment of reserves.  CW2 is only identified as

being a consultant "responsible for underwriting Coventry's PFFS product."  ¶¶ 37, 96.   Neither

of these descriptions offers any basis to give either CW1 or CW2 any weight when they state

generally that it was "apparent" by early 2008 that Coventry was "not adequately reserved."

¶¶ 88, 97, 99; see also ¶ 92 (recounting general, unattributed allegation to same effect).  Nor does

the Complaint explain the basis for CW1's opinions as to how reserves should have been

calculated.  ¶¶ 93-95.  These allegations are simply insufficient to permit CW1 or CW2 to opine

on any issues related to reserves.  Teachers' Ret. Sys., 477 F.3d at 181 (rejecting CW's assertion

that company had no saleable product and as to value of division where the complaint did not say

"how this person would know this information or would have expertise in valuing a business");

Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 140-41 (D. Conn. 2007) (rejecting CW testimony

that reinsurer's accounting and claims processing problems made its loss reserves inadequate,

where, among other things, "none of the CWs are alleged to have been involved in or to have any

familiarity with the process of setting or estimating loss reserves").

Second, the only two allegations regarding reserves that purport to identify a time at

which the problem occurred are too vague to establish the falsity of any particular statement.

CW1 and CW2 state that "by early 2008," it was apparent that Coventry had not adequately

reserved.  ¶¶ 97, 99.[16]  There is no explanation of how CW1 and CW2 reached this conclusion or

any analysis of the amount by which the reserves were supposedly understated.  Ironworkers,

432 F. Supp. 2d at 588 (finding that plaintiffs' claims were inadequate because they did not

"allege even a general figure for such amounts" that supposedly "should have been reserved");

Chubb, 394 F.3d at 152-53 (rejecting allegations regarding supposed manipulation of reserves

---

[16]   Of course, even if these allegations were adequate, they establish that any theoretical class period could not
commence until some unspecified time in the beginning of 2008, which is the first point at which any CW
contends that it "was apparent" to someone that the reserves were "inadequate."

when confidential witnesses provided no "particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized").

These allegations are certainly not sufficient to establish that Coventry's February 2008 statement—or any other statement—was false.  In the February 8, 2008 conference call, Mr. Guertin explained that as a result of PFFS's rapid growth Coventry had incurred expenses faster than the rate of claims submission and payment, that Coventry "made a concerted effort to increase our overall claim processing speed," that Coventry had analyzed reserves issues as part of its assessment of claims delays and that the problems identified were not material and that "our reserves were fine."  Ex. 5 at 4, 7 (Feb. 8, 2008 Conf. Call Tr.); <u>see also</u> ¶¶ 147-51.[17] Nothing in the CWs' utterly conclusory statement that it was "apparent" that the Company had not adequately reserved is adequate to establish a particularized false statement.

Finally, plaintiffs may not point to the fact that the PFFS reserves were ultimately inadequate and the MLR increased to establish the contemporaneous falsity of any particular statement.  In the <u>Malin</u> decision, the district court criticized plaintiffs' listing of various factual statements regarding the defendants' reserve process and simply asserting that those statements were false without supporting facts:

> Plaintiffs do not allege with particularity why these statements were fraudulent. Plaintiffs simply list the statements and assert that because large reserve increases were necessary, the accounting practices described must not have been followed. … There is no evidence . . . that Defendants' statements about the Company's accounting procedures were false or that they were not followed. . . . [T]he process of estimating loss reserves is a difficult one, and even following these accounting policies might not result in adequate loss reserves.  It is clear . . . the Plaintiffs must provide evidence of fraud, aside from the mere fact of the loss reserve increases, to prevail on their claims.

---

[17]    As described <u>infra</u> at 35, n.22, far from showing that Mr. Guertin's statements about the Company's "concerted effort" were false, certain statements attributed to the CWs corroborate this representation.

499 F. Supp. 2d at 145-46.  "Plaintiffs must do more than allege that Defendants could not have

actually believed that loan loss reserves were adequate because they later increased reserves."

Id. at 148; see also In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 689-90 (S.D.N.Y.

2004) (holding that reserves statements were inactionable unless worded as guarantees).

Moreover, plaintiffs simply cannot bring securities claims based on the premise that defendants

were "incorrect or unskillful" in determining the requisite amount of reserves.  Id. at 689-90.

That, however, is all this Complaint has alleged.  The claims based on inadequate reserves

should be dismissed.

> **b.      No Statements Regarding Claims Processing Are Sufficiently
>            Alleged To Be False**

Many factual allegations contend that PFFS claims processing was significantly delayed,

a fact that contributed to the understatement of reserves.  Even aside from the flaws with the

reserves claims as discussed above, no statement uttered by any defendant is rendered materially

false with respect to claims processing because the confidential witnesses do not provide

particularized facts supporting plaintiffs' position but instead simply make generalized

statements about overall delays.

Many allegations regarding claims are deliberately vague assertions worded in the

passive voice to the effect that the delays were "overwhelming" the company or that the

problems caused by delays "became apparent."  See, e.g., ¶¶ 72, 87, 99.  Numerous other

allegations fail to quantify the effect of delays, simply stating that they existed.  ¶¶ 73-75, 78-80,

83-86 (describing  problems and stating that delays existed but not quantifying amounts or

significance), 88 (stating that volume of PFFS claims was "higher than expected" and the claims

were "costing the Company significantly more" without specifying any amounts).  The CWs

admit that some portion of the alleged problems with claims processing arose because the

providers did not submit the claims in a timely manner, not because of any action by Coventry. ¶ 87 (stating that Coventry did not receive claims for 90-120 days after service). Even the few allegations that provide some specificity as to the scope of the purported problems fail to aver when these problems supposedly existed. See, e.g., ¶¶ 76 (contending that some unspecified queues had backlogs of up to 90,000 claims at some unknown point in time), 77 (alleging "it routinely took more than 45 days for a claim to be initially reviewed" and some claims "were more than 100 days old" without stating when these problems existed).

Thus, all of these allegations and other similar contentions throughout the Complaint do not render any particular statement false because they do not specify the scope of the problems, when the problems existed or when the claims backlog required Coventry to make changes in its reserves; these allegations certainly do not explain the amount of additional reserves Coventry should have taken at any particular time. Iron Workers, 432 F. Supp. 2d at 587-88. Vague allegations that a problem was "well" or "generally" known are not enough to establish contemporaneous falsity. Teachers' Ret. Sys., 477 F.3d at 181 (rejecting allegations that it was "'well-known'" that a company had overpaid when complaint failed to "tie this 'well-known' sentiment to any particular date or persons") (citation omitted); Chubb, 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]").

