**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE CONVENTRY HEALTHCARE, INC. SECURITIES LITIGATION,<br><br>                      Plaintiff,<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Action No. 08:09–CV–2337—AW |

---

## MEMORANDUM OPINION

Pending before the Court is Defendant Coventry Health Care, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Complaint. (Doc. No. 46). Also pending before the Court is Defendants' Motion to Dismiss Class Action Complaint by 401(K) Plan Investment Committee. (Doc. No. 48). The parties have fully briefed these Motions, and the Court deems that no hearing is necessary. *See* LOC. R. 105(6) (D. Md. 2010). For the reasons stated herein, the Court will **GRANT**-in-**PART** and **DENY**-in-**PART** Defendants' Motion to Dismiss Consolidated Class Complaint (Doc. No. 46). The Court will **DENY** Defendants' Motion to Dismiss Class Action Complaint by 401(K) Plan Investment Committee (Doc. No. 48).

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This action, filed on September 3, 2009, arises out of alleged securities fraud committed by Defendant, Coventry Health Care, Incorporated ("Coventry") and its officers.[1] The following officers of Coventry are named as defendants in this matter: Dale Wolf ("Wolf"), President and Chief Executive Officer and Director; Shawn M. Guertin ("Guertin"), Executive

---

[1] Several of the named defendant officers have since resigned from their positions at Coventry, but these officers served in the positions stated during the times relevant to this suit.

Vice President, Chief Financial Officer, and Treasurer; Defendant John J. Ruhlmann ("Ruhlmann"), Senior Vice President and Corporate Controller; and Defendant Francis S. Soistman, Jr. ("Soistman"), Executive Vice President of Coventry's Individual Consumer and Government Business Division.

Lead Plaintiffs in this matter, New England Teamsters & Trucking Industry Pension Fund, United Food and Commercial Workers Union Local 880—Retail Food Employers Joint Pension Fund, and Southern California IBEW-NECA Pension Plan purchased common stock from Coventry during the Class Period, and allegedly suffered damages as a result of the Defendants' allegedly fraudulent behavior. *Id.* at ¶17. Plaintiffs filed this suit as a class action under Federal Rule of Civil Procedure 23(a) and (b) (3), representing a class of those who purchased common stock from Coventry during the Class Period and who were damaged as a result. Plaintiffs aver that the Class Period began on February 9, 2007, and ended on October 22, 2008. (Doc. No. 43, at ¶¶107, 229). The Court will briefly recount the facts that give rise to this suit.

Coventry Health Care, Inc. is a health care company that manages "health plans, insurance companies, network rental/managed care services companies, and workers' compensation services companies." Doc No. 43, at ¶ 18, 45. The company is organized into three business divisions: (1) the Commercial Business division; (2) the Individual Consumer & Government Business division; and (3) the Specialty Business division. *Id.* at ¶46. The federal government program, Medicare, gives its recipients the option of receiving their Medicare benefits through private companies, such as Coventry. The Center for Medicare and Medicare Services ("CMS") contracts with Coventry, and in exchange for the private insurance that

Coventry provides to Medicare beneficiaries, CMS reimburses Coventry each month through a fixed payment for each member that receives coverage through Coventry.

As a crucial element of their business, Coventry keeps reserves for payment of claims, known as "medical liabilities"—claims that are reported but not yet paid and estimates of health care services incurred but not yet reported ("IBNR"). Coventry declares that it analyses and discloses its "Medical Loss Ratio," ("MRL") which is "the ratio of [medical] expenses of providing health care services, expressed as a percentage of insurance premiums." (Doc. No. 46-1, at 11). Coventry indicates that "a higher percentage means that a relatively high percentage of premium payments taken in by Coventry is being paid out to health providers or other payees; a lower MLR percentage, conversely means that Coventry is retaining relatively more of the premium payments thus making greater profits." *Id.* at 11. The products that Coventry provides has two varying effects on the Company's finances—the products can affect the "amount of reserves it carries to cover past claims and . . . the amount it actually expends in payment of current year claims." *Id.*

At issue in the case at bar is Coventry's Private Fee-for-Service ("PFFS") product, which allowed Medicare-eligible persons to use a more vast range of medical providers than their pre-existing plans allowed. Plaintiffs aver that Coventry was depending on the success of this product to stimulate growth for the company. Moreover, Coventry supposedly began offering PFFS plans on January 1, 2007, under the brand name "Advantra Freedom." *Id.* at ¶55. According to the Amended Complaint in this matter, the PFFS plan participants were "not limited to network providers, but [could] utilize any provider willing to accept the plan's terms and conditions." *Id.* at ¶¶53,59. The Amended Complaint further alleges that Coventry began offering the PFFS product in January 1, 2007. *Id.* at ¶¶2, 55.

Plaintiffs aver that the information obtained from numerous confidential witnesses demonstrate that Coventry engaged in practices indicative of securities fraud with respect to the PFFS program. According to Plaintiffs, the fast growth in the number of PFFS enrollees at the beginning of the program caused numerous problems for Coventry. *Id.* at ¶72. One confidential witness provided information indicating that Coventry had challenges keeping up with the growth of PFFS. *Id.* at ¶73. Such challenges included enrolling new members in plans quickly enough, servicing the new members, and timely processing provider claims. *Id.* at ¶73. Several other confidential witnesses echoed these observations. Plaintiffs allege that the difficulties that the company was experiencing in processing the claims associated with PFFS were known or recklessly disregarded. *Id.* at ¶90. As a result of the difficulties that the company was undergoing processing the claims, the Company's medical and medical liability reserve calculations were unreliable and "materially understated throughout the Class Period." *Id.* at ¶92, 95. Consequently, Plaintiffs allege, the MLR for the PFFS program was higher than the company was disclosing to its investors. As such, the PFFS program was less profitable than investors were aware. *Id.* at 100. Purportedly, Defendants consistently touted the success of the PFFS program, despite the obvious problems the program was experiencing.