In short, whether assessed on their own or in conjunction with plaintiffs' claims regarding reserves, the allegations regarding claims delays are insufficient to establish a false statement.

### 4.     Numerous Statements Are Inactionable Because They Are Merely Predictions Of Future Events

Throughout the Complaint, plaintiffs assert that every statement regarding the Company's future earnings, growth, and prospects with respect to PFFS was false, stating

generally that Coventry had "no reasonable basis" for its estimates, particularly in light of the

purported reserves issue. [18]   Claims attacking all of these statements should be dismissed because

they are not alleged to be false, because they are not alleged to be material, and/or because they

fall under the PSLRA's safe harbor.

### a.     Plaintiffs Do Not Allege That Any Of The 2007 Predictions Were False

The first reason that many of plaintiffs' general claims regarding "predictions" and

"prospects" should be rejected is that the Complaint does not actually allege that any of the 2007

predictions were not met.  Plaintiffs do not contend that Coventry missed any quarterly or annual

guidance in 2007, and plaintiffs do not claim that any descriptions of prior earnings were

inaccurate.  All of these claims should be dismissed.

### b.     Guidance Or Predictions Regarding Earnings Are Inactionable Because They Were Not Worded As Guarantees

The second independent basis for dismissal is the inherently uncertain nature of

predictions.  The Fourth Circuit has repeatedly and consistently treated predictions of earnings

and growth as immaterial unless they were worded as guarantees.  In re Trex Co., Inc. Sec.

Litig., 454 F. Supp. 2d 560, 575-76 (W.D. Va. 2006) (summarizing Fourth Circuit law).  As the

Fourth Circuit explained:

> Predictions of future growth . . . will almost always prove to be wrong in
> hindsight.  If a company predicts twenty-five percent growth, that is simply the
> company's best guess as to how the future will play out. . . . If growth proves less
> than predicted, buyers will sue; if growth proves greater, sellers will sue.
> Imposing liability would put companies in a whipsaw, with a lawsuit almost a
> certainty.  Such liability would deter companies from discussing their prospects,
> and the securities markets would be deprived of the information those predictions
> offer.

Raab, 4 F.3d at 290.

---

[18]     At least the following statements include predictive statements:  ¶¶ 107-09, 112-18, 120, 123, 125-27, 129, 132-37, 142-52, 158-64, 167, 169-77, 179-82, 187.

Here, not one of the statements offering guidance on earnings or predicting future growth was worded as a guarantee but instead clearly described the predictions as just that—predictions. Thus, they are inactionable under straightforward Fourth Circuit jurisprudence.  See, e.g., Marsh Group v. Prime Retail, Inc., 46 F. App'x 140, 146 (4th Cir. 2002) (finding statements immaterial under Raab line of cases as a matter of law even when management stated that its dividend was "sacred," "sacrosanct" and that it "staked its reputation on its commitment to continue to pay the company's dividend") (citation, punctuation omitted); Trex, 454 F. Supp. 2d at 575-76 (finding statements of guidance figures to be "projections of future performance not contingent on specific stated supporting facts, and made without guarantee" and thus inactionable); id. at 577 (finding guidance in which defendant "'expect[ed]'" certain revenue and earnings growth was not a guarantee) (citation omitted); In re Visual Networks, Inc. Sec. Litig., 217 F. Supp. 2d 662, 667 (D. Md. 2002) ("Defendants' prediction that revenues would grow by 50% in 2000 and 2001" fell within category of inactionable puffery under Fourth Circuit law); In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 683 (D. Md. 2002) (rejecting numerous statements regarding anticipated earnings, guidance, revenues and dividends as immaterial under Raab).

Plaintiffs cannot rescue their claims by arguing that supposed omissions regarding claims processing delays and related issues rendered the guidance and projections materially misleading.  When the underlying statement is immaterial, it does not matter on what grounds plaintiffs challenge it.  "Even if there is a duty to disclose because of the possibility of resting on misleading projections, the omission is only actionable if the underlying affirmative statements are material.  The allegedly omitted facts . . . do not bring materiality to the company's 'puffing' statements of revenue and earnings growth under the standards set forth by the Fourth Circuit."

25

Trex, 454 F. Supp. 2d at 577 (citation omitted); see also Iron Workers, 432 F. Supp. 2d at 586

(rejecting claims based on earnings predictions because plaintiffs failed to "cite specific

statements where [defendant] guaranteed that revenues would continue.  The general allegation

that the reporting of revenues implicitly represented that such results would continue is

insufficient."); USEC, 190 F. Supp. 2d at 821-22 (rejecting claims that seventy-five statements

were "false" when they consisted of "[p]redictive statements" regarding growth and earnings and

"soft puffing statement[s]").[19]

### c.   To The Extent Plaintiffs' Claims Are Based On Failure To Estimate Necessary Future Reserves, Their Claims Are Inactionable For The Same Reasons

Plaintiffs' claims regarding reserves are particularly defective because "[b]y their very

nature, reserve levels are projections of future events and results."  In re Kindred Healthcare, Inc.

Sec. Litig., 299 F. Supp. 2d 724, 733-34 (W.D. Ky. 2004); see also Malin, 499 F. Supp. 2d at

147 (explaining in the reinsurance context that calculation of loss reserves is "informed

guesswork" and that one "cannot … expect equivalent certainty in a balance sheet's statement of

loss reserves") (citation, punctuation omitted).  This is particularly true with respect to reserves

for claims incurred but not yet paid.  Stephens v. Nat'l Distillers and Chem. Corp., 6 F.3d 63, 65

(2d Cir. 1993) ("IBNR reserves, on the other hand, are reserves set aside before claims are even

filed.  Thus IBNR reserves are extremely conjectural, and may need adjustment as time passes