Coventry failed to disclose these problems to investors until June 2008, Plaintiffs allege. *Id.* All the while, Plaintiffs aver, Defendant knew or recklessly disregarded the problems that the PFFS program was presenting for the company. Allegedly possessing information about the severe claims processing problems that the company was experiencing, Plaintiffs state that Coventry misled investors about the success of the PFFS program during the class period with its positive public statements about the PFFS program. Plaintiffs present the Court with approximately sixty allegedly false and misleading statements that Coventry made in forms filed

with the SEC, press releases, conference calls, and other public statements during the class period. These purportedly misleading statements are the basis for the suit at bar.

In related cases before this Court,[2] Plaintiffs bring causes of action against Defendants arising under ERISA, 29 U.S.C. §1001, *et seq*. for the acts described in the Amended Complaint at bar. In the instant case, Defendants have filed a Motion to Dismiss the Class Action Complaint, contending that the "Class Action Complaint [at bar]. . .alleg[es] ERISA claims arising from the simple fact that the price of employer securities held by an ERISA plan dropped after the employer reported adverse business conditions. Accordingly it warrants the same treatment as the many others that have been dismissed before it." (Doc. No. 48-1, at 10). The Court acknowledges that other actions have been filed with this Court alleging ERISA violations for acts related to the ones alleged in the Amended Complaint at bar. However, the Amended Complaint alleges no ERISA violations. Therefore, the Motion to Dismiss ERISA counts from this matter is inapposite to the case before the Court, and thus, Defendants' Motion will be **DENIED**. The motion, however, will be addressed in the related cases arising under the same acts as the instant case, as these cases do allege violations of ERISA.

In the Amended Complaint before the Court, Plaintiffs allege three counts against Defendants, asserting the following violations: Violation of 10 (b) of the Exchange Act Against Rule 10b-5 (Count 1); violation of Section 10 (b) of the Exchange Act and Rule 10b-5(a) and (c) (Count II); violation of Section 20(a) of the Exchange Act (Count III).

## II. STANDARD OF REVIEW

---

[2] *Boyd, et al. v. Coventry Health Care, Inc., et al.* (09-2661-AW); *Billig v. Coventry Health Care, Inc.*, et al. (10-462-AW); *Nelson v. Coventry Health Care, Inc., et al.* (09-3063-AW), *Milner v. Coventry Health Care, Inc. et al.* (09-2850-AW); and *Nigro v. Coventry Health Care, Inc. et al.* (09-3074-AW).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In two recent cases, the United States Supreme Court clarified the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Those cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly,* 550 U.S. at 556 n. 3 (2007). That showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In its determination, the Court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979). In addressing a motion to dismiss, a court should first review a complaint to determine what pleadings are entitled to the assumption of truth. *See Iqbal,* 129 S.Ct. at 1949-50. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* at 1949. Indeed, "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Id.* at 1954. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To survive a motion to dismiss under the Section 10 (b) of the Exchange Act and Rule and Rule 10b-5, the Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission)." *In re Mutual Funds Investment Litigation*, 566 F.3d 111, 119 (4th Cir. 2009).   Adequately pleading scienter requires, that the Plaintiff plead sufficient facts to demonstrate "'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 623 (4th Cir. 2008)(citing *Ottmann v. Hanger Orthopedic Group, Inc*. 353 F.3d 338, 343-44 (4th Cir. 2003).

 The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a heightened pleading requirement on plaintiffs alleging fraud, requiring a plaintiff to allege the following:

a)  The defendant made an untrue statement of material fact; or

b)   The defendant omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

15 U.S.C. §78u-4(b)(1).

Furthermore, PSLRA requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Finally, PSLRA requires that the Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

As the Court stated in *Mutual Funds Investment*, "[b]ecause 'Congress only addressed misrepresentations and scienter in § 78u-4(b) [of the PSLRA],' the other elements of a securities fraud claim are analyzed under the pleading standards of the Federal Rules of Civil Procedure . . . . Rule 9(b) requires that plaintiffs plead 'with particularity ... "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.""" 566 F.3d at 119 -20 (internal citations omitted).

## III.    ANAYLSIS

### a.  Use of Confidential Sources

Defendants allege that the Amended Complaint in this matter fails to meet the pleading requirement for a cause of action arising under Section 10(b). Citing *Matrix Capital Mgmt. LP v. Bearingpoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) and *Cozzarelli v. Inspire Pharms,* Inc., 549 F.3d 618 (4th Cir. 2008) to support their argument, Defendants assert that the Plaintiffs "must plead a material misrepresentation or omission made with scienter relating to the purchase or sale of a security on which investors reasonably relied to their detriment." (Doc. No. 46-1, at 16). Several confidential witnesses provided information for the allegations made in the Amended Complaint which addresses the Defendants' knowledge or reckless disregard of the weaknesses in the PFFS program. According to Defendants, the confidential witnesses who

provided the factual support for the allegations in the Amended Complaint fail to meet the standard supplied by *Teachers' Ret. Sys. Of La. V. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) for the use of confidential sources.   Defendants cite this case for the holding that, "[w]hen the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." (Doc. No. 46-1, at 17).   Defendants aver that the nine confidential witnesses cited in the Amended Complaint are not reliable sources for the information that these witnesses provide. *Id.*