---

[19]   Numerous other statements cited by plaintiffs are inactionable because they are even "softer" puffery than predictions and consist only of "general statements of pride and optimism."  Humphrey, 219 F. Supp. 2d at 682; see also USEC, 190 F. Supp. 2d at 822 (rejecting claims based on assertions that defendant was a "world leader").  Examples of these types of statements include:  (1) PFFS is "off to a roaring start," a "robust start," and has had a "successful entrée," ¶¶ 107 (Feb. 7, 2008), 116 (Apr. 27, 2007), 120 (May 10, 2007), 133 (Sept. 10, 2007); (2) we have a "high degree of confidence in our financial and actuarial teams who built this. . . . [P]rofitability comes first and growth comes second," ¶ 108 (Feb. 7, 2008); (3) Coventry is "right on track for another year of strong growth in revenue and earnings" and made "significant progress"; "we will undoubtedly have another terrific year in Medicare in 2008"; we "feel good about our position" for 2008, ¶¶ 115-16 (Apr. 27, 2007), 136 (Oct. 26, 2007), 150 (Feb. 8, 2008); (4) PFFS is well-positioned to follow suit of Medicare Part D's success story; ¶ 116 (Apr. 27, 2007); and (5) "We remain optimistic for the future." ¶ 175 (June 18, 2008); see also ¶¶ 117, 125, 142, 145, 147, 149-50, 159, 162, 163, 171, 181 (containing similar statements).

and their accuracy can be tested in retrospect"; so stating in context of regulatory proceeding challenging payment of dividends).  Accordingly, any claims based on a supposed failure to predict accurately the amount of future reserves needed are inactionable given the inherently uncertain nature of such predictions and given that Coventry never worded its reserves as guarantees.

The challenged statements in June 2008 warrant special comment.  In June, the Company announced that, after analysis of the PFFS business, the Company "discovered some issues regarding our own processing that were not only creating delays in the claim payment process but also creating some gaps in our analytics around understanding the true claim lag on this product."  ¶ 175.  Mr. Guertin went on to say, though, that the Company "expect[ed]" the MLR to settle between 85.5% and 85.9% for the full year and that "I believe" we have taken a "prudent" approach to resolving the problems.  Id.; see also ¶ 176 (making his "best estimate" on reserves going forward).  These statements, again, are inactionable predictions of future events. See, e.g., Malin, 499 F. Supp. 2d at 144 (rejecting claims based on future loss reserve estimates, especially when phrased in terms of "'I believe'" or "'we think'") (citation omitted); id. at 145 ("No reasonable investor reading these statements would view them as guarantees that XL's loss reserves were sufficient").  The mere fact that management expressed its opinion that loss reserves are "adequate" or sufficient at a given time does not change the fact that such statements are inherently predictive.  See, e.g., Kindred, 299 F. Supp. 2d at 734 & n.11 (explaining that, notwithstanding management's statement that reserves were "adequate," the company's public filings and other disclosures repeatedly pointed out the process by which it made reserves determinations and explained that these estimates could change); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal; finding company's announcement

of change to increase loss reserves did not render earlier statements of adequate reserves false because plaintiffs did not allege that the disclosures were "incompatible with what the most current reserve reports showed at the time the disclosures were made"); see also CIT Group, 349 F. Supp. 2d at 690-91 (holding that fact that defendants revisited amount of loss reserves did not render earlier statements false when made).

        **d.**      **Earnings Guidance And Projections Are Protected By The PSLRA Safe Harbor And The Bespeaks Caution Doctrine**

Although this Court need not reach this issue, all of plaintiffs' claims regarding earnings guidance, projections, and adequacy of future reserves are also inactionable because of application of the PSLRA's safe harbor and/or the bespeaks caution doctrine, both of which protect statements regarding forward-looking statements such as those challenged here.

The PSLRA defines forward-looking statements to include revenue projections, income, earnings, and other statements of "future economic performance," as well the "assumptions underlying or relating" to those statements. 15 U.S.C. § 78u-5(i)(1).[20] Forward-looking statements are protected if they include meaningful cautionary language, if they are immaterial, or if plaintiff cannot show that they were made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1). As already described, the statements regarding future performance are exactly the types of statements that this Circuit has repeatedly found to be immaterial as a matter of law, see supra at 24-26, and, as discussed subsequently, plaintiffs have shown no actual knowledge that

---

[20]    Moreover, Coventry's written public statements explicitly described these types of statements as forward looking. See, e.g., Ex. 1 at 3 (2006 Form 10-K filed Feb. 28, 2007) (identifying estimates, revenue projections, income, and future operations as forward-looking statements and noting that they may be affected by identified risk factors); Ex. 4 at 3 (2007 Form 10-K filed Feb. 28, 2008) (same); see also In re Lab. Corp. of Am. Holdings Sec. Litig., No. 03-591, 2006 WL 1367428, at *6 (M.D.N.C. May 18, 2006) (permitting incorporation of 10-K warnings into other documents; describing extensive case law so holding). Likewise, defendants' oral statements incorporated warnings regarding forward-looking statements. See, e.g., Ex. 6 at 1 (Apr. 27, 2007 Earnings Call) (incorporating warnings from Coventry's 10-Ks and noting that conference would include forward-looking statements); 15 U.S.C. § 78u-5(c)(2)(B) (permitting incorporation into oral statements of written disclosures).

any statement was false at the time it was made.  See infra at 35-38.  Thus, either of these two

prongs of the safe harbor would dispose of plaintiffs' claims.

However, plaintiffs' claims also fail because of the inclusion of meaningful cautionary

language.  Meaningful cautionary language conveys "substantive information about factors that

realistically could cause results to differ materially from those projected in the forward-looking

statement."  Humphrey, 219 F. Supp. 2d at 683-84 (citation omitted).  Here, Coventry provided

just such language, including warnings that earnings and predictions could be affected by higher

than expected health care costs for which there were insufficient reserves:

> **Our results of operations may be adversely affected if we are unable to accurately estimate and control future health care costs.**
> Most of the premium revenue we receive is based upon rates set months before we deliver services.  As a result, our results of operations largely depend on our ability to accurately estimate and control future health care costs.  We base the premiums we charge, at least in part, on our estimate of expected health care costs over the applicable premium period.  Factors that may cause health care costs to exceed our estimates include: … higher than expected utilization of health care services; . . . In addition, medical liabilities in our financial statements include our estimated reserves for incurred but not reported and reported but not paid claims.  The estimates for medical liabilities are made on an accrual basis.  We believe that our reserves for medical liabilities are adequate, but we can not assure you of this.  Any adjustments to our medical liabilities could adversely affect our results of operations.

Ex. 1 at 22 (2006 Form 10-K filed Feb. 28, 2007); Ex. 4 at 19 (2007 Form 10-K filed Feb. 28,

2008); see also Ex. 1 at 22 (stating that results of operations will be adversely affected if we are

"unable to increase premiums to offset increases in our health care costs"); Ex. 4 at 19 (same).