With respect to CW2, Defendants contend that CW2 could have no personal knowledge of his statement asserting, "when Coventry first entered the PFFS market at the start of 2007, the Company deliberately under-priced its PFFS plan premiums in the annual bids which it submitted to CMS in order in order to quickly grow its business." (Doc. No. 46-1, at 18). Plaintiffs respond to this assertion by arguing that "CW2 could plausibly have learned  [this information] . . . during the executive review meetings regarding PFFS that CW2 attended with Defendants Soistman and Guertin."  (Doc. No. 49, at 39).   Moreover, CW2 was described in the complaint as "a former Medicare Underwriting Consultant who worked at Coventry's corporate headquarters in Bethesda, Maryland from March 2007 to May 2010.  During the Class Period, CW2 was a member of a small group of employees responsible for underwriting Coventry's PFFS product. In addition, CW2 periodically attended executive review meetings regarding Coventry's PFFS business, at which Defendant Soistman, and occasionally Defendant Guertin, were present."  (Doc. No. 43, at ¶37).   While the Amended Complaint does appear to allege that CW2 had direct access to Defendant Soistman and Defendant Guertin,  there is no indication of

when or how frequently CW2 attended the executive review meetings where Defendant Soistman and Defendant Guertin were present. Moreover, there is no indication from the Complaint as to what executive review meetings CW2 attended with Defendant Guertin and Defendant Soistman. The broad assertion that "CW2 *periodically* attended meetings, at which Defendant Soistman, and *occasionally* Defendant Guertin, were present" does not describe this confidential witness with sufficient particularity to support an inference that this witness could reasonably attribute *scienter* to the Defendants. (emphasis added).

Defendants also suggest that the Court disregard the statements made by CW3 on the grounds that he did not begin working at Coventry until April 2007. The Amended Complaint avers that CW3 "was responsible for assisting PFFS providers with all issues, including claims resolution. In addition, CW3 was tasked with helping Coventry's Claims Department tackle the huge backlog of PFFS claims that accumulated during the Class Period." (Doc. No. 43, at ¶38). The information that CW3 provides in the Complaint is relevant to the manner in which PFFS claims were processed, a direct responsibility of CW3's job at Coventry, and thus, a matter over which CW3 would have had direct knowledge. However, it is not alleged in the Amended Complaint that CW3 had direct knowledge of what Defendants in this matter knew or recklessly disregarded or that this confidential witness had any direct contact with the Defendants. Therefore, the Court will disregard the allegations made by CW3.

The Court finds that the remaining confidential witnesses all suffer from the same deficiencies as CW2 and C3. None of these witnesses are alleged to have had any direct contact with the Defendants, and accordingly, it defies logic to conclude that these witnesses knew what the Defendants knew or recklessly disregarded. Defendants direct the Court to *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3rd Cir. 2004) for its observation that low

level employees lacked knowledge of what senior company executives knew.   (Doc. No. 46-1, at 19).   In *Chubb*, the Court found that the standard articulated in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) had not been met because the  Plaintiffs failed to " aver . . . when any of the [confidential sources] were employed by [the defendant].   Nor [did] Plaintiffs allege the dates that these sources acquired the information they purportedly possess[ed], or how any of these former employees had access to such information . . . . Plaintiffs' failure to make these allegations is also significant because we are left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor."  394 F. 3d at 148.   While the information supplied by confidential sources in the Amended Complaint at bar is not quite as deficient as those in *Chubb*, the Amended Complaint fails to state how CW2 through CW9 acquired the information regarding *scienter* that they attribute to the executive level defendants.

Only CW1 is alleged to have had direct contact with all of the defendants, and he is the only confidential witness who states precisely when he interacted with the Defendants.  Plaintiffs allege that CW1 received direct information supporting its claim that Coventry knew about the inadequate reserve levels during an executive meeting in April 2008, a meeting in which CW1 allegedly participated.  From the Amended Complaint, it appears that the remaining confidential witnesses had no interaction with the executives in the company, and consequently, would have no way of conclusively being able to determine what the Defendants knew or should have known with regards to the claims processing issues.

The Court makes a similar observation about the confidential witnesses' allegations alleged to support scienter as the court did regarding the confidential witnesses in *In Malin v. XL Capital Ltd*.  499 F.Supp.2d 117, 141 (D.Conn.,2007).   In *Malin*, the Court observed that "none

of the CWs present any evidence that they communicated any of the alleged problems detailed above to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues." (citing *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1333 (S.D. Fla. 2004) (finding the confidential witness reports insufficient to support a finding of scienter because, *inter alia,* they did not "specifically allege that they 'told' any Defendant" the relevant information, "only that it was 'generally known'-that is not sufficient").    As noted in *Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp*., 394 F.3d 126, 155 (3d Cir. 2004), "[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA.").

As noted in the Court's discussion of the standard of review in this case, the Court recognizes that "the pleading standard is higher for allegations of misrepresentations and/or omissions under §10(b) than for allegations under §11 and 12(a)(2) that do not sound in fraud." *In re Constellation Energy Group, Inc. Securities Litigation*, 738 F. Supp. 2d 614, 634 (D. Md. 2010).    Moreover, "the PSLRA 'unequivocally raised the bar for pleading scienter.'  With regard to each act or omission alleged to be fraudulent, plaintiffs must plead facts that taken together as a whole give rise to a 'strong- *i.e.,* a powerful or cogent-inference' of scienter. *Id.* at 323, 127 S.Ct. 2499. The inference must be more than permissible or reasonable, it must be 'cogent and compelling.'" *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321, 127 (2007).

With these considerations, the Court finds the statements provided by confidential witnesses 2 through 9 insufficient to adequately plead scienter as to the Defendants.   *See In re Accurary, Inc. Shareholder Derivative Litigation*, No. 09-05580, WL 3447615, at *11 (N.D. Cal.

Aug. 31, 2010) (finding that Plaintiffs had not pled particularized facts that Defendants were aware of or actively concealed or allegedly conflated sales or backlog figures, when the Plaintiffs relied on the speculation of four confidential witnesses who did not purport to have any contact with the defendants).