That is, Coventry expressly warned its investors of precisely the risks of which plaintiffs

now complain:  the possibility that Coventry's estimates of medical liabilities might be

inaccurate and that this might affect the Company's operations.  Indeed, the 10-K filed February

28, 2008 contained a chart expressly showing investors the estimated effect to Coventry's

December 31, 2007 unpaid claims liability of hypothetical changes of certain percentages in the

completion factors, trend factors, and utilization rates.  Ex. 4 at 32.  For example, investors were

told that a hypothetical increase of one percent in the completion factor would decrease the

unpaid claims liabilities by $31,750,000, while a hypothetical one percent decrease in

completion factor would increase unpaid claims liabilities by $32,400,000.  Id.  This is the

essence of meaningful cautionary language because "the very problems that Plaintiffs identify as

the actual cause" of Coventry's eventual adjustment to guidance "are the same as the problems

that Defendants warn of in their cautionary language."  Lab. Corp., 2006 WL 1367428, at *5; see

also Humphrey, 219 F. Supp. 2d at 683-84.

      The older, bespeaks caution doctrine leads to the same result.  Under this analysis,

statements cannot constitute securities fraud if "cautionary language" in the document "negates

the materiality of the alleged misrepresentations or omissions."  USEC, 190 F. Supp. 2d at 823.

The warnings described above cautioning investors of the risk that Coventry might underestimate

the numbers of claims and, accordingly, underestimate reserves, are precisely the type of

language that has consistently been found to render predictions immaterial as a matter of law.  Id.

at 823-26 (finding statements immaterial because of extensive cautionary language warning

investors of the risks that materialized); CIT Group, 349 F. Supp. 2d at 689-90 (finding

statements regarding loss reserves inactionable because of disclosure of risks inherent in

estimating reserves).

      **5.**      **There Are No Allegations Establishing That Any Statement Was False Because Of Errors In Premium Pricing**

      Most of the Complaint focuses on supposed misstatements implicating claims delays and

reserves issues.  Nonetheless, plaintiffs seemingly attempt to extend the class period until

October 2008, when Coventry disclosed that the premiums for PFFS were not high enough to

cover claims made, ¶¶ 188-89, by arguing that Coventry "knew" premiums were too low.

There is, however, only one allegation that addresses the issue of underpricing premiums. Paragraph 63 simply asserts that "when Coventry first entered the PFFS market at the start of 2007, the Company deliberately under-priced its PFFS plan premiums in the annual bids which it submitted to CMS in order to quickly grow its PFFS business." ¶ 63.  CW2, the source for this allegation, did not begin employment at Coventry until March 2007, ¶ 37, nine months after the bids for 2007 were submitted in the summer of 2006.  ¶ 71.  CW2 offers no basis for his or her purported knowledge regarding Coventry's decisions the year before that person was employed; there are also no details explaining how the premiums should have been priced or why any particular statement regarding this issue was false when made.  Teachers' Ret. Sys., 477 F.3d at 177 ("the complaint advances insufficient facts to show how [the source] could have had any access to this information and therefore fails to satisfy PSLRA's stringent requirements for pleading misleading statements or omissions").  Thus, plaintiffs have not pled facts sufficient to establish that any statement was false because of problems regarding premium pricing.

**6.     No Statements Regarding Coventry's IT System Were False**

Plaintiffs also contend that statements describing Coventry's IT systems were false.  The Complaint quotes identical statements from Coventry's Forms 10-K filed in February 2007 and February 2008, stating:

> We have implemented advanced information systems. … Each of our health plans operates on a single financial reporting system along with a common, fully integrated application which encompasses all aspects of our commercial, government, and non-risk business, including enrollment, provider referrals, premium billing and claims processing. . . . We have dedicated in-house teams providing infrastructure and application support services to our members.

¶¶ 110, 153.

The Complaint does not establish that any aspect of this statement was false, even assuming arguendo that these general descriptions of a company's IT systems could be material.

31

To the extent that plaintiffs claim that these statements were "false" because there were claims processing delays, the mere existence of problems does not mean that the system did <u>not</u> operate on a "single financial reporting system," that there were not "common, fully integrated application[s]" that encompassed all aspects of a particular business, or that there were not "dedicated in-house teams" providing support services.  The only conceivable theory on which plaintiffs could proceed is, yet again, impermissible fraud by hindsight.  <u>See, e.g.</u>, <u>Hillson Partners Ltd. P'ship v. Adage, Inc.</u>, 42 F.3d 204, 209 (4th Cir. 1994) (stating, pre-PSLRA, that such approaches are impermissible under Rule 9(b)); <u>Keeney v. Larkin</u>, 306 F. Supp. 2d 522, 534 (D. Md. 2003) (rejecting claims as impermissible fraud by hindsight when there were no allegations that defendants knew they could not make a payment at the time they spoke).

Moreover, none of the confidential witnesses sufficiently establishes that any problems with computer systems existed at the time any particular challenged statement was made.  CW4, who was a "Claims Processor," ¶ 39, was not hired until September 2008, ¶¶ 39, 75, and can thus have no personal knowledge of events transpiring throughout the putative class period.  <u>See supra</u> at 11-12.  This witness can represent only that when he or she joined Coventry, there was a backlog, ¶ 75, a fact that is not inconsistent with the existence of an IT system in precisely the form described by Coventry.  As to comments on the computer system itself—CW4 and CW5 contend that it was "outdated," "DOS-based" and "not user-friendly," ¶ 81—the Complaint offers no support for the implicit assumption that a "Claims Processor," ¶ 39, or a "Claims Specialist," ¶ 40, has sufficient expertise to determine the most appropriate IT system for a nationwide managed health care company.  More importantly, these vague comments do not establish that the description of Coventry's overall IT system was false and misleading, particularly given that both CW4 and CW5 attribute some problems to the nature of the claims

themselves and the manner in which they were submitted. ¶ 82 (stating that PFFS claims were "complex or old claims that required time-consuming manual input"; stating further that "some claims were received and processed in paper format, while others were received and processed electronically"); ¶ 83 (noting providers' submission of duplicate claims for the same service).[21]

### 7. Plaintiffs Impermissibly Rely On Group Pleading And Attribute No Statements To Two Defendants

Even if plaintiffs had identified a materially false statement, certain of plaintiffs' claims should still be rejected because they impermissibly attempt to group the defendants together in attributing statements. ¶ 24. This approach is inconsistent with the PSLRA. Iron Workers, 432 F. Supp. 2d at 579 ("Grouping defendants together in a pleading fails to satisfy the requirement that the who, what, when, where, why, and how, be pled with specificity"); In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 370 (D. Md. 2004) (following the "sound reasoning of other district courts in this Circuit" and declining to apply group published information doctrine "because it is inconsistent with the particularity and specificity required by the PSLRA and Rule 9(b)"; citing numerous cases so holding).