### b. Materially False Statements

Defendants aver that the Plaintiffs' Amended Complaint fails to set forth a materially false statement as required by Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants direct the Court to sixty statements cited in the Amended Complaint, which Plaintiffs purport to be false.   The Court will evaluate these statements for a determination of whether Plaintiffs have comported with the pleading requirements of PSLRA and Rule 9(b).

To summarize Plaintiffs' claims, Plaintiffs generally allege that Defendants were experiencing significant delays in processing their PFFS claims, resulting in a drastic backlog of these claims. Consequently, the IBNR reserve levels were inadequate to sustain the extensive number of PFFS claims, and Coventry's profits from the PFFS business were not as high as the company had publicly projected.

Plaintiffs allege that Defendants made several misleading statements in 2006 and 2007 regarding the success of Coventry's PFFS program.  Using the information supplied by several confidential witnesses, Plaintiffs aver that Coventry was aware of the PFFS claims processing issues, and thus were also aware that that the IBNR reserve levels were inadequate to sustain the PFFS claims that the company was receiving.  However, Plaintiffs aver that Defendants failed to disclose the problems that they were experiencing processing the claims.   Contrarily, in press conferences, conference calls, and forms filed with the SEC, Defendants allegedly gave several positive statements regarding the profitability of the Coventry PFFS program.

Defendants argue that "plaintiffs allege no facts that any of the individual defendants knew or should have known that the PFFS claims processing problems would affect the Company's earnings before they were disclosed to the public in June 2008. . . .[P]laintiffs do not even attempt to allege that any of the defendants knew of alleged problems until at least 'early 2008.'" (Doc. No. 46-1, at 41).

### 1. Statements made before April 2008

Throughout the Amended Complaint and the response to Defendants' Motion to Dismiss, Plaintiffs aver that "it was apparent by early 2008 that Coventry had not adequately reserved for IBNR claims in its PFFS business." *See* Doc. No. 43 at ¶¶7, 97, 99, 101, 105, 217, 218. This information comes from the only two confidential witnesses who had access to the named Defendants in this matter. The other confidential witnesses offer information regarding the fact that Coventry was overwhelmed with claims processing. However, the Amended Complaint nowhere alleges that any confidential witness besides CW1 had immediate access to the Defendants. In fact, the Amended Complaint alleges that only CW1 attended an executive meeting where the executive management discussed the problems with the PFFS program in April of 2008.

With respect to the statements made before "early 2008," the Court does not believe that Plaintiffs have adequately pled that these statements were false or misleading and made with *scienter*. Plaintiffs contend that the insider trading of the executive Defendants supports a strong inference of scienter. Additionally, Plaintiffs aver that Defendants deliberately underpriced their PFFS plans to gain membership in the program, but "[b]efore the scheme had a chance to implode, however, the Individual Defendants ensured they would reap at least some of their rewards by cashing out significant stock holdings. . . . . During the next five weeks (between

February 13, 2007 and March 21, 2007), the Individual Defendants sold more than 314,000 shares of Coventry stock for proceeds of nearly $18 million." (Doc. No. 55, at 63).

The Fourth Circuit has held that "insider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'" *Teachers' Retirement Systems*, 477 F.3d at 184. However, even if the timing of these sales were "suspicious," the Court cannot ignore the plain language of the Amended Complaint which clearly states that "it ***was apparent*** by early 2008 that Coventry had not adequately reserved for IBNR claims in its PFFS business." (Doc. No. 43, at 25)(emphasis in original). The Complaint alleges that only one of the individual defendants, Defendant Soistman, sold a significant amount of shares after the Defendants allegedly knew or should have known about the PFFS problems. (Doc. No. 43, at ¶ 223). All of the other Defendants sold their shares before April 2008, the date which CW1 has alleged that defendants actually knew about the problems with PFFS. *Id.* Accordingly, only one defendant traded his shares after the time in which the Defendants knew about the PFFS claims processing problems. Moreover, as Defendants note and as the Court in *Teachers* found to be compelling on the issue of whether insider trading could imply scienter in the case before that court, "the Complaint does not provide defendants' trading patterns outside of the class period to permit comparison with their trades within the class period." 477 F.3d at 185; Doc. No. 46-1, at 37. Although not indicated in their Amended Complaint, Defendants alert the Court to the fact that "the Individual Defendants sold more than 314,000 shares of Coventry stock for proceeds of nearly $18 million. This was by far the most active trading period in the Individual Defendants' history with Coventry." (Doc. No. 49, at 55). Notwithstanding this allegation, "[a]llegations of heavy trading or large profits, without further information, do not satisfy the scienter requirement." *In re Cree*, *Inc. Securities Litig.*, 333 F. Supp. 2d 461, 476 (M.D.N.C.

2004)(citing *In Re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 897 (W.D.N.C. 2001).

Even if the Court were to find that Plaintiffs had adequately alleged that the trading patterns of the Defendants were highly unusual, it is important to highlight that insider trading supports a strong inference of scienter, but does not necessarily equate to a finding that scienter has adequately been pled.   As stated above, CW1's attendance at the April 2008 meeting is the only indication from the Amended Complaint of a time in which Defendants had knowledge or should have had knowledge of Coventry's claims processing problems.  The problems purportedly discussed at the April 2008 meeting, in conjunction with the concession that it was apparent by early 2008 from the only two confidential witnesses who had actual interactions with the individual defendants, supports an overwhelmingly strong inference that Defendants did not have the requisite scienter until April 2008, as April 2008 is the only date CW1 is alleged to have directly heard Defendants discuss problems with PFFS.   Therefore, the Court does not find that the allegations of insider trading support a strong inference of scienter.

The Court does not need to address the falsity of statements made before April 2008, as the Amended Complaint simply does not provide sufficient facts to support an inference that the statements made before April 2008 were made with knowledge of their falsity or with reckless disregard to their falsity**.**  With this said, the Court finds that Plaintiffs have failed to adequately plead that the statements made before "early 2008" were intentionally misleading.