Most notably, the Complaint does not allege that Mr. Soistman or Mr. Ruhlmann made a single challenged statement during the class period. As to Mr. Soistman, the Complaint mentions only his statements at a conference held a full month before the class commenced, ¶ 58,

---

[21] Plaintiffs attempt to bootstrap onto their other allegations claims that defendants' financial statements were false because they did not comport with generally accepted accounting principles ("GAAP") and failed to disclose a lack of internal controls. See, e.g., ¶ 4. In particular, paragraphs 197 through 212 assert that because Coventry's financial statements failed to "account for and disclose existing uncertainties as to probable losses," it made false statements of compliance with GAAP, see, e.g., ¶¶ 200-01, and that various executive certifications regarding internal controls were false because of deficiencies in the claims payment system. See, e.g., ¶¶ 203-08. These claims are based on precisely the same underlying factual allegations as are all the previous claims and thus fail to set forth a particularized materially false statement for precisely the same reasons. See supra § III.B (addressing failure to plead particularized false statements). In addition, the failure to plead scienter likewise applies equally to these claims. See infra § III.C; see also PEC Solutions, 418 F.3d at 390 ("[T]his alleged GAAP violation adds nothing new; rather, it simply rides around in circles on the inadequate coattails of the scienter pleading.").

and testimony relating to the marketing of PFFS, which is not at issue.  ¶ 69.  There are no statements alleged to have been made by Mr. Ruhlmann.  There are, moreover, no allegations that either Mr. Soistman or Mr. Ruhlmann believed that any statement was false, that they informed anyone else of this opinion, and that those individuals adopted this opinion but then publicly made contrary statements.  Nolte v. Capital One Fin. Corp., 390 F.3d 311, 316 (4th Cir. 2004) (affirming dismissal of non-speaking defendant for failure to include requisite allegations).  In the absence of such allegations, the failure to attribute any statement to Mr. Soistman or Mr. Ruhlmann requires their dismissal.  In re Cable & Wireless, PLC, Sec. Litig., 321 F. Supp. 2d 749, 766 (E.D. Va. 2004) (finding numerous statements impermissibly pled because of reliance on group pleading).

### C.     The Complaint Does Not Set Forth A Strong Inference Of Scienter

The PSLRA requires plaintiffs to state "with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  Although scienter may be pleaded either through allegations setting forth reckless or intentional conduct, Cozzarelli, 549 F.3d at 623, the inference of wrongful conduct drawn from those allegations must be "at least as likely as any plausible opposing inference."  Tellabs, 551 U.S. at 328 (emphasis in original).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324.

### 1.     There Are No Adequate Allegations Of Intentional Or Reckless Conduct

"[T]o allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a 'strong inference' that each defendant acted with at least recklessness in making the false statement."  Teachers' Ret. Sys., 477 F.3d at 184 (citation omitted, emphasis in original).  Plaintiffs come nowhere close to meeting this burden.

a.      **The Complaint Does Not Attempt To Plead Any Scienter As To
2007**

Even crediting all of plaintiffs' allegations relating to confidential witnesses, plaintiffs

allege no facts that any of the individual defendants knew or should have known that the PFFS

claims processing problems would affect the Company's earnings before they were disclosed to

the public in June 2008.[22]  Although the putative class period begins in January 2007, plaintiffs

do not even attempt to allege that any of the defendants knew of alleged problems until at least

"early" 2008.  See ¶¶ 99-106 (alleging generally that "by early 2008, it was known by

Coventry's executive management that 'profits were not what was expected' for the Company's

PFFS business").  At a minimum, the failure to include even cursory allegations of knowledge

before "early 2008" requires dismissal of all 2007 claims because plaintiffs have not pled that

any statement in 2007 was made with scienter.

b.      **The Allegations Of Actual Knowledge Or Recklessness In 2008
Are Too Vague To Proceed**

Even as to 2008, however, the Complaint includes no allegations showing actual

knowledge or recklessness.  Importantly, not one of the confidential witnesses refers to any

communications with any of the individual defendants.[23]  Therefore, even if the Complaint had

adequately alleged facts that made any of the challenged statements actionable, there are no

averments showing how or why the defendants knew or should have known those facts.  See,

e.g., Nolte, 390 F.3d at 316 (finding allegations that an employee believed that systems were

---

[22]    If anything, allegations in the Complaint undercut any contention that statements made in 2007 were false.  For
example, CW9 alleges that there was a specific call center responsible for handling PFFS claims and
enrollments, ¶ 73; and CW5 stated that the company worked "mandatory overtime" to address claims issues, ¶
80.  These statements corroborate the Company's efforts to address concerns and problems with its new
product and undermine any inference that defendants knew or should have known that their statements about
PFFS were false.

[23]    Although CW2 claims to have attended "'executive review meetings'" where Mr. Soistman and "occasionally"
Mr. Guertin were present, this witness does not allege what occurred at these meetings.  ¶ 37.

inadequate did not suffice because there was no allegation that "management was ever informed of these concerns or that they had any other reason to doubt the system's reliability").

The closest the Complaint comes to attempting to plead any knowledge or recklessness by any individual defendant are the following four allegations:[24]

- "[B]y early 2008, it was known by Coventry's executive management that 'profits were not what was expected'" for PFFS.  ¶ 101.

- "[P]roblems with PFFS were discussed among Coventry's executive management" during the annual executive meeting in April 2008.  ¶ 102.

- "[M]anagement was aware of the claims overload."  ¶ 79.

- "[D]uring the first half of 2008," Coventry undertook an internal initiative that was "spearheaded by Defendant Wolf, and was designed to shore up the Company's other business segments and compensate for the losses in PFFS."  ¶ 105; see also ¶¶ 217-19 (repeating these facts).

The first three contentions do not identify any individual but instead contain sweeping, generalized references to "executive management" or "management."  Moreover, even if plaintiffs had identified a particular defendant, the Complaint does not adequately plead what this person supposedly knew or should have known.  Allegations that "profits were not what was expected," that "problems with PFFS were discussed," or that there was a "claims overload" provide no specificity about the nature, scope, or effect of the alleged problems that someone supposedly knew or should have known.  Finally, plaintiffs do not sufficiently show when the unidentified "management" personnel knew or should have known about the unspecified "problems."  Averments about "early 2008" or even "April 2008" are inadequate.