### I.        2008 Statements

The statements made in 2008 require further inquiry as to whether Plaintiffs have adequately pled that they were misleading.  The Court will evaluate the statements made on January 7; February 8; February 28; March 17; March 18; April 25; May 12, May 21; June 18; July 25; and August 7 of 2008.

### a. Statements made from January 7-March 18, 2008

The Court has reviewed the statements Defendants made from January 7, 2008 to March 18, 2008. Defendants highlight that these statements contain unchallenged statements of fact and therefore are not actionable. (Doc. No. 46-1, at 17, n. 13). Defendants cite *In re Medimmune, Inc. Securities Litigation*, 873 F. Supp. 953, 965 (D. Md. 1995) for the proposition that "factually accurate statements cannot form the basis of a securities claim." *Id.* at 23. However, the Court believes that Defendants offer an overly generalized characterization regarding statements of historical or present fact. These statements can be the basis for a securities fraud violation if these statements contain a material misrepresentation or omission, and the Defendant makes the statement with knowledge or recklessness. *See In re Humana, Inc. Securities Litigation*, No. 08-162, 2009 WL 1767193, at *7-9 (W.D. Ky. June 23, 2009). Plaintiffs aver that in this statement, Defendants "made categorically positive statements about the Company's new PFFS business. . . [and] touted growth in membership and revenues." (Doc. No. 49, at 19)

The Court believes that the information contained in this statement does contain both statements of present fact and puffery regarding the PFFS business' success in 2008. (". . . . [C]ertainly the noteworthy event of 2007 was the Private-Fee-for-Service Business, where we grew from zero to in excess of 150,000 members. So, very successful launch for us in Private-Fee-for-Service. . . . . Obviously, as this demonstrates, as we have said all along, the Employer pipeline for Medicare, Private-Fee-for-Service remains robust.")

However**,** "[w]hile opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman v. Food Lion, Inc.* 197 F.3d 675, 683 (4th Cir. 1999). Plaintiffs aver that "all of the statements that Defendants seek to label

as puffery are actionable because they were contrary to concrete information in Defendants' possession, and were materially misleading in the context of those omissions, including: the claims processing errors and delays created by the rapid growth of PFFS; the fact that Defendants could not accurately estimate claims expenses or reserves; and that as a result, PFFS reserves and MLR were understated and Coventry's financial statements violated GAAP." (Doc. No. 49, at 32.

Regarding the statements of present fact, Plaintiffs aptly direct the Court to *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management, LLC*, 595 F.3d 86, 92 (2nd Cir. 2010) for its holding that "the veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." The issue that the Court must decide is whether the Plaintiff has adequately alleged that the Defendants made this statement with scienter as to the misleading nature of this statement by failing to disclose the PFFS claims processing problems that the company was enduring or by misrepresenting how successful the PFFS program was by failing to disclose the delays in processing new claims.

As noted previously in this Opinion, other than the date of April 2008, the Amended Complaint does not give the Court any indication of a precise time when Defendants should have known or actually knew about the PFFS claims processing problems, and hence the inadequacy of their reserve levels. The Amended Complaint and the pleadings in this matter reflect CW2's statement that "it was apparent to Defendants by the beginning of 2008 that the volume of PFFS claims that Coventry was receiving was much greater than the Company had initially projected . . . ." (Doc. No. 49, at 17). However, such a vague allegation with respect to when the Defendants should have known about the PFFS claims processing problems, with no additional

factual support, precludes the Court from making a finding that Plaintiffs have adequately pled scienter as to this statement.   It is not clear to the Court what "early 2008" signifies.  Defendants clearly made these statements in "early 2008."  Nonetheless, Plaintiffs have pled no facts which demonstrate what dates constitute "early 2008" or how CW came to the determination that "it was apparent to Defendants by the beginning of 2008" that reserve levels were inadequate. Accordingly, the Court finds that Plaintiffs have failed to adequately plead that statements made before April 2008 violated the Exchange Act, and the Court will **GRANT** Defendants' Motion to Dismiss as to these statements.

### b.  Statements made from April 25, 2008 to May 21, 2008

Plaintiffs allege that the statements made on August 25, 2008 and May 21, 2008 "were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)  that due to Coventry's failure to accurately measure and adequately reserve for its PFFS claims expenses, those expenses were materially understated;

(b)  that since the first quarter of 2007, Coventry had not adequately reserved for IBNR claims expenses in its PFFS business, and would be forced to materially shore up those reserves;

(c)  that the true MLR for Coventry's PFFS business was significantly higher than reported;

(d)  that Coventry's PFFS business was less profitable than expected that since Coventry was locked into its 2008 PFFS premium prices, the PFFS business would continue to fall short of profitability expectations for the remainder of 2008;

(f)  that Coventry's 2008 earnings guidance was heavily dependent upon the success and profitability of PFFS; and

(g)  that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Coventry's PFFS business, its prospects and growth."

(Doc. No. 43, at 47, ¶152).

The Court finds that the Plaintiffs have adequately pled that the statements made on April 25, 2008 and May 21, 2008 were materially misleading. CW1 alleged that during the annual executive meeting held in April 2008 (in which this witness participated), he observed the Defendants discuss problems with the PFFS business. ("[P]roblems with PFFS were discussed among Coventry's annual executive management during its annual meeting, held in April 2008, in which CW1 participated."). The Amended Complaint does not give the Court an indication as to what "problems" were discussed. Looking at the entire Amended Complaint, the Court assumes that the "problems" discussed were problems with the claims processing overload that the Defendants were experiencing and the effect that the processing delays were having on the Company's reserve levels. As additional grounds for finding that Plaintiffs have sufficiently alleged that the statements made on April 25, 2008 were adequately alleged, the Court finds the observation made in *In Re Peoplesoft, Inc.* persuasive. *See* No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal. 2000). In *In Re Peoplesoft Inc.*, the Court stated that "the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income." *Id.* at *3. The fact that CW1 allegedly heard "problems" discussed at the annual executive meeting supports the inference that the problems discussed were the pervasive problems processing PFFS claims. Accordingly, Plaintiffs have made sufficient factual allegations to support the argument that the Defendants knew or should have known about the claims processing issues and how this would affect IBNR levels at the time this statement was made.