---

[24]   The remaining allegations simply state that "it should have been apparent" or use similarly vague language and do not contend that any particular person was aware of any particular issue.  ¶¶ 94, 97, 99.  Nor do broad averments of "knowledge" that simply treat "management" as a single entity satisfy the PSLRA.  See, e.g., ¶¶ 7 (alleging "[b]y early 2008, it was known to Defendants that . . . [PFFS] profits . . . would not be in line with expectations"); 26, 214 (alleging individual defendants had access to undisclosed information because of their positions). The Fourth Circuit has rejected such generalized assertions as insufficient under the PSLRA.  See, e.g., PEC Solutions, 418 F.3d at 389 (criticizing such "passive voice" allegations of scienter); Teachers' Ret. Sys., 477 F.3d at 181 (rejecting allegations that did not connect assertions to particular individuals).

These generalized averments fail to satisfy the PSLRA's scienter requirement.  "For each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false."  First Union, 128 F. Supp. 2d at 886; id. at n.14 (citing Advanta, 180 F.3d at 534) (noting that "as to scienter, plaintiffs are now required to plead 'who, what when, where, and how'"); see also In re PEC Solutions Sec. Litig., No. 03-331, 2004 WL 1854202, at *2 (E.D. Va. May 25, 2004) (same), aff'd, 418 F.3d 379 (4th Cir. 2005); Iron Workers, 432 F. Supp. 2d at 578 (same).  While these pleading burdens apply to any challenged statement, the PSLRA places a "particularly heavy burden" on plaintiffs for forward-looking statements—like the ones made by Coventry executives here about PFFS business going forward—because plaintiffs "must show that each of the Defendants actually knew that each statement for which he is being charged was false."  First Union, 128 F. Supp. 2d at 895 (emphasis added); see also Slayton v. Am. Express Co., 604 F.3d 758, 773-77 (2d Cir. 2010) (affirming district court's dismissal of securities fraud suit because plaintiffs failed to demonstrate that defendant's forward-looking statement was made with "actual knowledge" of its falsity and that mere recklessness was not enough).

Even the last contention in which plaintiffs identify Mr. Wolf by name is impermissibly vague.  No individuals other than Mr. Wolf are mentioned, plaintiffs do not allege what Mr. Wolf supposedly knew that caused him to implement the initiative, plaintiffs do not explain what "spearhead[ing]" means or otherwise identify what Mr. Wolf did, and plaintiffs refer to an impermissibly broad time frame ("the first half of 2008").  Moreover, the mere undertaking of this initiative does not adequately allege that defendants "knew" an "earnings revision . . . would

be necessary."  ¶ 105.  To the contrary, paragraphs 105 and 106, recounting the supposed

"internal initiative," are entirely consistent with the Company's representation in June 2008 that

it had identified problems and attempted to resolve them.  These paragraphs do not establish

scienter, either on their own terms or through any insinuation that the Company took too long to

address the problems that it identified.  As the Seventh Circuit explained:

> Prudent managers conduct inquiries rather than jump the gun with half-formed
> stories as soon as a problem comes to their attention.  [The company] might more
> plausibly have been accused of deceiving investors had managers called a press
> conference before completing the steps necessary to determine just what had
> happened [with the problem].  Taking the time necessary to get things right is
> both proper and lawful.  Managers cannot tell lies but are entitled to investigate
> for a reasonable time, until they have a full story to reveal.

Higginbotham v. Baxter Int'l, 495 F.3d 753, 760-61 (7th Cir. 2007); see also Pugh v. Tribune

Co., 521 F.3d 686, 695 (7th Cir. 2008) (holding that where defendants conducted investigation

following accusations of fraud and informed public as information became available, "[t]his is

exactly what they should have done, and they did it within a reasonable time").  A discussion of

"problems" among "executive management" in April 2008, ¶ 102, and an internal initiative to

compensate for losses, ¶¶ 105-06, followed by an announcement of decreased guidance in June

2008, ¶ 173, shows prudent management acting in a reasonable time; it is not indicative of fraud.

### c.   There Are No Allegations Establishing That Any Defendant Knew That The Reserves Were Understated At Any Particular Time

There are also no allegations establishing that defendants were aware or should have been

aware that Coventry had insufficient reserves to address future claims under the PFFS plan.  As

already noted, medical claims reserves are inherently forward-looking and are simply the best

estimate based on information then available.  See supra at 26-28; see also In re John Alden Fin.

Corp. Sec. Litig., 249 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003) ("Medical claims reserves are

current projections of expenses the insurer will ultimately incur for medical services provided to

its insureds") (citing <u>Delta Holdings, Inc. v. Nat'l Distillers and Chem. Corp.</u>, 945 F.2d 1226, 1229 (2d Cir. 1991)); <u>see also id.</u> at 1279 n.4 (commenting on "the subjective nature of estimating medical claims reserves," and noting that company relied on an outside auditor that was extensively involved in the reserving process and that never suggested that the reserves were unreasonable or should have been increased).

Given the predictive nature of reserves, there are no allegations that even come close to establishing that any defendant knew or should have known that any statement was false based on the inadequacy of reserves. None of the CWs make such allegations; at most, they include vague allegations about "problems" or expressing their own opinion as to what the actuarial team should have done. ¶¶ 94, 100. These allegations are simply inadequate. <u>Malin</u>, 499 F. Supp. 2d at 141-42 (dismissing securities fraud complaint; emphasizing absence of allegations establishing that CW allegations regarding insufficient loss reserves were conveyed to individual defendants); <u>Hess v. Am. Physicians Capital Inc.</u>, No. 04-31, 2005 WL 459638, at *11 (W.D. Mich. Jan. 11, 2005) (dismissing complaint because plaintiffs failed to allege that defendants knew their loss reserves were uncertain; noting that loss reserves are inherently uncertain and defendants had specifically cautioned about that; and commenting that defendants' reserves had been subject to close review by multiple parties, including regulators, auditors and independent actuaries and that no one had raised any concerns or "red flags"). Compounding the problem, the Complaint does not even establish that any of the CWs were even in a position that they would have been familiar with the process of setting reserves, thereby linking the CW allegations about insufficient reserves to some specific knowledge or understanding that these undisclosed witnesses would have had about the process. <u>See</u> <u>supra</u> at 19-21.