In the statement made on April 25, 2008, Coventry stated that they were "pleased to confirm that [their] businesses continue[d] to perform well [were] fundamentally sound." (Doc.

No. 43, at 52, ¶162).   While the Court could construe this statement as consisting of mere puffery or an inactionable statement of future economic performance, the Court notes that the fact that the Defendants allegedly had knowledge of the problems processing PFFS claim, if true, would render the statement materially misleading.   "While mere puffery is insufficient to state of claim of securities fraud, public statements must be consistent with reasonably available data and should not misrepresent existing facts."   *City of Sterling Heights Police & Fire Ret. Sys. Abbey Nat'l,* PLC 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006).   The Court also recognizes that forward-looking statements such as the ones that appear in the statement that Coventry made on April 25, 2008 are generally protected by PLSRA's safe harbor.   As this District stated in *In re Constellation Energy Group, Inc. Securities Litigation*, 738 F.Supp. 2d 614, 625 (D. Md. 2010), "The Private Litigation Reform Act ('PSLRA'), enacted in 1995 provides a safe harbor for statements identified as 'forward-looking statements' if they are (1) accompanied by 'meaningful cautionary statements' or (2) immaterial." (citing 15 U.S.C. §77z-2(c)(1)(A); 15 U.S.C. §78u-5(c)(1)(A).   The Court went onto state that liability only attaches "if the plaintiff proves that the statement was '(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 738 F. Supp. 2d at 625.   Finally, a statement may also be in-actionable if it falls within the parameters articulated by the judge-made "bespeaks caution" doctrine.   Under this doctrine, "cautionary language in offering document, as part of the total mix of information, may negate the materiality of an alleged misstatement or omission." *Id.*

Although this is a close question, the Court finds that Plaintiff has adequately alleged that the statement made on April 25, 2008 contained material omissions, sufficient to take this statement outside of the protection of the PLSRA's safe harbor provision or the "bespeaks

caution doctrine." While the statement contains assertions of present and historical fact, some puffery, and forward-looking statements, it does not appear that the statement contains any cautionary language to alert the public about the statement's deficiencies. In light of the fact that Defendants allegedly knew that the profitability of the PFFS program would be influenced by the claim delays and the overwhelming number of claims that Coventry was receiving through its PFFS program, the Court finds that Plaintiffs have sufficiently alleged that omitting such information from the public statement offered on April 25, 2008 constituted a material omission that rendered the statement misleading.

Reviewing the statements made on May 12, 2008 in Coventry's 10-Q form, the Court finds that Plaintiffs adequately pled that this statement is misleading, for the same reasons that the Court discussed for the statement made on April 25. Like the statements made on April 25, 2008, these statements also contain statements of present and historical fact. However, Plaintiffs have adequately alleged that these statements contain a material omission with respect to the claims processing issues that the company was experiencing.

### c. Statements made on June 18, 2008

Defendants argue that the statements made on June 18, 2008 are improperly pled because "it is impossible to tell what particular aspect of the numerous statements quoted in the Complaint is supposedly inaccurate." (Doc. No. 46-1, at 20). Defendants properly assert that "paragraph 175 consists of two pages of single-spaced excerpts from a June 18, 2008 conference call containing statements from Mr. Guertin and Mr. Wolf regarding numerous topics. Likewise, paragraph 176 quotes almost three pages of single-spaced questions and answers from the same call. Paragraph 179, however, states only that these 'statements' were false because they 'downplay[ed] the severity of the problems,' failed to state that Coventry had experienced claims

problems during the entirety of the class period, and the "MLR for its PFFS" was still understated." *Id.* at 21. As support for their contention that this statement is inadequately pled, Defendants direct the Court to *In Re Cryomedical Sciences, Inc. Securities Litigation* in which the Court asserted, "[a]lthough lengthy quotations from statements from the Defendants may provide quite specific information as to time, place, content, and speaker, such technical compliance does not satisfy rule 9(b)'s edict in the securities fraud context . . . .[R]ule 9(b) requires that the complaint set forth the facts on which the belief is founded . . . ." 884 F. Supp. 1001, 1013 (D. Md. 1995).

The Court agrees with Defendants that Plaintiffs have not adequately alleged which portion of this long statement is false, leaving the Court to speculate as to what aspect of this statement is false. Moreover, the Plaintiffs' vague allegations that the statement "downplayed the severity of the problems by misleading blaming them on delays in claims being received by providers" fails to provide sufficient factual support for how this statement contains a material omission or misrepresentation. Aside from the vaguely pled allegations of misrepresentation, contrary to Plaintiffs' allegations, the Court's reading of the Amended Complaint in this matter leads the Court to the conclusion that in this statement, the Defendants did mention the claims processing problems that the company was experiencing.[3]

By the Plaintiffs own admission, "*until the June 18, 2008 admission,* Defendants were either not being truthful when they stated that the PFFS business was operating smoothly, or were not being truthful when they stated that they were closely monitoring the business and there were no red flags." (Doc. No. 49, at 48) (emphasis added). The Amended Complaint states that

---

[3] In the Amended Complaint, the June 18, 2008 statement appears to address the PFFS claims processing issues, stating, "The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million."