"[T]he failure to establish adequate reserves" is merely "corporate mismanagement" and "is generally not sufficient to establish securities fraud." In re E.Spire Commc'ns Inc. Sec. Litig., 127 F. Supp. 2d 734, 748 (D. Md. 2001). "The fact that a company did not increase its reserves fast enough is not evidence of fraud." Id.

### 2. There Are No Allegations Identifying A Motive For Any Defendant To Engage In Wrongful Conduct

The Complaint suggests that the defendants were motivated to inflate Coventry's share price to profit from personal sales of Coventry stock. "But insider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'" Teachers' Ret. Sys., 477 F.3d at 184 (citation omitted). "The mere pleading of insider trading without regard to either the context or the strength of the inferences to be drawn is not enough to support a strong inference of scienter." E.Spire, 127 F. Supp. 2d at 743.

This Complaint falls far short of showing that the trades were made consistent with knowing or reckless fraud as to Messrs. Guertin, Soistman, or Wolf.[25]  First, the Complaint does not allege that defendants timed their sales to profit from any particular disclosures.  For example, plaintiffs point to sales by Mr. Guertin and Mr. Soistman on June 14, 2007 and by Mr. Wolf throughout 2007, but provide no explanation for how these sales were related to "fraud" that was allegedly disclosed to the public more than a year later.  Teachers' Ret. Sys., 477 F.3d at 184 (rejecting any inference of fraud and faulting plaintiff for not alleging that "defendants timed their sales to profit from any particular disclosures").  Indeed, plaintiffs only refer to one sale by Mr. Guertin, ¶ 223, and that sale occurred on June 14, 2007 months before plaintiffs even try to allege that "management" was "aware" or purportedly knew about any problems, which

---

[25]    Plaintiffs have not alleged that Mr. Ruhlmann made any trades and thus do not even attempt to establish any motive for him.

supposedly did not happen until "early 2008" at the earliest.  See supra at 35.  Thus, plaintiffs cannot rely upon the 2007 sales to plead scienter.

Second, plaintiffs do not provide the full context of trades made by each defendant within the putative class period, instead selectively choosing and describing certain dates on which defendants sold stock.  For example, plaintiffs include supposedly suspicious sales by Mr. Guertin and Mr. Soistman on June 14, 2007; in fact, the public disclosures specifically state that these sales occurred to satisfy tax withholding on lapse of restrictions of restricted stock awards. See Ex. 7 (Guertin Form 4 from June 14, 2007); Ex. 8 (Soistman Form 4 from June 14, 2007). Similarly, plaintiffs point to a number of sales of stock by Mr. Wolf on November 1, 2007 and February 19, 2008, but fail to acknowledge that the public filings disclose that these sales were made pursuant to a Rule 10b5-1 plan.  See Ex. 9 and Ex. 10 (Wolf Form 4's from Nov. 1, 2007 and Feb. 19, 2008).  "A Rule 10b5-1 plan prearranges stock transactions [by corporate executives] and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information.  17 C.F.R. § 240.10b5-1(c)."  In re NutriSystem, Inc. Sec. Litig., 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009).  Plaintiffs have not pleaded that the plan was "adopted at a time when … defendant was aware of material nonpublic information," and thus any inference of fraud from these sales is negated.  Id. at 567.

Third, plaintiffs also fail to provide any analysis of defendants' trading patterns outside the putative class period to permit comparison with their trades within the class period. Teachers' Ret. Sys., 477 F.3d at 184.  The Complaint does not acknowledge the small percentage of shares sold in proportion to the overall number of shares retained by the defendants.  "The sale of merely some stock during the Class Period is not sufficient to give rise to an inference of

fraudulent intent," and the Court should consider the entirety of defendants' stock holdings, including "exercisable stock options" in order to determine whether scienter is adequately pleaded through motive to profit.  E.Spire, 127 F. Supp. 2d at 743; see also Teachers' Ret. Sys., 477 F.3d at 184 (taking into account defendants' vested stock options and noting the complaint fails to allege facts that provide any context that the insider sales were suspicious).  Thus, without more, the fact that Mr. Soistman sold 30,000 shares of Coventry stock on May 14, 2008 is legally meaningless.

Finally, any minimal inference of scienter that can be drawn from these sales is further undercut by the fact that these allegations relate to an exceedingly long putative class period. The allegedly fraudulent scheme lasted for more than a year-and-a-half, which "weakens any inference of scienter that could be drawn from the timing of defendants' trades" and more plausibly, the "lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim." Teachers' Ret. Sys., 477 F.3d at 185; see also id. (citing In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092-93 (9th Cir. 2002)) (noting that "[b]y way of comparison, the Ninth Circuit has considered a class period of just 15 months 'unusually long.'").

> **3.      The Most Plausible Inference Is That Defendants Underestimated The Reserves Necessary And Claims Expenses For A New Product And Provided Information To The Public As They Became Aware Of It**

In the end, the most "cogent" and "compelling" inference, Tellabs, 551 U.S. at 314, from the facts alleged in the Complaint is that Coventry developed a new insurance product, and lacking any historical information about appropriate reserves and claims expense, simply had some problems, despite its best efforts.  When Coventry became aware of the potentially serious problems with its newly created PFFS insurance plan, it reviewed the issues, implemented

42

initiatives to remedy the problems, and disclosed the potential effect of these problems in a timely manner.  This inference is strengthened by several points.

First, plaintiffs' allegations that Coventry and its management knowingly or recklessly under-priced its PFFS product is weakened by the fact that Coventry was required to submit its PFFS pricing to CMS for its approval and eventually would be locked into that price for a year. See, e.g., ¶¶ 103 (alleging defendant knew in early 2008 that Coventry was locked into 2008 pricing that would "fall short for the rest of 2008"), 220 (same).  Plaintiffs' theory of fraud requires one to make the irrational inference that Coventry wanted to deliberately under-price its product at a rate it could not change with the unequivocal result that it would lose money.  It is simply not rational to infer that a corporation would deliberately act in a manner that would decrease its profits.  Under such circumstances, courts have cautioned that "[o]ne who believes that another has behaved irrationally has to make a strong case."  DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990); see also Cozzarelli, 549 F.3d at 627 (rejecting inference of scienter because, among other things, "[i]t is improbable that [a company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure").  Plaintiffs' scienter argument should be rejected because they have not presented the requisite "strong case" to support an irrational theory.