"on June 18, 2008, Defendants finally *began to reveal* that, in contravention to their positive statements, Coventry's key PFFS initiative was significantly less profitable than expected, and would not be able to generate the future growth that Coventry and its investors had been counting on. That day, Coventry issued a press release announcing that it was lowering its full year 2008 earnings guidance by 17%, from $4.39 to $4.50 per share, to $3.65 to $3.75 per share." (Doc. No. 43, at 55) (emphasis added).

Thus, in the representations made in the June 18, 2010, it appears that the Defendants acknowledged the problems with the PFFS program. The vague allegation that "this announcement was only a partial disclosure of the shortfall in profitability in Coventry's PFFS business, however, because Defendants downplayed the severity of the problems by misleading blaming them on delays in claims being received by providers, and the MLR for Coventry's PFFS business continued to be distorted" (Doc. No. 43, at 87) is not persuasive, especially in light of Coventry's admission that the Company had processed claims in a slower manner than what was optimal. ("In the spirit of full disclosure, we have also found a number of things that we could do better as well. Not entirely surprising for a new product, but, over the past few weeks, we have discovered some issues regarding our own processing that were not only creating delays in the claim payment process but also creating some gaps in our analytics around understanding the true claim lag on this product.")

The improper form of this allegation, coupled with the Plaintiffs' proffered reasons for why this statement is misleading and the actual substance of the statement, leads the Court to conclude that this statement is inactionable.

### d. July 25, 2008 Statements

Defendants claim that the statements made on July 25, 2008 contained "factually unchallenged statements" which are inactionable for the purposes of a securities claim (Doc. No. 46-1, at 23, n. 13)(noting that the statement made on July 25, 2008, among various other statements in the Amended Complaint, contain factually unchallenged statements.). Plaintiffs aver that the statements are not *per se* inactionable solely because they contain accurate statements of fact. Plaintiffs contend that "[w]hether Defendants' statements were accurate or inaccurate is not the question the federal securities laws address." As noted before in this Opinion and as Plaintiffs highlight, "the veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

Plaintiffs posit that the reason the statements made on July 25, 2008 were misleading is because in the statements, Defendants "continued to downplay the severity of the problems, *inter alia*, by attributing the $50 million increase in IBNR reserves and higher MLR in Coventry's PFFS business to delays in claims being received from providers, which had purportedly led to an influx of claims during the quarter. In contrast to Defendants' proffered explanation, however, as detailed herein, Coventry was experiencing in-house delays and problems with processing PFFS claims throughout the Class Period. Further, Coventry's MLR for its PFFS business continued to be understated. As a result, investors still did not know the full truth about the failure of Coventry's PFFS initiative." (Doc. No. 43, at 62, ¶179).

The reasons that Plaintiffs proffer for why this statement is misleading are unavailing. Plaintiffs allege that in this statement, Defendants "downplayed" the severity of the problems processing PFFS claims throughout the class period. However, the Court does not believe that this allegation presents enough factual support for the claim being made. The meaning of

"downplayed" is ambiguous, and the Court does not have sufficient information before it to assess how, if at all, the Defendant "downplayed" the severity of the PFFS claims processing problems. In fact, in the statement that the Defendants made on July 25, 2008, the Defendants stated that "The increase in the Medicare PFFS medical loss ratio is a result of receiving a much higher than expected level of PFFS claims related to prior periods." (Doc. No. 43, at 65). With Defendants' admission, the Court finds that the Plaintiffs have not adequately pled that the Defendants "downplayed" the severity of the PFFS claims processing problems.

Next, Plaintiffs assert that the Defendants continued to understate its MLR in this statement. Defendants argue that "[g]iven the predictive nature of reserves, there are no allegations that even come close to establishing that any defendant knew or should have known that any statement was false based on the inadequacy of reserves." (Doc. No. 46-1, at 45). However, a statement regarding the adequacy of reserves is not actionable unless they are worded to create guarantees on the part of the defendants or the defendants did not actually believe the statements regarding the adequacy of reserves to be true. *See In re CIT Group, Inc. Securities Litigation*, 349 F.Supp. 2d 685, 688 (S.D.N.Y. 2004). Defendants did not word any statement regarding the MLR as a guarantee. Moreover, Plaintiffs make no factual allegations supporting a contention that Defendants knew that their statement regarding the MLR was untrue.

As such, the Court does not find that Plaintiffs have adequately alleged that this statement was materially misleading under PLSRA.

### c. Statements August 7, 2008

Like the statements made on July 25, 2008, Plaintiffs aver that the statements made in Coventry's Form 10-Q filed with the SEC on August 7, 2008 were materially misleading.

Explaining why these statements were misleading, Plaintiffs offer the same reasons that they offered for the statements made on July 25, 2008. ("Defendants continued to downplay the severity of the problems, *inter alia*, by attributing the $50 million increase in IBNR reserves and higher MLR in Coventry's PFFS business to delays in claims being received from providers, which had purportedly led to an influx of claims during the quarter. In contrast to Defendants' proffered explanation, however, as detailed herein, Coventry was experiencing in-house delays and problems with processing PFFS claims throughout the Class Period. Further, Coventry's MLR for its PFFS business continued to be understated. As a result, investors still did not know the full truth about the failure of Coventry's PFFS initiative.") (Doc. No. 43, at 62, ¶179).

For the same reasons that the Court articulated for the statements made after May 21, 2008, the Court finds that the Plaintiffs have not adequately pled that the statement made on August 7, 2008 was materially misleading. Accordingly, the only statements that the Plaintiffs have alleged are materially misleading are the statements which Defendants made on April 25, 2008 and May 21, 2008.