Second, plaintiffs' inference of fraud is undermined because during the putative class period, the Coventry Board of Directors approved an increase in the company's share repurchase program in an amount equal to five percent of the Company's existing stock. Ex. 11 at 8 (Aug. 7, 2008 Form 10-Q for the period ended June 30, 2008).  During the time period when plaintiffs allege that Coventry was acting to artificially inflate its stock price, Coventry was engaged in an extensive stock repurchase program.  For example, the Company repurchased 4.2 million shares

from January 1, 2008 to March 31, 2008 at an average price of $51.29 (for a cash outlay of $215.4 million); from April 1, 2008 to June 30, 2008, Coventry repurchased its shares at an average price of $44.70 for a cash outlay of $44.7 million.  Id.  Plaintiffs allege that Coventry's stock eventually closed at $13.93 per share after the disclosures were revealed to the market, a price well below what Coventry paid to repurchase it.  ¶ 190.  "A company's decision to reinvest [in] its own stock undermines an inference of scienter because it presumably would make 'no sense to purchase that stock if defendants knew the prices to be inflated.'"  Morse v. McWhorter, 200 F. Supp. 2d 853, 898 (M.D. Tenn. 2000) (citation omitted), vacated on other grounds, 290 F.3d 795 (6th Cir. 2002); see also In re Tibco Software, Inc. Sec. Litig., No. 05-2146, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("stock repurchase programs actually negate a finding of scienter") (emphasis in original).  "It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated."  Mathews v. Centex Telemgmt., Inc., No. 92-1837, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994).

Third, various other allegations in the Complaint undercut the assertions of scienter. Plaintiffs' own CWs recount that Coventry established a new processing center for PFFS claims in 2008 and that the Company hired a large number of new processors.  ¶¶ 79-80.  Although CW3 and CW5 assert that these changes did not alleviate the problems, id., these efforts are consistent with the Company's representations in 2008 that it had identified problems in claims processing and that it believed it had made appropriate efforts to resolve them.  ¶¶ 105-06, 150-51.  Moreover, when problems allegedly evolved over time and defendants were purportedly working to correct them as well as disclosing the existence of some problems to investors, these factors all weigh in favor of an inference that defendants were not acting with scienter.  Matrix, 576 F.3d at 187-89.

### D.      There Is No Basis For Scheme Liability

Plaintiffs' attempt to assert some sort of scheme liability also fails.  ¶¶ 239-47.  A claim for scheme liability must allege with particularity that a defendant committed a deceptive or manipulative act in furtherance of the scheme to defraud with scienter; plaintiff must also plead reliance.  See, e.g., Lautenberg Found. v. Madoff, No. 09-816, 2009 WL 2928913, *11-12 (D.N.J. Sept. 9, 2009).

The first reason to reject the scheme liability claim is that the only allegations that mention any "scheme" in the Complaint simply refer to the defendants' supposedly false statements and attendant, supposedly suspicious, stock sales.  ¶¶  28, 213, 227.  That is, plaintiffs have not included any allegations that would establish the existence of any scheme separate from the making of the "false" statements.  For all the reasons already described, no such claims can proceed, because there was no false statement (or, as plaintiffs would have it, no "scheme") and no scienter.  In re Mut. Funds Inv. Litig., 566 F.3d 111, 129 (4th Cir. 2009) cert. granted sub nom. Janus Capital Group, Inc. v. First Derivative Traders, No. 09-525, 2010 WL 2555208 (U.S. June 28, 2010) (citing Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148, 158 (2008) (stating, in the context of secondary liability, that the "existence of a fraudulent scheme does not permit a plaintiff to avoid proving any of the traditional elements of primary liability, such as scienter and reliance")).  As did the plaintiffs in Lautenberg, plaintiffs' "scheme liability" claims here "merely re-state[]" the same supposed misrepresentations and omissions that constitute their 10b-5(b) claims, 2009 WL 2928913, at *12, and thus fail for the same reasons.  Alternatively, to the extent plaintiffs intend to assert some other scheme, it should be rejected for failure to plead such a scheme with particularity.

In addition to the absence of any scheme or scienter, this claim also fails for failure to allege reliance on any conduct that could conceivably be separate from the statements already

addressed.  <u>Stoneridge</u>, 552 U.S. at 160-61.  To take but the most obvious example, there are no

allegations explaining how any investor could possibly have relied on any conduct by Mr.

Soistman or Mr. Ruhlmann to their detriment.  <u>Id.</u> at 161 (leaving open the possibility that a

scheme might exist without statements but finding that vendors who participated in a scheme for

the purpose of creating a falsely positive image of a company's revenues could not be held liable

because the "deceptive acts, which were not disclosed to the investing public [were] too remote

to satisfy the requirement of reliance"); <u>In re Refco, Inc. Sec. Litig.</u>, 609 F. Supp. 2d 304, 315-16

(S.D.N.Y. 2009) (dismissing scheme liability claims against law firm when plaintiffs "did not

know of, and thus did not rely on, any of Mayer Brown's work on the fraudulent loan

transactions"; so holding even though court found that plaintiffs had pleaded scienter); <u>see also</u>

<u>id.</u> at 317 (citing numerous cases dismissing scheme liability claims for failure to establish

reliance).

In the end, any "scheme" that plaintiffs could possibly plead that would be separate from

their other claims would merely assert impermissible aiding and abetting liability.

### E.    The Control Person Claims Should Be Dismissed

Because the primary claims for liability fail, the control person claims should also be

dismissed. <u>See, e.g.</u>, <u>Matrix</u>, 576 F.3d at 192. Moreover, as to Mr. Soistman, the Complaint fails

to plead that he could be a control person even if there were a primary violation.  A control

person must have the "power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise."  <u>Mut.</u>

<u>Funds</u>, 566 F.3d at 130 (citation, punctuation omitted).  There are no such allegations as to Mr.

Soistman:  the Complaint mentions his name only to describe his title but provides no

information regarding the nature of his responsibilities.  ¶ 22.  There are no allegations

contending that he owned stock sufficient to control the company, nor are there any

allegations—cursory or otherwise—that he was in a position to control any aspect of Coventry. Cf. Mut. Funds, 566 F.3d at 131 (finding control adequately pled when complaint alleged that director, managing director, and portfolio manager "served in a day-to-day supervisory position … and had the power to control its operations"; also finding control as to other defendant who made public statements and commissioned an inquiry into market timing and who was alleged to "control the activities of [the company]").

## IV.    CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant their motion to dismiss the Complaint.

Respectfully submitted,

Dated: July 22, 2010

_Marc J. Sonnenfeld_ (admitted *pro hac vice*)
Karen Pieslak Pohlmann (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001

Grace E. Speights
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202.739.3000
Fax: 202.739.3001

*Attorneys for Defendants*