## II.        Scheme Liability-Count II

Plaintiffs assert that during the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) by "carry[ing] out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price of Coventry common stock; and (iii) cause Plaintiffs to purchase Coventry common stock at artificially inflated prices."   Plaintiffs aptly assert that in order to sufficiently state a claim under Rule 10b-5(a) and (c), "the plaintiffs must plead that (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by

relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *Royal Ahold*, 351 F. Supp. 2d at 372.

The Court turns its analysis to the fourth and fifth factors that the *Royal Ahold* court mentions—whether the defendants engaged in manipulative or deceptive conduct with scienter. As the Court has discussed, the only statements that Plaintiffs have properly alleged are misleading are the statement that were made on April 25, 2008 and May 21, 2008. Defendant Wolf and Defendant Guertin made the allegedly misleading statements on April 25, and Defendant Guertin made the allegedly misleading statements on May 21. The Court does not believe that Plaintiffs have adequately alleged scheme liability under 10b-5(b). In *In Re Alstom SA*, the Court articulated when liability can attach under this provision of the Exchange Act, stating,

> [I]is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations. The subsections provide alternate mechanisms of pleading a primary violation of Section 10(b). Thus, even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if it is alleged that they participated in scheme that encompassed conduct beyond misrepresentations.

406 F.Supp.2d 433, 475 (S.D.N.Y.,2005).

As the only misrepresentation that has been adequately alleged are the statements that were made on April 25, 2008 and May 21, 2008, the Court will center its attention on these statements, and Defendants' course of conduct that ensued after these statements were made. Plaintiffs argue that Defendants participated in an illegal scheme by "conceal[ing] from the market that the rapid membership growth of PFFS was overwhelming Coventry's claims processing capacity and creating numerous claims processing errors and delays, which left Defendants unable to accurately estimate

PFFS claims expenses, determine adequate reserve levels for IBNR claims, or accurately report the business' true MLR." (Doc. No. 49, at 60). Further, Plaintiffs contend that "Defendants' scheme enabled each of the Individual Defendants to reap huge profits by selling their personally-held Coventry stock while in possession of material non-public information." (Doc. No. 49, at 60). As noted earlier in this Opinion, the Complaint alleges that the Defendants were not aware of the problems with the PFFS program until April 2008. Defendant Soistman is the only defendant who traded his shares after the date which Defendants are alleged to have known or should have known about the problems with the PFFS program. (Doc. No. 43, at 86). The Court finds that Plaintiffs have adequately alleged that Defendant Soistman is liable under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). While Defendants Guertin and Wolf made the allegedly misleading statements on April 25, 2008, it has not been adequately alleged that they "undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." Furthermore, Plaintiffs have not adequately alleged that any other Defendant engaged in any scheme under 10b and Rule 10b5-(a) and (c). Accordingly, COUNT II will be dismissed as to all individual defendants, except Defendant Soistman. As the Court believes that Plaintiffs have adequately pled the reliance element of this cause of action, the Court will **DENY** the Motion to Dismiss Count II as to Defendant Soistman and Coventry Health Care, Inc. but **GRANT** Defendants' Motion to Dismiss against Defendants Wolf, Rulhmann, and Guertin.

### III.    Violation of Section 20 (a) of the Exchange Act—Count III

In Count III, Plaintiffs aver that "Individual Defendants acted as controlling persons of Coventry within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Coventry, and their ownership of Coventry stock, the Individual Defendants had the power and authority to cause Coventry to engage in the

wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant Section 20(a) of the Exchange Act."  (Doc. No. 43, at ¶249).   To state a claim under § 20(a), a plaintiff must allege: "'(1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator.' Once the plaintiff establishes a *prima facie* case of control, the burden shifts to the defendant to show a lack of culpable participation or knowledge." 738 F.Supp.2d at 638-39.  (internal citations omitted).   "'Control' has the same meaning under § 15 of the 1933 Act and § 20(a) of the 1934 Act. To plead control a plaintiff must "plead facts showing that the controlling defendant had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."  In *re Constellation Energy Group, Inc. Securities Litigation*, 738 F.Supp.2d at 639 (D.Md.,2010)  (citing *Mutual Funds*, 566 F.3d, at 129-130).

Defendants specifically argue that this claim should fail as to Mr. Soistman.  Defendants aver, "as to Mr. Soistman, the Complaint fails to plead that he could be a control person even if there were a primary violation.  A control person must have the power to 'direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." (Doc. No. 46-1, at 52) (citing *Mutual Funds*, 566 F.3d at 130).  Defendants aver that the Complaint only mentions Soistman's name and title, but does not describe the nature of his responsibilities. *Id.*   The Court finds that the Complaint adequately alleges that Soistman, along with the other individually named Defendants, had the power to direct the company via his position as the Executive Vice President of Coventry's Individual Consumer and Government Business Division.   From Soistman's position at Coventry along with the responsibilities he is alleged to have engaged in, including testifying before Congress

regarding Coventry's marketing of its PFFS plan, the Court can draw a reasonable inference that he was a control person under Section 20(a). Accordingly, the Court will **DENY** Defendants' Motion for Summary Judgment as to Count III.

## CONCLUSION

In sum, the Court finds that Plaintiffs have sufficiently alleged that only the statements made on April 28, 2008 and May 21, 2008 are actionable under the Exchange Act. Additionally, the Court will deny Defendant's Motion to Dismiss Count II as to Defendant Soistman and Coventry Health Care, Inc., but will grant Defendants' Motion as to Defendants' Wolf, Rulhmann, and Guertin. Finally, the Court will deny Defendants; Motion as to Count III of the Amended Complaint. In this case, the Court will also deny Defendants' Motion to Dismiss the Class Action Complaint by the 401(K) Plan Investment Committee. An Order consistent with this Opinion will follow. The Court will proceed to issue Scheduling Order in this case.


Date:   <u>March 30, 2011</u>                              _____/s/_____
                                                          Alexander Williams, Jr.
                                                          United States District Judge